# EXHIBIT A

### Fully Disclosed Clearing Agreement

**THIS AGREEMENT, including all schedules, annexes and other appendices,** ("**Agreement**" or "**Clearing Agreement**") is made between COR Clearing LLC, a limited liability company organized under the laws of Delaware located at 1200 Landmark Center, Suite 800 Omaha, Nebraska 68102 ("**Clearing Broker**" or "**COR Clearing**"), and First Standard Financial Company LLC, a limited liability company organized under the laws of New York located at 40 Wall Street, 28th Floor, New York, New York 10005 ("**Correspondent**" or "**First Standard Financial**").

### Recitals

**WHEREAS,** Correspondent desires that Clearing Broker shall provide certain services (the "**Services**") to Correspondent with respect to accounts of introduced customers (individually, a "**Customer**", collectively, the "**Customers**") and proprietary accounts (collectively, "**Accounts**") introduced to Clearing Broker by Correspondent, which include: (i) executing, clearing and settling securities transactions ("**Transactions**") on behalf of Correspondent; (ii) preparing and delivering confirmations of Transactions and periodic Account statements; (iii) extending credit ("**Margin**") to Accounts; (iv) performing cashiering functions, including, but not limited to, receiving and delivering checks, funds and securities and collecting commissions and other fees of Correspondent; (v) safeguarding Account funds and securities; and (vi) maintaining books and records with respect to the Accounts;

**WHEREAS,** the parties are subject to certain state and federal laws and regulations relating to securities markets and transactions and the customs and usages, rules, by-laws, and constitutions of the Securities and Exchange Commission ("**SEC**"), the Financial Industry Regulatory Authority ("**FINRA**"), any national or regional securities exchange ("**Exchange**"), any registered clearing agencies, the Board of Governors of the Federal Reserve System, or the United States Department of the Treasury (collectively, the "**Applicable Rules**");

**WHEREAS,** the word "**securities**" as used within this agreement shall have the same meaning and be defined in the same manner as provided by Section 3(a)(10) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**");

**WHEREAS,** the term "**business day**" shall mean any day on which the New York Stock Exchange is open and conducting business; and

**WHEREAS,** Correspondent is a securities broker dealer and desires to utilize the Services as provided in this Agreement in accordance with the Applicable Rules.

**NOW, THEREFORE,** in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Clearing Broker and Correspondent hereby covenant and agree as follows:

### Section 1. General Provisions

**1.1   Incorporation of Recitals.** The above recitals are hereby incorporated as an integral part of this Agreement as if fully set forth herein.

**1.2   No Agency or Partnership Created.** Nothing contained in this Agreement shall be deemed to create a partnership, joint venture or agency relationship between Clearing Broker and Correspondent.

**1.3   Allocation of Responsibility.** As between Clearing Broker and Correspondent, Correspondent shall be responsible for the relationship with each Customer. Clearing Broker's function is limited to the provision to Correspondent of the Services as described herein. Unless specifically allocated to Clearing Broker, Correspondent shall be responsible for all duties and functions with respect to Customers and concerning any Accounts.

**Section 2.   Services to be Performed by Clearing Broker**

**2.1   Services.** The Services shall include the following:

**2.1.1 Opening of Accounts.** Clearing Broker shall establish Accounts for Customers introduced by Correspondent, upon receipt from Correspondent of the information described in Section 3.1. Upon receipt of information from Correspondent changing or correcting any information with respect to the Account, Clearing Broker will make such change or correction.   Clearing Broker shall act on information provided by Correspondent in reliance upon the representations and covenants made by Correspondent within this Agreement regarding the Customer Identification Program and Anti-Money Laundering Program of the Correspondent.

**2.1.2 Execution.** Clearing Broker shall execute Transactions in accordance with orders and instructions received from Correspondent pursuant to Section 3.2 below. If Correspondent gives specific instructions with respect to routing of Transactions, the Clearing Broker will follow those instructions. If Correspondent does not give such specific instructions with respect to the routing of Transactions, the Clearing Broker may (a) execute the order with another brokerage firm that is a market maker in the security involved, (b) execute the order through a primary or regional exchange, or (c) execute the order through another market center where it believes that the required elements for best execution are present, in each case in accordance with all Applicable Rules and Correspondent direction. In return for routing an order to a specific market, the Clearing Broker may receive cash payment or favorable adjustments on trade errors. Any remuneration received by the Clearing Broker will be considered a reduction of its execution costs and will not accrue to Accounts. The Clearing Broker will comply with all Applicable Rules concerning disclosure to Customers regarding order routing and payment for order flow.

**2.1.3 Confirmations.** Except as may otherwise be agreed, Clearing Broker shall generate and mail directly to Customers in accordance with instructions received and accepted from Correspondent confirmations with respect to all Transactions. Clearing Broker shall make available electronic copies to Correspondent of all such confirmations and any other written communications sent to and received from a Customer. Correspondent understands and agrees that all such confirmations shall indicate that the Account is introduced to Clearing Broker by Correspondent.

**2.1.4 Books and Records.** Clearing Broker shall prepare and maintain books and records with respect to Transactions and Accounts as required by the Applicable Rules. Clearing Broker shall also maintain on behalf of Correspondent such additional books, records including stock records, and other documents or information as Correspondent shall request and Clearing Broker may agree. Clearing Broker shall upon request of Correspondent provide Correspondent with access to, at Correspondent's expense, originals or electronic copies of any such books, records, documents and information in the possession of Clearing Broker.

**2.1.5 Cashiering.** Clearing Broker shall perform certain cashiering functions for Correspondent. Said functions may include the processing of deposits by Correspondent to bank accounts established by and for the benefit of Clearing Broker of customer funds and the receipt by Correspondent of securities sold for the Accounts as well as certain administrative functions relating thereto, including the: (i) receipt, delivery and transfer of securities purchased, sold, borrowed and loaned; (ii) receipt and payment of funds owed by or to Customers; (iii) provision of custody and safekeeping for securities, funds and cash so received; (iv) handling of margin accounts; (v) receipt and distribution of dividends and other distributions; and (vi) the processing of exchange offers, rights offerings, warrants, tender offers and redemptions. Correspondent shall provide Clearing Broker with the data and documents that are necessary or appropriate to permit Clearing Broker to perform its obligations under this Section, including but not limited to, copies of records documenting receipt of Customers' funds and securities received directly by Correspondent in accordance with the Applicable Rules. In the event of a tender offer or similar action, shares purchased for cash or borrowed will not be considered part of an Account's tendered position until such shares are in Clearing Broker's actual possession. Clearing Broker will reduce the tender for the applicable Accounts by the amount of the short or un-received shares. During the tender period in which there are competing and counter tender offers for a security, Clearing Broker will tender on a trade date basis only the number of the shares net long the applicable Accounts as of either the proration or withdrawal date. All customer funds shall be promptly deposited and securities shall be promptly forwarded by Correspondent to Clearing Broker. Clearing Broker shall be responsible for performing administrative and bookkeeping functions with respect to deposits, fees and charges in the Accounts. Clearing Broker shall not be responsible for any securities or funds until properly delivered to Clearing Broker pursuant to Clearing Broker's requirements. Correspondent shall not be entitled to issue checks or any negotiable instruments directly to Customers using instruments for which the Clearing Broker is the maker or drawer without written approval of the Clearing Broker. Approval shall be at the sole discretion of the Clearing Broker and may be considered only upon Correspondent providing notice and evidence satisfactory to the Clearing Broker of the establishment and ability to maintain and enforce supervisory procedures with respect to the issuance of checks or negotiable instruments pursuant to Section 3.9.

**2.1.6 Margin.** With respect to any Account in which Margin is requested to be extended, Clearing Broker shall obtain from Correspondent an agreement executed by the Customer in form and substance satisfactory to Clearing Broker (the "**Margin Agreement**"). All Transactions shall be considered cash transactions until such time as Clearing Broker has received, approved and accepted the applicable executed Margin

Agreements. Clearing Broker shall generate and make all Margin and Margin maintenance calls in accordance with the Applicable Rules. Clearing Broker shall have sole discretion with respect to the amount of Margin maintained by any Account, including proprietary accounts of Correspondent, and may, in its sole discretion, impose higher Margin requirements than those imposed by the Applicable Rules or deny or revoke Margin at any time. Clearing Broker, as creditor, is responsible for compliance with Regulation T, 12 CFR, part 220, the Federal Margin Regulations promulgated by the Board of Governors of the Federal Reserve System (the "**Board**"), any interpretive ruling issued by the Board, and any other applicable Margin and maintenance requirements of the Applicable Rules with respect to Margin Accounts. As provided in Section 3.5 herein, Correspondent is responsible for obtaining all cash or securities required to be deposited in the Accounts, whether to satisfy a debit balance or other liability arising in an Account (individually and collectively, the "**Account Debits**") or otherwise. Notwithstanding the above, Clearing Broker may, at any time, and without liability or obligation to do so (or to do so again in the future), contact any Customer or collect funds or securities from any Customer with respect to any Account Debit with or without prior notice to Correspondent. Nothing contained in this Agreement shall relieve Customer from his/her obligation to pay to Clearing Broker all amounts due in his/her Account.

Correspondent understands and agrees that day trading (i.e., the purchasing and selling or the selling and purchasing of the same security on the same day in a margin account) entails an added degree of risk. Without limiting any of the terms of this Agreement, Correspondent agrees that with respect to any Customer that is a "**pattern day trader**" (i.e., a Customer that executes four (4) or more day trades within five (5) business days), Correspondent shall promptly notify Clearing Broker in the event that: (a) any such Account's day trading margin requirement shall exceed $100,000 or (b) the day trading margin requirement of any group of Accounts which are under common control or acting in concert shall exceed $100,000. For the purposes of this paragraph, "**prompt notice**" shall mean as soon as possible in the same trading day but in no event later than the close of business on that day; thereafter Correspondent shall make a determination that the Account or the group of Accounts have exceeded the day trading margin requirement of $100,000. For purposes of this paragraph, "**notice**" shall mean email notification by Correspondent to Clearing Broker's Risk Officer or such other address as Clearing Broker shall from time to time designate.

**2.1.7   Account Transfers.** Pursuant to written notification executed by a Customer and forwarded by Correspondent to Clearing Broker, any Customer may choose to transfer its Account to another broker dealer. Upon receipt of such notice, Clearing Broker shall have exclusive responsibility for compliance with Applicable Rules. Correspondent shall be responsible for cancelling any open orders. In accordance with industry practice, Clearing Broker may accept and process directions received directly from the Customer with respect to the transfer of the Account to another broker dealer; Clearing Broker may refuse to accept any other orders or instructions received directly from a Customer except those received on behalf of Customer from Correspondent.

**2.1.8   Correspondent and Customer Service.** Clearing Broker shall be responsible for receiving and responding to all inquiries from Correspondent regarding the Accounts and all confirmations and statements relating to the Accounts. Except as otherwise required by the Applicable Rules, all such inquiries should initially be directed to Clearing Broker's Customer Service Department.

**2.1.9   Fully Disclosed Basis.** Clearing Broker shall carry the Accounts on a fully disclosed basis.  Clearing Broker shall be responsible for making all disclosures to Customers required by FINRA Rule 4311. Correspondent shall be responsible to make any disclosures and obtain any agreements from its Customers required by the Applicable Rules, including, without limitation, any disclosures or agreements required for listed options, penny stocks, derivative securities, account transfers or conversions. The cost of making such disclosures or obtaining such agreements shall be borne by Correspondent.

**2.1.10   Clearance and Settlement of Trades.** Clearing Broker shall clear and settle Transactions in the Accounts in accordance with the Applicable Rules. Clearing Broker shall receive from Correspondent or directly from Customer any securities sold which must be in good deliverable form and will deliver such securities in accordance with the Applicable Rules.

**2.1.11   Statements.** Clearing Broker shall prepare and mail directly to Customers in accordance with instructions received and accepted from Correspondent periodic statements for the Accounts in accordance with the Applicable Rules. All such statements shall indicate that the Account is introduced by Correspondent and carried by Clearing Broker. Statements will display Correspondent's name and telephone number and the Customer Service Department at the Clearing Broker so that customers may contact either the Correspondent or the Clearing Broker.  Additionally, the statement shall disclose that all funds and securities of Customers are in the custody of Clearing Broker and not of Correspondent.

**2.1.12   Safekeeping.** Clearing Broker shall hold in custody and safekeeping all securities and payments received for the Accounts, collect and disburse dividends and other distributions with respect to street-name securities within the Accounts and process in accordance with any instructions received from Correspondent exchange offers, rights offerings, warrants, tender offers, redemptions or proxy requests received with respect to securities in the Accounts. Clearing broker reserves the right to reject any security or payment which in its reasonable judgment poses a risk to Clearing Broker. However, Clearing Broker will not be responsible for any funds or securities delivered by a Customer until such funds or securities are actually received by Clearing Broker or deposited in bank accounts maintained by Clearing Broker. In addition to the terms of this Agreement, Clearing Broker assumes liability for any subcustodian it uses in accordance with SEC Rule 15c3-3 and any current interpretation thereof.

**2.1.13   Exception and Suspicious Activity Reports.**   To the extent provided by Applicable Rules, at the commencement of this Agreement and annually thereafter, Clearing Broker shall furnish to Correspondent a list of reports that may assist Correspondent, in Correspondent's sole opinion, in supervising and monitoring

Accounts, including, but not limited to, exception reports. Correspondent shall promptly notify Clearing Broker as to which of such reports should be furnished to Correspondent. It is understood that Clearing Broker shall not be responsible for supervising Correspondent's activities or compliance with Applicable Rules.

Clearing Broker shall conduct screening of Customer Account activity to detect indications of suspicious cash transactions or security transfer activities that could indicate violations of Applicable Rules including money laundering. Clearing Broker shall provide Correspondent with reports, where allowed by Applicable Law, that may indicate potential suspicious activity and provide reasonable and necessary training to Correspondent in the use of such reports to assist Correspondent in complying with its anti-money laundering and reporting obligations under the Applicable Rules. Nothing contained herein, however, shall relieve Correspondent from its obligations to establish, maintain and enforce a Customer Identification Program and to file such reports required of Correspondent under Applicable Rules including, but not limited to, cash and currency transaction reports, where applicable, suspicious activity reports, and such other reports required pursuant to Applicable Rules.

**2.1.14  Customer Complaints.** To the extent provided by Applicable Rules, Clearing Broker shall promptly furnish to Correspondent and Correspondent's designated examining authority any written complaint from a Customer with respect to Correspondent's responsibilities and functions hereunder received by Clearing Broker. Clearing Broker shall notify such Customer in writing that Clearing Broker received such complaint and furnished same to Correspondent for response and to Correspondent's designated examining authority. Correspondent authorizes and instructs Clearing Broker to forward promptly any written customer complaint received by Clearing Broker and/or its associated persons relating to functions and responsibilities under this Agreement to Correspondent and Correspondent's designated examining authority or, if none, to Correspondent's appropriate regulatory agency or authority. Further, Correspondent authorizes Clearing Broker to notify the Customer, in writing, that Clearing broker has received the complaint, and the complaint has been forwarded to Correspondent and Correspondent's designated examining authority (or, if none, to the appropriate regulatory agency or authority).

**2.1.15  Confidentiality of Customer Information.** Clearing Broker shall maintain the confidentiality of all non-public personal information provided with respect to the Customer and shall provide for adequate security and integrity of the records regarding such customer information in accordance with the Applicable Rules. Clearing Broker shall provide each Customer with a notice regarding its privacy policies and procedures in accordance with Regulation S-P of the SEC upon the opening of the Account.

**2.1.16  Access to Electronic Order Entry Devices.** To the extent that Clearing Broker provides Correspondent with electronic order entry devices to route orders to any National Exchange or securities market, Clearing Broker shall assure itself that Correspondent employs adequate written control procedures to minimize the potential for errors. Correspondent assumes all risk in the utilization of such devices.

**2.1.17  Order Audit Trail System (OATS).** Clearing Broker has taken all necessary steps to comply with FINRA's requirements relating to the Order Audit Trail System ("**OATS**"). To the extent applicable, for all NASDAQ transactions executed by Clearing Broker, Clearing Broker agrees to perform OATS reporting for all data commencing at the time order is received by Clearing Broker. Clearing Broker will not report any data (a) covering time periods before an order is received, (b) on transactions that were settled and/or cleared but not executed by Clearing Broker, or (c) for transactions that were cleared through another clearing broker. Correspondent is required to file a "**new order report**" detailing the time the order was entered by Correspondent and a "**route report**" indicating the time the order was sent to Clearing Broker in order to satisfy Correspondent's OATS requirements. Unless Correspondent is otherwise required to do so by applicable laws or regulations, this Agreement shall not impose a supplemental duty on Correspondent to file such "**new order reports**" on trades executed by Correspondent. Correspondent acknowledges and agrees that Clearing Broker shall not be responsible for any order information that is not received by Clearing Broker. Correspondent shall be responsible for repairing any rejections of OATS data it receives or is made aware of for data previously reported to the OATS reporting authorities by or on Correspondent's behalf.  Upon reasonable request by the Correspondent, Clearing Broker agrees to make available to Correspondent, through the use of reports or electronic reporting systems any rejection of OATS data that it receives or is made aware of for data previously reported to the OATS reporting authorities by or on behalf of Correspondent.   Clearing Broker shall promptly notify Correspondent upon the occurrence of any event that limits Clearing Broker's ability to submit OATS data on behalf of Correspondent. Notwithstanding the foregoing, nothing contained herein shall relieve Correspondent of its reporting obligations under paragraph (c) (3) of OATS Rule 7450. Each party shall make and keep records in accordance with the Applicable Rules in connection with their obligations hereunder.

**2.1.18  Client Services Alerts and Other Informational Memoranda.** Clearing Broker shall from time to time issue Client Services Alerts or other informational memoranda to Correspondent setting forth Clearing Broker's policies and procedures including anti-money laundering and terrorist financing. Correspondent agrees to become familiar with such Bulletins and informational memoranda and to abide by them.

**2.2 Right to Subcontract.** In performing the Services, Clearing Broker may contract with third party data processing, service bureaus or other vendors (the "**Vendors**") to provide ancillary or support services, including but not limited to, data and content providers, third party technology vendors or other third party providers to perform functions such as pricing or the printing and mailing of statements, confirms, proxies or other documents processed by Clearing Broker in fulfilling its obligations under this Agreement. With respect to certain Services designated by Clearing Broker, Correspondent shall contract directly with Vendors identified by Clearing Broker or as may be selected by Correspondent and approved by Clearing Broker. Upon Correspondent's reasonable request, Clearing Broker will cooperate with Correspondent in asserting such rights as Clearing Broker may have pursuant to contracts with the Vendors.   From time to time Correspondent may request or send instructions, via email, service center, or otherwise, to Clearing Broker authorizing Clearing Broker to deliver or transmit Customer data to certain designated third party providers of Correspondent.  In this event, Correspondent acknowledges and agrees that (i)

it is Correspondent's responsibility to perform its requisite due diligence of such designated third party provider and shall enter into separate agreement with such third party provider for safeguarding of its Customer data in accordance with all applicable federal and state laws, rules and regulations; (ii) Correspondent has obtained all applicable consents from its Customers, if required to do so by federal or state law, rule or regulation in order to instruct Clearing Broker to transmit or share such Customer data with the designated third party providers; and (iii) Correspondent, and not Clearing Broker, shall be fully liable, for the use, misuse, or access of the Customer data by the Clearing Broker's designated third party provider.

### 2.3 Limitations and Restrictions.

**2.3.1**    Clearing Broker expressly reserves the right, in its sole discretion, to limit and restrict any of the Services including, without limitation, by rejecting any order or transaction for any Account, by refusing to execute, clear or settle any Transaction, to carry or to continue to carry any Account, or to provide Margin for any Account.

**2.3.2**    Clearing Broker may liquidate any and all Transactions or collateral held in an Account in the following circumstances: (i) upon the request of Correspondent; (ii) upon the death, incapacity, insolvency, or bankruptcy of Customer where Customer has a balance due Clearing Broker; (iii) upon Clearing Broker's decision, in its sole and absolute discretion, to deny or revoke Margin to the Account, (iv) upon a Customer's failure to honor any obligations with respect to Transactions, the Account or Margin; (v) in the event failure to do so would result in a violation of the Applicable Rules; or (v) Clearing Broker in conjunction with Correspondent determines to do so.

**2.3.3**    Unless otherwise expressly agreed to in a writing signed by both parties, Clearing Broker shall not be responsible for providing any of the following services: (i) accounting, bookkeeping or record keeping, cashiering or other services with respect to commodity transactions or other transactions not involving securities; (ii) preparation of Correspondent's payroll records, financial statements or any analysis thereof; (iii) preparation or issuance of checks in payment of Correspondent's expenses, other than expenses incurred by Clearing Broker on behalf of Correspondent; (iv) payment of commissions, salaries or other remittances to Correspondent's salespersons or other employees or agents; (v) preparation or filing of any of Correspondent's reports to the SEC or any state securities commission or any Exchange, provided, however, that Clearing Broker will, at the request of Correspondent, furnish Correspondent with any necessary information contained in records kept by Clearing Broker and not otherwise available to Correspondent for use in making such reports; (vi) delivery of prospectuses or other disclosure documents required pursuant to Applicable Rules other than disclosures required to be made pursuant to FINRA Rule 4311 or any similar rule of any Exchange, or SEC Rule 10b-16, (vii) making and maintaining reports and records required by the Currency and Foreign Transactions Reporting Act of 1970, as amended, and the regulations thereunder, or any other similar provisions within the Applicable Rules; (viii) verification of address changes of Customers; and (ix) any other function, task or service not specifically allocated to it in this Agreement. Correspondent shall be responsible for customer change of address verification and updating such information on Clearing Broker's new account records.

**2.3.4**   Clearing Broker shall cooperate with Correspondent in sharing information regarding Customer transactions that may involve suspicious activity provided, however, Clearing Broker is entitled to file such suspicious activity reports as the Clearing Broker in its sole discretion believes are necessary and nothing contained within this Agreement shall require Clearing Broker to provide Correspondent with any report Clearing Broker is prohibited by law from sharing or to provide Correspondent with any information regarding a suspicious activity report in which  Correspondent is identified as being engaged in activity suspected of violations of any law or regulation.

**2.3.5**   Solely for purposes of the Securities Investor Protection Act of 1970 and the SEC's financial responsibility rules, Customer Accounts shall be considered to be accounts of Clearing Broker and not of Correspondent. Nothing in this paragraph will otherwise change or affect the provisions of this Agreement that provide that Customer Accounts remain Correspondent customer accounts for all other purposes including but not limited to supervision, suitability and indemnification.

**2.3.6** If Correspondent directs Clearing Broker to enter into any transaction to be effected on any securities exchange or in any market on which transactions are settled in foreign currency, (i) any profit or loss arising as a result of a fluctuation in the rate of exchange between such currency and the United States Dollar shall be entirely for Correspondent's account and risk, (ii) all initial and maintenance margin required or requested by Clearing Broker shall be in the currency required by the applicable marketplace or clearing agency in such amounts as Clearing broker in its sole discretion may require, and (iii) Clearing Broker is authorized to convert funds in the Accounts into and from such foreign currency at rates of exchange prevailing at the banking or other institutions with which Clearing broker normally does business.

## Section 3. Functions and Obligations of Correspondent

Correspondent shall perform the following functions and obligations with respect to the Accounts:

### 3.1   Customer Accounts

**3.1.1 Opening and Approving of Accounts.** Correspondent shall open and approve an Account for each Customer only upon obtaining, verifying and retaining current and correct documentation containing the financial and personal information and agreements for each Account ("**Account Documents**") required by the Applicable Rules. Correspondent shall introduce the Accounts for acceptance by Clearing Broker by furnishing to Clearing Broker the information required to open the account (including, without limitation, compliance with Correspondent's Customer Identification Program as well as standing instructions, representative number and such other information or agreements as Clearing Broker may deem necessary to perform the Services, including the obligations set forth in Section 4.6 below) and such Account Documents as Clearing Broker may require. Correspondent shall promptly furnish to Clearing Broker any changes or corrections to the Account information or Account Documents necessary to keep such information and Account Documents current and correct. Correspondent

represents and warrants that it is licensed (or has ascertained it is exempt from licensing) in each jurisdiction (domestic or foreign) where it does business.

**3.1.2 Confidentiality of Customer Information** Correspondent shall maintain the confidentiality of all non-public personal information provided with respect to the Customer and shall provide for adequate security and integrity of the records regarding such customer information in accordance with the Applicable Rules. Correspondent shall provide each Customer with a notice regarding its privacy policies and procedures in accordance with Regulation S-P of the SEC upon the opening of the Account and annually thereafter.

**3.2 Execution of Trades, Confirmations and Periodic Statements.** Correspondent may forward Customer orders and instructions for Transactions to Clearing Broker for execution pursuant to Section 2.1.2. If Correspondent executes Transactions "away" from the Clearing Broker, or if Correspondent provides specific instructions to Clearing Broker with respect to order routing, Correspondent will comply with all Applicable Rules concerning best execution and disclosure to Customers of order routing or payment for order flow. Correspondent shall provide Clearing Broker with all necessary information to generate and mail directly to Customers confirmations with respect to any and all Transactions and periodic statements with respect to the Account. Correspondent understands and agrees that all confirmations and periodic statements shall indicate that the Account is carried, and Transactions are cleared and settled, by Clearing Broker. It is understood that Clearing Broker shall accept, without any inquiry or investigation, all directions from Correspondent, as agent of each Customer, regarding Transactions in Accounts, and any other instructions from Correspondent, as agent of each Customer, concerning Accounts or the property therein, including the transfer of funds to third parties except as such instructions may conflict with the Clearing Broker's rights and obligations under this Agreement.

**3.2.1 Examination and Notification of Errors.** Correspondent shall examine all confirmations, statements, and other reports in whatever medium provided to Correspondent by Clearing Broker. Correspondent must notify Clearing Broker of any error claimed by Correspondent in any account; as to purchase and sales transactions prior to settlement date and as to all other transactions within the time in which Clearing Broker is able to, without violating applicable law, reverse the transaction. If Correspondent fails to do so, Correspondent shall be deemed to have waived its right to make any claim against Clearing Broker with respect to such error.

**3.2.2 Responsibility for Errors in Execution.** Correspondent shall be responsible for transmission to Clearing Broker of all orders and for any errors in the Correspondent's recording or transmission of such orders.

**3.3 Disclosure to Customers.** Correspondent shall provide to Customers any disclosures and obtain any agreements from its Customers as required by the applicable rules, including, without limitation, any disclosures or agreements required for listed options, penny stocks, derivative securities, account transfers or conversions. The cost of making such disclosures or obtaining such agreements shall be borne by Correspondent. Without limiting the generality of the foregoing, Correspondent shall advise Customers in writing upon the opening of an Account and at least annually thereafter that they may obtain information about the Securities Investor

Protection Corporation ("SIPC"), including the SIPC brochure, by contacting SIPC, and shall also provide the website address and telephone number of SIPC.

**3.4  Supervision of Accounts.** Correspondent acknowledges that Clearing Broker's relationship with Correspondent and with Customers shall be strictly limited to the provision of the Services hereunder and that Clearing Broker shall only perform and be responsible for such Services. Correspondent shall have the exclusive responsibility for ascertaining the investment objective of each Customer, **"Knowing the Customer,"** the suitability of Transactions effectuated for Customers, and Clearing Broker shall have no such responsibility with respect thereto. Correspondent shall have the exclusive responsibility for compliance with FINRA Rule 2310 and Rule 3050 with respect to each Account and every order, Transaction or instruction. Correspondent has established and maintains, and shall have exclusive responsibility for adherence to, compliance and supervisory procedures adequate to assure compliance by Correspondent, its agents, servants and employees with the Applicable Rules and this Agreement, which procedures for supervision include provisions with respect to: (i) the opening, approving and monitoring of Accounts including the suitability of Transactions; (ii) the reasonable basis for recommendations made and investment advice and investment strategies provided to Customers; (iii) the orders and execution of orders for Transactions in compliance with Customer instructions; (iv) the frequency of trading in the Accounts, whether or not such Transactions are instituted by Correspondent, its partners, officers, employees or any registered investment adviser; (v) discretionary Accounts; (vi) restricted Accounts as defined by the Applicable Rules; (vii) compliance with restricted or control stock requirements of the Applicable Rules, including assuring that such orders in restricted or control securities have been held for the requisite holding period and such execution of or transaction in such control or restricted securities is in compliance with all Applicable Rules; (viii) securing and transmitting orders in a form and format as specified by Clearing Broker; (ix) compliance with mutual fund prospectus requirements regarding purchase and sale activity and for obtaining and executing dealer agreements with any principal underwriter for mutual funds from which Correspondent seeks to purchase mutual fund shares for its Customers.; (x) oversight of Customer trade activity with regard to potential market manipulation, including mutual fund late trading and market timing, and (xi) compliance with the handling of accounts for employees or officers of a member organization, self-regulatory organization or other financial institutions.

**3.5  Customer Payments.** While each Customer is directly responsible to Clearing Broker with respect to payment for all securities purchased, and for the delivery of all securities sold, for his or her Account, Correspondent shall be responsible for obtaining from each Customer such funds or securities as are required to be deposited or maintained in Accounts. Correspondent shall be responsible to Clearing Broker for payment for securities purchased in the Accounts until actual and complete payment therefor has been made. Correspondent shall be responsible to Clearing Broker for delivery of securities in the Accounts until acceptable deliveries of such securities have been completed. Correspondent shall direct Customers to make all payments for Transactions payable to Clearing Broker. Correspondent shall promptly transmit all funds and promptly deliver all securities received in connection with its activities as a broker or dealer directly to Clearing Broker. Correspondent shall deposit in bank accounts established for the benefit of Clearing Broker prior to the close of business on the day of receipt all funds and checks received by Correspondent with respect to any Account as specified by Clearing Broker to enable Clearing Broker promptly and properly to record such remittances and receipts in the Account. Alternatively and if mutually agreed upon by the parties, Correspondent will utilize a check

scanning deposit mechanism to be provided by Clearing Broker. Correspondent shall send all securities received by it to Clearing Broker by overnight delivery service on the day of receipt, or as specified by Clearing Broker. Correspondent is responsible for the collection of the initial Margin required pursuant to the Applicable Rules to support each Margin transaction for an Account, the amount of any Margin maintenance requirement pursuant to the Applicable Rules and the timely payment of all Account Debits, interest and other charges incurred in an Account. Correspondent is also responsible to Clearing Broker for the collection of funds or securities required to settle any Transactions. If requested by Clearing Broker, Correspondent shall promptly transmit to Customers all requests for initial and maintenance Margin and for funds or securities to settle Transactions or pay Account Debits. Correspondent shall be liable for any loss, liability, damage, cost or expense (including but not otherwise limited to fees and expenses of legal counsel) incurred or sustained by Correspondent or Clearing Broker, or both, as a result of the failure of any Customer to timely make payments or deposits of securities to satisfy Account Debits, settle Transactions or to comply with any Margin calls or any term or provision of a margin agreement with Clearing Broker, and/or consent to loan and hypothecation of securities. In its sole discretion, at any time, Clearing Broker may effect a "buy-in" or "sell-out" of a Transaction or liquidate an Account Debit and collect from the Customer any deficiency resulting from the "buy-in" or "sell-out" or liquidation. Clearing Broker may charge interest to Correspondent on any resulting Account Debits.

**3.6   Waiver of Procedures.**

**3.6.1** Subject to the Applicable Rules, Correspondent may request Clearing Broker to alter or waive compliance with any one or more of Clearing Broker's practices or policies with respect to one or more Accounts or Transactions, which waiver may be granted or denied in Clearing Broker's sole discretion. Upon making a request for waiver, Correspondent undertakes to reimburse, indemnify and hold harmless Clearing Broker from any loss of any kind that may result from such waiver and the accommodation of the request by Clearing Broker.

**3.6.2** Correspondent may request that Clearing Broker extend, or continue to extend, credit to an Account in excess of the credit that Clearing Broker would otherwise be willing to extend, which request may be granted or denied in Clearing Broker's sole discretion. In connection with such an extension of credit, Correspondent shall deposit to the Account established solely for this purpose and maintained by Correspondent at Clearing Broker (the **"Margin Collateral Account"**) such Acceptable Securities or Cash as Clearing Broker may request in an amount determined by Clearing Broker from time to time in order to secure such extension of credit. **"Cash"** means immediately available United States Dollars; and **"Acceptable Securities"** means: (1) any security which is issued or fully guaranteed as to principal and interest by the United States of America; and (2) such other securities acceptable to Clearing Broker in its sole discretion.

**3.6.3** In the event any deposit required to be deposited under this Agreement into the Margin Collateral Account is not timely made, Clearing Broker may in its sole discretion and regardless of whether the Margin Collateral Account is then in compliance with applicable margin requirements, pledge, re-pledge, hypothecate or re-hypothecate without prior notice any or all securities which Clearing Broker may hold in an account

of the Correspondent at Clearing Broker (either individually or jointly with others), separately or in common with other securities or any other property, for the sum then due or for a greater or lesser sum and without retaining in its possession and control for delivery a like amount of similar securities; sell out any or all securities which Clearing Broker may hold for such Account or in an Account of the Correspondent at Clearing Broker (either individually or jointly with others), or buy in any or all securities required to make delivery; or apply to an appropriate committee of any national securities exchange or association for an extension of the time within which payment or delivery is due. Any sale, purchase or cancellation authorization hereunder may be made, in Clearing Broker's sole discretion, on an exchange or other market where such business is then usually transacted, or at public auction, or at a private sale without advertising the same and without any notice, prior tender, demand or call; and Clearing Broker may purchase the whole or part of such securities free from any right of redemption and the Account and the Correspondent shall remain liable for any deficiency. Any election as to whether to enforce the foregoing provisions against either the Account or the Correspondent, or the allocation between such Accounts, is at Clearing Broker's sole discretion, and any decision to act or not to act will not limit or supersede Clearing Broker's rights under Section 9 of this Agreement.

**3.7 Validity and Authority of Information.** Correspondent shall obtain and maintain the necessary documents, information, systems and interfaces with Clearing Broker's systems in order to perform the functions and obligations allocated to Correspondent pursuant to this Agreement. Correspondent represents and warrants to Clearing Broker that: (i) all Accounts, orders, Transactions, instructions, Margin and Account Debits established, entered, incurred or maintained have been duly and validly authorized and are legally binding and enforceable according to their terms against the Customer; (ii) all securities delivered by a Customer or Correspondent to Clearing Broker are genuine, will be in good delivery form, free of liens, claims and encumbrances and have not been reported lost, missing or stolen; and (iii) all documents delivered to Clearing Broker will be genuine and duly executed by the parties named therein.

**3.8  Customer Correspondence.** All Customer correspondence shall be reviewed, responded to and resolved by Correspondent; provided, however, that to the extent any Customer correspondence contains any inquiry or complaint relating to Services provided by Clearing Broker, Correspondent shall promptly provide Clearing Broker with copies of the correspondence. Clearing Broker shall cooperate with Correspondent by providing such information and copies of documents and records as are reasonably necessary for Correspondent to respond to such Customer.

**3.9  Negotiable Instruments.** In the event that the Services provided herein shall allow Correspondent to issue to Customers negotiable instruments such as drafts or checks, for which Clearing Broker is the drawer or maker, Correspondent shall have provided to Clearing Broker supervisory procedures satisfactory to Clearing Broker with respect to the issuance of such instruments and hereby represents and covenants that it shall maintain and shall enforce such supervisory procedures relating to such instruments.

**3.10  DVP/RVP and Prime Brokerage Transaction.**

**3.10.1** Correspondent agrees that all Customers who engage in delivery versus payment ("**DVP**") or receipt versus payment ("**RVP**") transactions (and their agents) will utilize the facilities of a securities repository for the confirmation, acknowledgment, and book entry settlement of all depository eligible transactions, subject to the exceptions of the Applicable Rules with respect to all DVP/RVP transactions, except for the delivery of confirmations.

**3.10.2** Correspondent shall not engage in any prime brokerage transactions without the prior approval of Clearing Broker.

**3.10.3** Correspondent agrees that all transactions where Correspondent acts as an executing broker for Accounts that utilize a prime broker ("**Prime Brokerage Customers**"), shall be conducted in accordance with the requirements of the SEC No-Action Letter, dated January 25, 1994 (the "**SEC No-Action Letter**").

**3.10.4** Correspondent shall notify Clearing Broker with respect to each Prime Brokerage Customer for which Correspondent intends to act as an executing broker and Correspondent shall be solely responsible for conducting its own credit review with respect to such Prime Brokerage Customer. Correspondent shall promptly notify Clearing Broker, but in no event later than 3:00 p.m. Eastern Standard Time of trade date, in a mutually acceptable fashion, of such trades in sufficient detail for Clearing Broker to be able to report and transfer any trade executed by Correspondent on behalf of a Prime Brokerage Customer to the relevant prime broker. Correspondent understands and agrees that if the prime broker shall disaffirm or DK any trade executed by Correspondent on behalf of a Prime Brokerage Customer, Correspondent shall, if it has not already done so, open a Margin Account for such Prime Brokerage Customer and shall transfer or deliver the trade to such Margin Account for the risk and expense of Correspondent to the same extent as for any Account introduced by Correspondent pursuant to this Agreement. Correspondent shall: (i) perform and record a "locate" for any short sales directed by Customers for execution; (ii) provide all information to Clearing Broker related to the eligibility of any of Customers to receive or to continue to receive prime brokerage services; (iii) obtain and deliver to Clearing Broker an executed Schedule A to SIFMA Form 150 for each prime brokerage agreement between Clearing Broker (as Prime Broker) and each Executing Broker accepted by Clearing Broker, showing each prime brokerage customer of Correspondent and, thereafter, deliver to Clearing Broker executed Forms 1 to Schedule A of Form 150 to reflect additions and deletions of prime brokerage customers as appropriate. Correspondent understands and agrees that for certain Prime Brokerage Customers, Clearing Broker may act as both Clearing Broker and prime broker (the "**Prime Broker**").

**3.10.5** Correspondent agrees to indemnify and hold harmless Clearing Broker and its controlling persons, officers, directors, agents, servants and employees from and against costs, losses, claims, liabilities, fines, penalties, damages and expenses (including reasonable attorney and accountant fees) arising out of or resulting from Correspondent's activities as an executing broker.

**3.11 Reporting Obligations.** Correspondent is responsible for filing all currency transaction

reports and suspicious activity reports, including form SAR-SF, cash transaction reports ("**CTR**"), and such other reports required of Correspondent pursuant to the Applicable Rules.  Unless prohibited by law, Correspondent shall notify Clearing Broker of any suspicious activity it may have detected so that Clearing Broker and Correspondent can determine whether to jointly file any SAR-SF regarding a Customer. Similarly, Clearing Broker may share information about any suspicious activity it detects with Correspondent. Correspondent shall share with Clearing Broker all CTR filings and any other reports filed with regulatory authorities regarding cash and currency transactions unless such sharing or communications regarding such reports are prohibited by law. Both Clearing Broker and Correspondent shall comply with the provisions of SEA Rule 17a-8 to the extent that the provisions are applicable. Correspondent hereby agrees to take necessary measures to comply with the income tax withholding requirements of Section 3406 and Sections 1441 through 1446 (the nonresident alien withholding requirements) of the Internal Revenue Code of 1986, as amended ("**IRC**") with respect to Customers. Correspondent agrees to furnish to Clearing Broker any tax information, e.g., taxpayer identification numbers and certifications provided by the Customer on IRS Forms W-8, W-8BEN, W-8IMY, W-8EXP, W-8ECI, W-9, or any acceptable substitute in its possession relating to each Account.  Correspondent acknowledges that Clearing Broker will rely on such information for purposes of determining Clearing Broker's obligation to withhold federal income tax pursuant to Sections 1441 through 1446 and 3406 of the IRC.

**3.12 Underwriting; Syndicates.**  Provided Correspondent is eligible and has the requisite regulatory authority pursuant to Applicable Rules to engage in securities transactions as an underwriter, Correspondent shall inform Clearing Broker in writing which securities Correspondent intends to act as underwriter, or as to which Correspondent intends to enter into, or join, a syndicate (whether as part of the underwriting or selling group) relating to the issuance or placement of those securities. Clearing Broker shall have the reasonable right to limit or prohibit Correspondent's underwriting or syndicate activities with respect to any security.  Clearing Broker may impose certain conditions upon Correspondent's serving as an underwriter or its participation in any syndicate.

**3.13 Market Making.**  Upon the execution of this Agreement, Correspondent shall provide to Clearing Broker a written list of all securities with respect to which Correspondent is a market maker. Correspondent shall give prior written notice of any proposed changes in its market making activities.  Correspondent shall provide Clearing Broker on a timely basis with information regarding any changes in its market making securities sufficient to ensure that any confirmations sent to Customers by Clearing Broker on Correspondent's behalf contain correct information regarding Correspondent's role in the transaction. Clearing Broker shall have the right to limit or prohibit Correspondent's market making activities with respect to any security and to demand an additional deposit to the Deposit Account pursuant to Section 6.2 with respect to any market making activities of the Correspondent.

**3.14 Secondary Correspondents.**  Correspondent covenants that it shall not, without the prior approval of Clearing Broker, enter into or execute any agreement with another broker-dealer, including an affiliated broker-dealer (each, a "**Secondary Broker-Dealer**"), which would have the effect of extending to such Secondary Broker-Dealer any service or product provided by Clearing Broker to Correspondent. Correspondent further understands, acknowledges and agrees that (i) it bears sole responsibility for satisfying any additional or supplementary regulatory

Page 16 of 39

requirements relating to entering into a relationship with the Secondary Broker-Dealer, including, without limitation, the obligation, if any, to obtain the prior approval of the Correspondent's designated examining authority, the Secondary Broker-Dealer's designated examining authority, or both, and (ii) Clearing Broker may require that Correspondent accept additional responsibilities or obligations as a condition of its consent to allow such Secondary Broker-Dealer to receive such services and products through or with Correspondent, including, without limitation, that Correspondent guaranty the obligations of such Secondary Broker-Dealer, or that Correspondent increase the amount of the deposit required under Section 6.2 of this Agreement. Correspondent further agrees that any secondary or piggyback relationship that is established will conform to the requirements of Rules 3150 and 4311. These rules require that Correspondent maintain the proprietary and customer accounts of any secondary member broker dealer for which it is acting as an intermediary in such a manner to enable Clearing Broker and the FINRA to easily identify data belonging to each piggyback account. The data must also be maintained in a manner that enables Clearing Broker to report data about each piggyback firm separately from the data about Correspondent.

**3.15 Use of Clearing Broker Name.** Each and every use by Correspondent of any of the names "COR" or "COR Clearing", or "COR Clearing LLC", or the name of any affiliated entity of Clearing Broker, or any abbreviation or acronym relating to or made up from any of these names, or any amended name based on or derived from any of these names, in any external communication from Correspondent, including, without limitation, any marketing materials, client communications, account documents, or usage in a proprietary or non-proprietary web-site or other Internet usage, shall be submitted to Clearing Broker prior to use for review and approval. Clearing Broker reserves the right to withhold its consent to any such usage, or to restrict or place conditions on such usage.

**3.16 Amendments to Form BD.** Correspondent shall provide Clearing Broker with at least one written copy of each material amendment, modification or change to Correspondent's Form BD at least (i) fifteen (15) days before its effective date or (ii) no later than the time of its submission to the appropriate regulator. Correspondent shall provide copies of any regulatory notice to Clearing Broker at the same time it is transmitted to the appropriate regulator.

**3.17 Intentionally Deleted**

**3.18 Notice of Offer or Solicitation of Offer and Rights to Invest In Correspondent.** (a) Upon receipt of any offer or entering into any agreement to solicit an offer for an investment in or acquisition of Correspondent or Correspondent's holding company, entry into any discussions with brokers, bankers, consultants, advisors, investors, competitors or others relating to or that could result in a change in the capitalization or ownership of Correspondent or of Correspondent's holding company or owners, and upon receipt of any notice from FINRA requesting additional capital be placed in Correspondent (any of the above, an "**offer**"), Correspondent shall notify Clearing Broker immediately upon, but in no event more than 48 hours after, receiving any such offer or entering into any such agreement to solicit such an offer and provide to Clearing Broker all documents and information relating to the offer and an indication of Correspondent's response to the offer.

(b) In the event Correspondent or Correspondent's holding company or owners receive an

offer for or seek to sell any securities of Correspondent, Correspondent shall, upon receipt of a demand from Clearing Broker, engage one or more business appraisers of national reputation reasonably acceptable to Clearing Broker to value the Correspondent and any securities sought to be sold, and Correspondent shall cooperate fully and promptly with such appraisers. The appraisers so selected shall prepare and deliver to Correspondent and Clearing Broker their appraisal within twenty-one (21) days of demand from Clearing Broker. Clearing Broker shall have the option, but not the obligation, to purchase the securities of Correspondent sought to be sold on the terms and at the value determined by the appraisal by entering into a purchase agreement within thirty (30) days after receipt of the appraisal. In the event that Clearing Broker does not purchase the securities on the terms set forth above, then the right of investment granted in this paragraph (b) shall lapse only as to the specific offer, but shall pertain to any subsequent offer, and Correspondent may seek or receive offers from third parties, subject to the rights of Clearing Broker set forth in paragraph (c), below. For the avoidance of doubt, "**securities**" shall include, without limitation, any shares of common or preferred stock, membership interests, debt instrument, or other contract conveying an economic or voting interest in Correspondent.

(c) subject to the provisions of paragraph (b), above, in the event any of Correspondent or Correspondent's holding company or owners receives an offer to purchase securities of Correspondent, and such offer shall be acceptable to Correspondent or Correspondent's holding company or owners, Correspondent will not sell such securities or any portion thereof without first offering the same securities and terms to Clearing Broker and any of its affiliates pursuant to this paragraph. Correspondent shall give Clearing Broker the right to purchase such securities, subject to regulatory approval, at the price and on the terms of the offer so made. This right shall be extended by Correspondent giving written notice of the offer to Clearing Broker, requiring Clearing Broker to accept the offer in writing and to sign a purchase agreement within forty-five (45) days after the mailing of the notice. In the event that Clearing Broker does not purchase the securities on the terms set forth above, then the right of first refusal granted herein shall lapse only as to the specific offer, but shall pertain to any subsequent offer received.

**3.19 Notice of Conversations with Competitors.** Correspondent shall timely notify Clearing Broker with written notice (a) prior to Correspondent engaging in bona fide conversations, negotiations or discussions with any firm that provides competitive services with Clearing Broker (a "**Competitor**") and (b) at least sixty (60) days prior to accepting capital from a Competitor. The notice shall discuss scope of services to be discussed, potential earliest timing of a transfer of services, if any, and all offer and transaction documents. Clearing Broker shall have the right to match the terms of any proposed capital infusion or loan to Correspondent, and Correspondent shall be prohibited from accepting any such financing from a Competitor unless the competing offer is materially superior economically to any offer made by Clearing Broker pursuant to its right hereunder.

**3.20 Deposit Amount.** The Initial Deposit may be increased by Clearing Broker at any time as a result of Clearing Broker's evaluation, in its sole discretion, of the risks presented by any changes in Correspondent's business activity or regulatory or financial risks. In determining the size of any increase in the Initial Deposit, Clearing Broker may look to Correspondent's margin balances, number of accounts, regulatory history, client and other claims, and broker turnover, among other factors.

### Section 4. Representations and Warranties

The parties make the following representations and warranties:

**4.1   Organization.** Each party is duly organized and in good standing under the laws of the jurisdiction pursuant to which it was formed and is qualified to do business in each state in which it does business and is required to qualify.

**4.2   Power and Authority.** Each party has the requisite power and authority to enter into, execute and perform its obligations under this Agreement and, when so executed and delivered, this Agreement shall constitute a legal, valid and binding obligation enforceable in accordance with its terms.

**4.3   Registration.** Each party and its employees, when so required, are registered as a broker, dealer or agent under the applicable state "blue sky" laws and the Exchange Act and is a member in good standing of the FINRA and any Exchange of which it is a member.

**4.4   Net Capital and Financial Reporting.** Each party is in compliance with and maintains in excess of the minimum net capital required by Rule 15c3-1 under the Exchange Act and is in compliance with the capital and financial reporting requirements of the FINRA as well as all capital requirements of every state in which it is registered as a broker or dealer.

**4.5   Compliance and Litigation.** Each party, its officers, directors, agents, employees and servants are in material compliance with all Applicable Rules.

> **4.5.1** Correspondent further represents and warrants that, there is no claim, action, proceeding, investigation or inquiry pending or threatened before any court, tribunal, administrative judge or hearings officer alleging a violation of an Applicable Rule, or seeking suspension or cancellation of its broker or dealer registration with any state or the SEC or its membership in any Exchange or the FINRA.

> **4.5.2** Correspondent further represents and warrants that there is no claim, action, proceeding or arbitration pending or threatened in any court or tribunal seeking damages in excess of $10,000.

**4.6   Anti-Money Laundering Programs** Each party has established and maintains an anti-money laundering program consisting of (i) written internal policies, procedures and controls designed to prevent and detect money laundering activity and suspicious currency or securities transactions that could facilitate money laundering activities, (ii) designation of a compliance officer to monitor the program, (iii) continuing training to employees regarding anti-money laundering, and (iv) independent audit functions to annually test its anti-money laundering program.

> **4.6.1** Correspondent further represents that it has written policies and procedures establishing a customer identification program to verify the identity of Customers, maintain records of such verification efforts including the name, address, tax identification information and such other identifying information required by Applicable Rules and consulting and comparing all proposed Customers against the OFAC list. For

its part, Clearing Broker independently, and to meets its own obligations (and not acting as an agent for Correspondent) performs OFAC checks using a third party vendor. Clearing Broker assumes no liability for the negligence of the third party vendor. In the event Clearing Broker discovers a "match" for a potential OFAC/SDN listed person or entity, Clearing Broker will contact Correspondent and each will work in good faith to take appropriate steps. Furthermore, Correspondent hereby agrees and acknowledges that it is obligated to comply with restrictions and conditions on opening and accepting certain Accounts, including but not limited to, the following:

### a. Non-Resident Alien Accounts Carried Directly or Through an Investment Advisor.

For any Account opened for a non-resident alien, Correspondent must record the customer's passport number and obtain a copy of the government document used to verify the individual's identity at the time the Account is opened. Correspondent must also obtain a copy of a passport or other governmental identification for any of the following: the grantor/settler of a foreign trust; and any beneficial owner of an offshore corporate account if: (1) the account is a personal holding company or private investment company; or (2) the beneficial owner of the entity which maintains the account holds more than a 10% interest in the entity. Correspondent may not open any Account for a personal holding company or private investment company if one or more beneficial owners are U.S. persons. With respect to those Accounts involving investment advisers, Correspondent will conduct a sufficient inquiry to obtain, record and verify information as outlined above about the advisor's customer, including ascertaining the identity of each beneficial owner, of any such Account prior to opening the Account unless Correspondent has ascertained that the investment adviser meets the exception set forth in SEC No Action letter dated February 13, 2004 relating to reliance on investment advisers or other SEC guidance applies.

### b. Shell Bank Accounts, Foreign Bank Accounts, and Private Banking Accounts.

Correspondent, working in conjunction with Clearing Broker, shall implement the provisions of sections 312, 313, and 319 of the USA PATRIOT Act. Copies of all certifications obtained by Correspondent shall be promptly forwarded to Clearing Broker. In this connection, Correspondent will detect Accounts for unregulated shell banks through its CIP and through ongoing monitoring of Transactions. Upon finding or suspecting such Accounts, Correspondent will take immediate steps to investigate and to terminate any verified Account for an unregulated foreign shell bank. Correspondent will immediately notify Clearing Broker of any action taken to terminate a shell bank relationship. Clearing broker will also notify Correspondent if it detects and closes an account due to a determination that a shell bank relationship exists. Correspondent will require its foreign account holders to complete the model certifications and re-certifications as issued by the U. S. Treasury,

Correspondent will review Accounts to determine whether it offers any "private banking" Accounts and will conduct due diligence on such Accounts. Correspondent will also review public information to determine whether any "private banking" account holders are "senior foreign political figures". If Correspondent discovers that a particular "private banking" account holder may be a "senior foreign political figure", it will conduct additional enhanced due diligence and report transactions that may involve money laundering.

In all cases for the obligations set forth in this Section 4.6.1, Correspondent will record such information in systems provided to it by Clearing Broker.

**4.6.2** Each party will take such special measures with respect to any foreign jurisdiction, institution(s), class(es) of transactions, or type(s) of account(s) designated by the U.S. Treasury Department to be of "primary money laundering concern" in accordance with Section 311 of the USA Patriot Act and will, comply with Section 314(a) of the USA Patriot Act.

**4.6.3** Clearing Broker represents it has systems designed to comply with the electronic transfer of funds, specifically the "Funds Transfer Rule" and the "Travel Rule", 31 C.F.R. 103.33(f) and (g), when processing disbursements on behalf of Correspondent, Clearing Broker shall comply with these rules based on information provided by Correspondent

**4.6.4** Correspondent further represents that Clearing Broker may rely on any written or oral instructions, communications or orders furnished by Correspondent with respect to any Customer or Account.

**4.6.5** For all transactions using wired funds, whether incoming or requests for transfers, Clearing Broker or its agent shall compare relevant information against information supplied by third parties regarding persons subject to the OFAC list. Any instructions or requests for transfers of funds to persons not identified as a Customer shall be subject to prior approval of the Clearing Broker. Clearing Broker shall review relevant information regarding third party payments and deliveries, including the payee's name and address and the recipient bank's name and address, to detect persons subject to the OFAC list.

**4.6.6** Correspondent agrees that it will subscribe to the highest level of training and compliance services offered by Clearing Broker relating to anti-money laundering protections and the Bank Secrecy Act. The pricing for these services shall be set forth on Schedule A from time to time.

**Section 5. Information and Cooperation**

**5.1    Financial Information.** Each party shall promptly furnish to the other party copies of the audited financial statements and such other financial statements as are required to be furnished to Customers under the Applicable Rules. Correspondent shall provide copies to Clearing Broker simultaneously with filing any financial information, Form BD (or amendments thereto) or other reports with the FINRA, or the SEC, including, but not otherwise limited to, monthly and/or quarterly, whichever is applicable, financial and operational combined uniform single reports ("**FOCUS Reports**"), and shall provide Clearing Broker with such other information and reports

of operations and financial condition as Clearing Broker may request. Correspondent shall email copies of the FOCUS Reports electronically to Clearing Broker.

**5.2   Litigation and Claims.** Promptly after Correspondent knows or has reason to believe it is the subject of any claim, action, suit, proceeding, arbitration, investigation or inquiry before any court, tribunal, administrative agency, Exchange, FINRA, or private arbitration panel alleging a violation of the Applicable Rules or seeking suspension or cancellation of any registration or license of Correspondent, or damages in excess of $10,000, Correspondent shall notify Clearing Broker of the claim and furnish Clearing Broker with a copy of the claim.   In addition, Correspondent shall provide to Clearing Broker any answer or responsive statement submitted by Correspondent to such claim, and any other information which Clearing Broker may request. Clearing Broker retains the right to assess reasonable out of pocket costs, including reasonable legal fees, to Correspondent if it becomes necessary for Clearing Broker to obtain legal assistance as a result of such actions noted above.

**5.3   Cooperation.** Each party shall cooperate with the other and provide the other with all appropriate data in its possession pertinent to the proper performance of any function, obligation or Services allocated pursuant to this Agreement. Correspondent shall make available to Clearing Broker, its attorneys, accountants and authorized agents such Account Documents, books and records or other information as necessary to comply with the Applicable Rules or to defend against any allegation of a violation of an Applicable Rule.

**5.4   Advertising.** Correspondent shall not advertise or make any public statement with respect to this Agreement, the Services or the existence of any relationship with Clearing Broker without the prior written consent of Clearing Broker. Correspondent shall not make this Agreement or any document, schedule or information incorporated by reference available to any third party except as required by the Applicable Rules.

**5.5   Confidentiality.** The Correspondent shall prevent unauthorized access to, or disclosure of, and shall keep confidential, any information, in whatever format it exists, including verbal, written, visual, graphic, electronic or machine-readable form, received pursuant to this Agreement which is private, confidential or proprietary in nature to the other party and is not otherwise publicly available, including, without limitation, any information relating to a party's existing or prospective businesses and Customers, including, without limitation, information relating to business strategies and concepts, information relating to Accounts, the names, address, age, financial information, and all other information in the possession or under the control of a party pertaining to client accounts, and all documentation and other tangible or intangible discoveries, ideas, concepts, software, customer lists of any type or nature, research reports, designs, drawings, specifications, techniques, models, information, source code, object code, diagrams, flow charts, procedures, and "know-how" owned by a party ("**Confidential Information**").  By way of example only and without limitation, Confidential Information includes, with relation to either party: any trade secrets; information concerning, relating to or making reference to, in any way, the business and affairs of either party; financial practices or information; business practices, plans and strategies; price lists; customer lists and customer information (whether provided directly by a party or otherwise); current and anticipated customer requirements; market studies including information relating to the marketing or promotion of the disclosing party's products; product specifications, data, know-how, formulae, compositions, processes, designs, diagrams, sketches,

models, photographs, graphs, drawings, samples, inventions and ideas; past, current, and planned research and development; current and planned manufacturing plans, methods and processes; computer software and programs (including object code and source code); database technologies, systems, structures and architecture); systems manuals; information related to employees, contractors, subcontractors, consultants and suppliers; and any other information, however documented, that is deemed by a party to be proprietary that is disclosed by one party to the other pursuant to this Agreement. Confidential Information also includes non-public personal information ("NPPI") as that term is defined in Title V of the Gramm-Leach-Bliley Act ("GLBA") of 1999 or any successor federal statute, and the rules and regulations thereunder, all as may be amended or supplemented from time to time relating to the customers of either party. Clearing Firm will use commercially reasonable efforts to maintain confidentiality of Correspondent related information in compliance with all laws and regulations.

**5.5.1 Exceptions.** This Section shall not preclude disclosing information required for the performance of the Services or obligations required by this Agreement, or as required under the Applicable Rules ("Disclosure Requests"). Upon receiving notification of a Disclosure Request, a party will notify the other party unless expressly prohibited under Applicable Rules. Confidential Information shall not include information which (i) is developed by the other party without violating the disclosing party's proprietary rights; (ii) is or becomes publicly known (other than through unauthorized disclosure); (iii) is disclosed by the owner of such information to a third party free of any obligation of confidentiality; (iv) is already known by such party without an obligation of confidentiality other than pursuant to this Agreement or any confidentiality agreements entered into between the parties before the Effective Date of this Agreement; or (v) is rightfully received by a party free of any obligation of confidentiality. Notwithstanding the foregoing, should an Account request that Clearing Broker or an affiliate of Clearing Broker become its broker, acceptance of such Account by Clearing Agent or such affiliate shall not be deemed to violate this representation and warranty, nor result in a breach of this Agreement. Clearing Broker is authorized to provide account data directly to any requesting Customer or any representative authorized by a Customer.

**5.5.2. Disclosure and Use Restrictions.** All Confidential Information relating to a party shall be held in confidence by the other party to the same extent and in at least the same manner as such party protects its own confidential or proprietary information. Neither party shall disclose, publish, release, transfer or otherwise make available Confidential Information of the other party in any form to, or for the use or benefit of, any person or entity without the other party's consent. Each party shall, however, be permitted to disclose Confidential Information to its officers, agents, affiliates, subcontractors, third party service providers, and employees to the extent such disclosure is reasonably necessary for the processing and servicing accounts of Broker and its customers in fulfilling its duties and obligations under this Agreement, and such disclosure is not prohibited by GLBA, which amends the Exchange Act, as it may be amended from time to time, the regulations promulgated by the SEC thereunder or other applicable law; provided, however, that such party shall take all reasonable measures to ensure that Confidential Information of the other party is not disclosed or duplicated in contravention of the provisions of this Agreement by such officers, agents, affiliates, subcontractors, third party service providers and employees. In the event that Correspondent instructs

Clearing Broker to send Customers marketing materials via statement inserts or other marketing brochures on Correspondent's behalf, Correspondent represents and warrants that Correspondent is in compliance with Section 248.13 of Regulation S-P and has provided Customers with a clear and conspicuous notice that Correspondent may share Customer information with non-affiliated third parties for marketing purposes.   In addition to the foregoing, with respect to NPPI, each party shall, and shall cause its agents, employees, subcontractors, and third party service providers, to implement and maintain any additional, appropriate security measures to (a) ensure the security and confidentiality of NPPI; (b) protect against any threats or hazards to the security or integrity of NPPI; (c) prevent unauthorized access to or use of NPPI; and (d) otherwise keep NPPI confidential in accordance with the terms of this Agreement, GLBA and any other applicable law, rule or regulation of any jurisdiction relating to disclosure or use of personal information.

**5.5.3 Notification of Privacy Breach.**  Each party hereunder shall notify the other party promptly of any material breach of this Section 5 by Clearing Broker pursuant to this Agreement which directly impacts Correspondent.  Notwithstanding the above, for the purposes of GLBA and any other applicable state or federal privacy laws, Correspondent shall be deemed the data owner of its Customer's information, including but not limited to NPPI of its Customer, and as such, shall be responsible for notifying its customers, in accordance with applicable laws, rules or regulations, in the event of breach of its customer's NPPI. The obligations in this Section 5 shall not restrict any disclosure by either party pursuant to the Applicable Rules, or by order of any court or government agency, provided that the disclosing party shall give prompt notice to the non-disclosing party of such order unless otherwise prohibited under law, rule or regulation.

**5.5.4. Ownership of Confidential Information.** All Confidential Information is and shall remain the property of the disclosing party.  By disclosing the Confidential Information to the receiving party, the disclosing party does not grant to the receiving party any license, interest or rights of any kind in and to the Confidential Information. The receiving party agrees that the disclosure of the Confidential Information of the disclosing party does not confer upon the receiving party any rights in or to the disclosing party's Confidential Information.

**5.5.5 Non-Disparagement, Non-Disclosure.**  Correspondent agrees that neither it nor any affiliates shall disparage the Clearing Broker in any way.  This non-disparagement obligation shall be in perpetuity and shall survive the termination of this agreement and the termination of the relationship between any affiliate of Correspondent and their affiliation to Correspondent.  There shall be no public disclosures, to third parties or otherwise of any disparaging claims against Clearing Broker, including any statements to third-parties relating to any claims subject to arbitration or litigation, business practices, social interactions, policies, etc.  The veracity of such claims shall not be a defense unless provided to FINRA or other regulatory agency relating to potential violations of laws or regulations.  This provision shall include conversations conducted under non-disclosure agreements and confidentiality agreements.  Clearing Broker shall not be required to prove damages but will recover the greater of actual damages and the amount of the Clearing Deposit subject to the Arbitration Provisions.  The Correspondent

shall update its Employee manual and Compliance Manual to notify all employees and affiliates of this provision and the direct rights of Clearing Broker to affiliates of Correspondent. These rights shall survive the termination of the employee or affiliate relationship with Correspondent. Correspondent's annual compliance certifications from employees shall include certification relating to this obligation.

**5.5.6. Red Flags Identity Theft Protection**. During the course of the Services provided hereunder, Clearing Broker or the Correspondent may become aware of activities, patterns of activity, or practices that indicate the possible existence of identity theft (as defined by regulations of the Federal Trade Commission). As such, Clearing Broker and Correspondent agree that each shall implement appropriate measures, including the establishment and maintenance of policies and procedures designed to: (i) detect and respond to such activities, patterns or practices; and (ii) notify the other upon detection of such activities, patterns or practices. In addition, if either party does become aware of activities, patterns of activity, or practices indicating the possible existence of identity theft, the discovering party will promptly notify the other party hereunder, and will take reasonable measures to assist in implementing an appropriate remediation or response.

### Section 6. Payment and Deposit Accounts

**6.1    Payment Account.** Upon execution of this Agreement, Clearing Broker shall establish an Account for Correspondent entitled the "**Payment Account.**" Clearing Broker shall collect for Correspondent and hold in the Payment Account all commissions, fees and other charges established by Correspondent from time to time and paid by the Customers together with any other income of Correspondent. Clearing Broker shall make payments to Correspondent from the Payment Account in accordance with Section 8.1 of this Agreement.

**6.2    Deposit Account.** Upon execution of this Agreement, Clearing Broker shall establish an Account for, and in the name of, Correspondent entitled the "**Deposit Account**". Correspondent shall deliver to Clearing Broker for deposit to the Deposit Account cash or securities which are (a) direct obligations of, or guaranteed as to the timely payment of principal and interest by, the United States, (b) acceptable to Clearing Broker, and (c) registered in the name specified by Clearing Broker or in good deliverable form and which in the aggregate have a fair market value, as determined solely in the discretion of Clearing Broker, equal to the Minimum Balance set forth below on the signature page of this Agreement. Clearing Broker shall not be obligated to perform any of the Services at any time that the aggregate fair market value of the Deposit Account is less than the Minimum Balance. Correspondent shall be obligated to deposit additional cash or securities acceptable to Clearing Broker to cause the fair market value of the Deposit Account to be maintained in an amount equal to the Minimum Balance. Clearing Broker, upon ten (10) business days' notice to Correspondent, may require the Minimum Balance to equal the aggregate of all obligations for which indemnity may be sought by Clearing Broker pursuant to Section 9. The Deposit Account shall not represent an ownership interest by Correspondent in Clearing Broker. The Deposit Account shall at all times contain cash, securities, or a combination of both, having a market value of at least the amount set forth below on the signature page of this Agreement. In the event of a substantial change in the nature and extent of Broker's business operations, Clearing Broker may require that an additional amount be deposited promptly in the Deposit Account. If such a deposit is not made in the amount specified, whether or not

Correspondent agrees that the amount is justified, Clearing Broker may terminate this Agreement forthwith.

**6.3     Nature of Deposit Account.** The Deposit Account is not part of the capital of Clearing Broker, does not constitute a partnership or equity interest in Clearing Broker, will not be subordinated to the claims of the creditors of Clearing Broker, and shall not be deemed to be Margin for any Account. The Deposit Account shall be afforded PAIB treatment. Interest on any cash balance in the Deposit Account shall be at the rate set forth in the attached Schedule A.

**6.4     Clearing Broker Rights to Accounts.** For any claim Clearing Broker may have against Correspondent or any Customer or Account, Correspondent grants Clearing Broker a continuing security interest and general lien upon the Deposit Account and Payment Account, and acknowledges Clearing Broker shall have a right of setoff against any Accounts to the extent of any Account Debit or claim. In connection therewith, Correspondent further grants Clearing Broker a security interest and right of setoff against all the moneys, securities and other property belonging to Correspondent in the possession or control of Correspondent or a financial intermediary for the account of Correspondent and authorizes Clearing Broker to perfect such security interest by giving notice thereof to such financial intermediary. In the event Clearing Broker has a claim against Correspondent or against any Account or Customer which has not been promptly paid, Clearing Broker shall have the right to satisfy the claim by liquidating any securities or other property (or buying in to cover any short position) and withdrawing the amount, in any order, from the following: (i) the relevant Account; (ii) the Payment Account; (iii) the Deposit Account; and (iv) other securities, cash, and property held by Clearing Broker for the Account, Customer or Correspondent. Clearing Broker shall notify Correspondent of any such liquidations and withdrawals. If Clearing Broker shall have any claim against Correspondent or Customers which has not been resolved within five (5) business days after Clearing Broker presents such claim to Correspondent; or (ii) if Clearing Broker shall suffer any loss or incur any expense for which it is entitled to be indemnified pursuant to this Agreement, and Correspondent shall fail to make such indemnification within five (5) business days after being requested to do so, Clearing Broker may deduct the amount of such claim, loss, or expense from any account of Correspondent that is held by Clearing Broker. Clearing Broker may withdraw cash or securities (or both) having a market value equal to the amount of such claimed deficiency. If those funds are withdrawn from the Deposit Account, then Correspondent shall be obligated to make an immediate deposit in the Deposit Account of cash or securities sufficient to bring the Deposit Account back to a value of at least the amount required below on the signature page of this Agreement.

**6.5     Disposition upon Termination.** Within thirty (30) Calendar days of termination of this Agreement, which, for Broker's net capital purposes such 30 Calendar day period shall commence five (5) Calendar days after the date of the initial transfer of Broker's customer accounts out of Clearing Broker after termination, Clearing Broker shall pay and deliver to Correspondent, the funds and securities in the Deposit Account, less any amounts to which it is entitled under this Section; provided, however, that Clearing Broker may: (i) retain the entire Deposit Account for such period of time until transfer of all Accounts has been completed and (ii) retain in the Deposit Account such amount for such period as it deems appropriate for its protection from any claim or proceeding of any type, then pending or threatened, until the final determination of such claim or proceeding is made. If a threatened claim or proceeding is not resolved or if a legal action or proceeding is not instituted within a reasonable time after the termination of this Agreement, any

amount retained with respect to such claim, proceeding, or action shall be paid or delivered to Correspondent.

**Section 7. Removed**

**Section 8. Fees**

**8.1    Deduction of and Change in Fees.**  Clearing Broker shall charge Correspondent, and Correspondent shall pay Clearing Broker, the fees set forth in the attached Fee Schedule, Schedule A. As compensation for Services, Clearing Broker shall deduct from the commissions, mark-up, mark-down, or fees charged to Customers, the amounts set forth in the fully-disclosed pricing schedule attached hereto as Schedule A.  Clearing Broker shall deduct the fees and all other sums Correspondent owes to Clearing Broker from the Payment Account, the Deposit Account or any other money or property of Correspondent held by or in the possession and control of Clearing Broker. After the deduction of fees and charges, Clearing Broker shall pay the balance in the Payment Account to the Correspondent within ten (10) business days after the final settlement date of each month.  In the event that the Payment Account balance is insufficient to cover the balance due the Clearing Broker then Correspondent will settle the balance due within ten (10) business days. Upon sixty (60) calendar days' written notice, Clearing Broker may amend the Fee Schedule at any time to add new or expanded Services at prices contained within a notice to Correspondent. Correspondent agrees to pay Clearing Broker the fees and charges described in Schedule A hereto. Except for the first six months after the Effective Date of this Agreement, Clearing Broker may amend the Fee Schedule to increase the fees by sending notice to the Correspondent's duly authorized person. Notwithstanding the foregoing, Correspondent may instruct Clearing Broker to pass through such fees to Customers.  Correspondent further agrees to notify its customers of all fees and charges in accordance with the Applicable Rules.  Clearing Broker shall charge Customers the commission, markup, and any other charge or expense that Correspondent instructs Clearing Broker to charge for each transaction.  If instructions are not received with respect to a transaction in the time period required by Clearing Broker to implement those instructions, Clearing Broker shall charge the Customer the commission, markup, or other charge or expense prescribed in the basic commission schedule delivered to Clearing Broker by Correspondent.  This basic schedule may be amended from time to time by Broker by written instructions delivered to Clearing Broker. Clearing Broker shall only be required to implement such amendments to the basic schedule to the extent such amendments are within the usual capabilities of Clearing Broker's data processing and operations systems and only within such reasonable time limitations as Clearing Broker may deem necessary to avoid disruption of its normal operating capabilities.

> **8.1.1 Penalties.** Each month that Correspondent shall be in breach of any of its obligations under Section 3 of this agreement (including, without limitation, under Sections 3.18-3.19) during any portion of the month, Correspondent shall be assessed a penalty fee equal to 25% of its monthly charges for such month.  This provision shall be a non-exclusive remedy of Clearing Broker, and nothing herein shall be construed to limit Clearing Broker's rights contained elsewhere in this Agreement relative to a breach of any such provisions, including termination of this Agreement.

**8.2 Additional Consideration.** As additional consideration for performing the Services, Clearing Broker shall be entitled to retain the benefit of utilizing the funds and securities in the

Accounts and of carrying Account Debits. Except as otherwise agreed by the parties, no interest shall be paid or credit given for any credit balances which may be left on deposit with Clearing Broker. Interest income earned through charges on Account Debits in any Account shall be proprietary to and fully retained by Clearing Broker. Clearing Broker shall bear the costs of any Margin to effect stock borrows.

### Section 9. Indemnification

**9.1 Indemnity.** Each party shall indemnify and hold harmless the other, and its controlling persons, officers, directors, agents, servants and employees (the **"Indemnified Party"**), from and against costs, losses, claims, liabilities, fines, penalties, damages and expenses (including reasonable attorney and accountant fees) (individually, a **"Claim"**, collectively, the **"Claims"**) arising out of or resulting from any actual or alleged breach of this Agreement, the enforcement of this Agreement, or any failure or omission to fully carry out any duties or obligations under this Agreement by the indemnifying party or any breach of any representation or warranty herein, as set forth in this Section 9; provided, however, that Clearing Broker shall be liable to indemnify Correspondent only in the event a Claim is the direct result of Clearing Broker's willful misconduct or negligence. In no event will Clearing Broker be responsible to any person for indirect, incidental, consequential or any similar damages, economic loss or lost profits arising out of any action or inaction by it, regardless of any notice.

**9.1.1 Correspondent Indemnification.** In addition to any other obligations it may possess under other provisions of this Agreement, Correspondent shall indemnify and hold harmless Clearing Broker, and any controlling person, officer, employee, director, manager, agent or other affiliate of Clearing Broker, from and against Claims (including fees and costs incurred in enforcing Clearing Broker's right to indemnification) in connection therewith arising out of any of the following:

a. Negligent Acts or Omissions. Any act or omission of negligence, fraud, dishonest or criminal act by Correspondent or any of its employees, agents, consultants;

b. Failure to Make Payment or Deliver Securities. A failure by Customer to make payment or deliver securities. A check received by Clearing Broker from a customer shall not constitute payment until it has been paid and the proceeds are actually received and finally credited to Clearing Broker (without any subsequent charge back) by its bank;

c. Margin Calls. Failure of a Customer to meet any initial margin call or any maintenance call, except that Clearing Broker shall be responsible for the portion of any such loss or damage that Correspondent establishes was directly attributable to Clearing Broker's failure to give notification to Correspondent as required by the Applicable Rules;

d. Broker's Failure to Perform. Failure of Correspondent to perform any duty, obligation, or responsibility with respect to Customers as set forth in this Agreement. Correspondent's indemnification obligation under this Section shall

not be affected by the participation of Clearing Broker or any person controlling it or controlled by it within the meaning of the Exchange Act, in any transaction giving rise to such an obligation, unless such participation constitutes recklessness, fraud, or criminal conduct;

e. Failure of a Customer to Perform Obligations. Any failure by any of Customers to perform any commitment or obligation with respect to a transaction carried by Clearing Broker under this Agreement, whether or not such failure was under the control of Correspondent;

f. Customer Claims and Disputes. Any claim or dispute between Correspondent and a Customer with respect to services provided under this Agreement, including, but not limited to, any claim or dispute concerning the validity of a Customer order in the form the order was transmitted to Clearing Broker by Correspondent and any claim arising in connection with Clearing Broker's guarantee of any signature of any Customer of Correspondent or at the request of Correspondent;

g. Warranties. Any adverse claim with respect to any security delivered or cleared by Clearing Broker, including a claim of a defect in title with respect to securities that are alleged to have been forged, counterfeited, raised or otherwise altered, or if they are alleged to have been lost or stolen. The parties agree that Clearing Broker shall be deemed to be an intermediary between Correspondent and Customer and shall be deemed to make no warranties other than as provided in Section 8-306(3) of the Uniform Commercial Code;

h. Default of Third-Party Broker. Any default by a third-party broker with whom the Correspondent deals on a principal or agency basis in a transaction either not executed by Clearing Broker or not cleared by Clearing Broker even if permitted by Clearing Broker as provided herein;

i. Check Signing. Any negligence, fraud, malfeasance, or error of any employee of Correspondent with respect to the use of any check-signing authority;

j. Prior Self-Clearing Arrangements. Any guarantee, indemnification, or hold harmless agreement in connection with Correspondent's business or Customers that Clearing Broker may provide to the National Securities Clearing Corporation, the Depository Trust Company, or any other clearing, depository, or self-regulatory organization with respect to transactions self-cleared by Correspondent prior to transfer of such functions to Clearing Broker;

k. Breach of Warranty by Broker. Any material breach by Correspondent of any representation or warranty made by it under this Agreement;

l. Deposit of Checks to Accounts. Any failure to exercise due diligence in reviewing checks received from Customers to ensure that same are in proper form, or in the issuance of instructions to Clearing Broker regarding the accounts into which checks are to be deposited;

m. Infringement of Intellectual Property Rights.  Any act or omission of Correspondent, its agents, employees or customers which infringes on any patent, trade secret, copyright, trademark, or other intellectual property rights;

n. Misuse of Passwords and Unauthorized Access.  The misuse, loss or unauthorized access to the systems and software products using the identification devices provided to Correspondent or its Customers;

o. Use of Customer Data by Correspondent's Vendors.  The transmission of Customer data to Correspondent's designated third party vendors, the access to such data or, the use or misuse of such data, including but not limited to an actual or suspected breach of Customer data by such third party vendor; or

p. Costs and Expenses of Responding to Requests and Legal Processing. Any and all costs and expenses, including legal fees, incurred by Clearing Broker in connection with or arising out of a subpoena, garnishment, lien, levy, attachment, inquiry, or other legal process concerning Correspondent or any of its employees or Customers.

Regarding the above items, (a) through (p), Correspondent will institute defense against any Claims at the sole expense of Correspondent and using mutually agreed upon counsel.  Correspondent will enter into joint defense agreement and provide Clearing Broker all information relating to the defense of such Claims, and Correspondent shall not agree to any settlement without the written consent of Clearing Broker, which consent will not be unreasonably withheld.  Notwithstanding the foregoing, Clearing Broker will have the right to assume the defense of such Claims at the sole expense of Correspondent, however, Clearing Broker shall not settle any Claims without consent of Correspondent, which consent shall not be unreasonably withheld.

**9.2 Notice of Claim.** The Indemnified Party shall give prompt notice of a Claim (the "**Notice of Claim**") to the indemnifying party and, when known, the facts forming the basis for the Claim, and the indemnifying party shall promptly pay such Claim. If a Claim involves any claim or demand by a third party, the indemnifying party shall be entitled (without prejudice to the right of any Indemnified Party to participate at its own expense through counsel of its own choosing) to defend or prosecute such a Claim at its expense and through counsel of its own choosing, if it gives written notice to the Indemnified Party within ten (10) calendar days after the Notice of Claim is given. If the indemnifying party has assumed the defense of a Claim, the Indemnified Party shall not settle or compromise such Claim without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld; provided, however, that an Indemnified Party may settle or compromise any Claim without such consent if the Indemnified Party does not seek indemnification therefore.

**9.3 Payment of Expenses.** The indemnifying party shall promptly pay the expenses of an Indemnified Party on a continuing basis in defending against a Claim. All such proper expenses not paid within thirty (30) days after an invoice is rendered therefore shall bear interest at a rate equal to the average interest rate charged by Correspondent to its Customers for a similar margin debit balance.

Page 30 of 39

**9.4 Claims Not Covered.** Clearing Broker shall not be responsible or liable for any Claim or damages arising out of or caused, directly or indirectly, by a failure to perform, or delay in performance of any obligations under this Agreement not caused by gross negligence or caused by circumstances beyond Clearing Broker's reasonable control, including, without limitation: (i) acts of God; (ii) interruption, unauthorized entry into, delay in, loss (partial or complete) of computer hardware or software, data processing system, market data system, order entry system, public utility, telecommunication service or communication network used by Clearing Broker, whether or not owned by Clearing Broker, (iii) act of civil or military authority; (iv) sabotage, riot, natural emergency, epidemic, war, government action, civil disturbance, explosion, earthquake, flood, fire or other catastrophe; (v) strike or other labor disturbance; (vi) Exchange, FINRA or government order, rule or regulation; (vii) energy or natural resource difficulty or shortage; and (viii) inability to obtain materials, equipment or transportation.   Clearing Broker shall not be liable to Correspondent or its Customers for any loss, liability, claim, damage or expense resulting, either directly or indirectly, from any communications network, data processing system, or computer system which Clearing Broker uses or which is used by Correspondent, whether Clearing Broker owns it or not, being rendered inoperable in whole or in part, or from any error or delay in any such network or system.

**9.5   Survival.** The indemnification provisions of this Agreement shall remain operative and in full force and effect, regardless of the termination of this Agreement, and shall survive any such termination.

**Section 10. Effectiveness, Term, Exclusivity, and Termination.**

**10.1   Effectiveness, Term and Exclusivity.**

   a. **Effective Date of Agreement:**  Subject to approval of FINRA or any other self-regulatory organization or entity as may be required under the Applicable Rules, this Agreement shall be effective as of the date written below on the signature page of this Agreement, including all applicable Termination Fees (the **"Effective Date"**).

   b. **Start of Services Under the Agreement:** The provision of Services under the Agreement and accompanying fees, as detailed on Schedule A, shall commence on the earlier of either: (i) Correspondent being approved for trading by Clearing Broker, or (ii) Correspondent's first trade date (hereinafter, the **"Start of Services Date"**).

   c. **Exclusivity of Agreement:** The clearing relationship defined by this Agreement will be exclusive to Clearing Broker or its successors. The Correspondent will not be permitted to engage in additional securities clearing relationships without the prior written consent of Clearing Broker or its successors.

   d. **Term of Services Under the Agreement:** Commencing with the Start of Services Date, the Clearing Broker and Correspondent's exclusive clearing relationship shall have an initial term of eighty-four (84) months (the **"Initial Term"**), unless and until terminated as hereinafter provided in this Section 10.  This Agreement will automatically renew for one year, at the end of the Initial Term and each renewal term (each, a **"Renewal Term"**), unless Correspondent delivers to Clearing Broker at least ninety (90) calendar days written notice of non-renewal as stated in Section 10.2.

**10.2  Termination Notice.** Subject to the terms and conditions of this Agreement, this Agreement may be terminated without cause by either party at least ninety (90) calendar days prior to the expiration of the Initial Term or any Renewal Term of the Agreement by written notice to the other party. In the event Correspondent terminates this Agreement, Correspondent shall pay the following: (i) the reasonable expenses of Clearing Broker in connection with transferring, converting or closing the Accounts, (ii) for the period between the termination notice and the date of termination (the "**Termination Date**"), 125% of the amounts otherwise owed in the fee schedule due to the enhanced regulatory and financial risks to the Clearing Broker during this lame-duck period.

**10.3  Termination upon Default.** In the event either party defaults in the performance of their respective obligations under this Agreement, the non-defaulting party may terminate this Agreement by delivering written notice to the defaulting party specifying the nature of such default and notifying the defaulting party that the default must be cured within the following thirty (30) calendar days. At the request of the Clearing Broker, the claim of default shall be submitted to an arbitrator to determine whether a default has occurred. If there is an arbitration, if the arbitrator finds there has been a default and, whether or not there is an arbitration, the defaulting party fails to cure the default within the prescribed 30-day period, the Agreement shall be deemed terminated forthwith upon receipt of a final termination notice by the non-defaulting party.

**10.4  Immediate Termination.** Notwithstanding the above, this Agreement may be deemed terminated immediately without notice and with cause, as follows:

(A) in the event Correspondent or its holding company or subsidiary or other affiliate shall: (i) become or be declared insolvent; (ii) voluntarily file or be the subject of a petition commencing a case under any chapter of Title 11 of the United States Code; (iii) make a general assignment for the benefit of its creditors; (iv) admit in writing its inability to pay its debts as they mature or fail to pay a debt as it comes due; (v) file an application or consent to the appointment of, or there is appointed, any receiver, or a permanent or interim trustee of that party or any of its subsidiaries, as the case may be, or all or any portion of its property, including, without limitation, the appointment or authorization of a trustee, receiver or agent under applicable law or under a contract to take charge of its property for the purpose of enforcing a lien against such property or for the purpose of general administration of such property for the benefit of its creditors; (vi) file a petition seeking a reorganization of its financial affairs or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute or file an answer admitting the material allegations of a petition filed against it in any proceeding under any such law or statute; or

(B) in the event that Correspondent: (i) is enjoined, disabled, suspended, prohibited, or otherwise becomes unable to engage in the securities business or any part of it by operation of law or as a result of any administrative or judicial proceeding or action by the SEC, any state securities law administrator, or any regulatory or self-regulatory organization having jurisdiction over such party; (ii) any senior officer or director of Correspondent or affiliate is arrested or charged in connection with any securities, banking, financial, investment management or similar crime, capital offense or with any fraud or subjects to any material civil penalties or is barred from working for a broker-

dealer; (iii) sells or enters into negotiations to sell all or substantially all of its assets or its firm without providing prior written notice to Clearing Broker; (iv) maintains, after demand by Clearing Broker on ten (10 days' notice) net capital, Minimum Balance or Deposit Account requirements to be less than the amounts deemed reasonable by Clearing Broker as defined in this agreement; (v) causes the occurrence of any condition or event that, in the reasonable judgment of Clearing Broker, will have a material adverse effect on Correspondent's ability to conduct  Correspondent's business, or Clearing Broker deems itself insecure with respect to  Correspondent's ability to perform Correspondent's obligations under this Agreement or to comply with Applicable Rules; (vi) conducts or participates in any activity, transaction, or conduct which in Clearing Broker's reasonable business judgment, may present a material adverse impact or reflection upon Clearing Broker's reputation; (vii) receives a determination from Clearing Broker that any statement, representation, warranty or covenant made herein or any document provided in connection with this Agreement shall be, or was at the time made false or misleading in any material respect, (viii) fails to follow reasonably and materially Clearing Broker's instructions, (ix) issues a termination notice pursuant to Section 10 which falsely or strategically alleges an Event of Default.  For avoidance of doubt, termination under Section 10.4 (A) or 10.4(B)(i), (iii), (iv) and (ix) shall not relieve Correspondent of its obligation to pay any termination fee hereunder.

**10.5 Termination or Limitations of Services by Clearing Broker.** Clearing Broker may terminate this Agreement at any time upon notice to Correspondent in the event Clearing Broker determines, in its sole discretion, that: (i) there has been a material adverse change in the financial condition, results of operations of Correspondent or business profile; (ii) there has been a material adverse change in the creditworthiness of Correspondent; (iii) the SEC, the FINRA or other regulatory body have provided notice or, in its sole discretion, Clearing Broker has determined that continuing one or more Services to Correspondent would result in a violation of any Applicable Rule or increased regulatory or financial risks to the Clearing Broker, or (iv) it has or may have Claims arising out of a breach of the obligations of the Correspondent under this Agreement, including, without limitations, those under Sections 3 and 8 hereof, in excess of ninety percent (90%) of the aggregate balances in the Payment Account and Deposit Account. Clearing Broker may, at its sole discretion, choose to limit the availability of the Services so as to enable Clearing Broker to limit its exposure to any risks posed to Clearing Broker by the Accounts. Such limitations on Services may include, but are not limited to: 1) the refusal by Clearing Broker to accept additional orders for any Accounts or restricting orders to liquidating orders only; 2) the refusal to take or make delivery on one or more Transactions or to finance such Transactions; 3) the termination of Clearing Broker's relationship with any Accounts; or 4) the imposition by Clearing Broker of higher Margin requirements in any or all Accounts. Any determination by Clearing Broker not to terminate this Agreement pursuant to this Section 10 shall not act as a waiver of Clearing Broker's rights hereunder.

**10.6 Effect of Termination.** Any termination of this Agreement shall not release Clearing Broker or Correspondent from any liability or responsibility to the other with respect to transactions effected prior to the Termination Date, whether or not claims relating to such transactions shall have been made before or after the termination.

**10.7 Termination Fee.** If, for any reason, Correspondent terminates this Agreement or, as a result of Correspondent's actions, Clearing Broker elects to terminate this Agreement pursuant to Section 10.4 or 10.5, then Correspondent shall pay certain fees to Clearing Broker. The fees are to include but not be limited to: (a) the termination fee (the **"Termination Fee"**) as liquidated damages, and not as a penalty, (the termination fee is the monthly fees due on the remaining term of the Agreement (the greater of the stated monthly minimum or a monthly fee equal to the average monthly fees incurred the trailing twelve (12) months)); (b) the expenses of Clearing Broker in connection with transferring, converting or closing the Accounts and (c) 125% of the fee schedule (including minimum monthly fee) from the time between the termination notice to the Termination Date or completing the transfer out, whichever comes first. Other fees payable may be noted in Schedule A.

In the event that Correspondent is the subject of the issuance of a protective decree pursuant to the Securities Investor Protection Act of 1970 (15 USC 78aaa-III), Clearing Broker's claim for payment of the Termination Fee under this Agreement shall be subordinate to claims of Correspondent's customers that have been approved by the trustee appointed by the SIPC pursuant to the issuance of such protective decree.

**10.8 Conversion of Accounts.** In the event that this Agreement is terminated for any reason, Correspondent shall arrange for the conversion of the Accounts to another clearing broker or to Correspondent if it becomes self-clearing. Correspondent shall give Clearing Broker Notice (the **"Conversion Notice"**) of: (i) the name of the broker that will assume responsibility for clearing services for the Accounts; (ii) the date on which such broker will commence providing such services; (iii) Correspondent's undertaking, in form and substance satisfactory to Clearing Broker, that Correspondent's agreement with such clearing broker provides that such clearing broker will accept on conversion all Accounts then maintained by Clearing Broker; and (iv) the name of an individual or individuals within new clearing broker's organization whom Clearing Broker may contact to coordinate the conversion. The Conversion Notice shall accompany Correspondent's notice of termination given pursuant to this Paragraph. If Correspondent fails to give Conversion Notice to Clearing Broker, Clearing Broker may notify Correspondent's Customers as Clearing Broker deems appropriate of the terms of this Agreement and may make such arrangements as Clearing Broker deems appropriate for the transfer or delivery of the Accounts. The expense of notifying those Customers and making such arrangements shall be charged to Correspondent.

In the event that Clearing Broker is required to make arrangements to move the introduced accounts in connection with a termination or failure of the Correspondent, Clearing Broker will only do so with the required regulatory approvals, if and where applicable. Failure to move 100% of the Correspondent's accounts upon termination will subject Correspondent to ongoing and additional fees, and no portion of the Correspondent's Security Deposit shall be released until the transfer of all Correspondent accounts is complete.

**Section 11.  Dispute Resolution.**

**11.1 Dispute Resolution and Waiver of FINRA Arbitration.** THE PARTIES IRREVOCABLY CONSENT AND SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN CONNECTION WITH ANY DISPUTE OR CONTROVERSY BETWEEN CORRESPONDENT

Page 34 of 39

AND CLEARING BROKER RELATING TO OR ARISING OUT OF OR RELATED IN ANY
WAY TO THIS AGREEMENT, AND WAIVE ANY OBJECTION TO VENUE IN SUCH
DISTRICT.

IN THE EVENT THAT THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF NEW YORK LACKS JURISDICTION WITH RESPECT TO SUCH DISPUTE,
THE PARTIES IRREVOCABLY CONSENT TO THE JURISDICTION OF ANY UNITED
STATES DISTRICT COURT HAVING JURISDICTION IN CONNECTION WITH SUCH
DISPUTE, AND WAIVE ANY OBJECTION TO VENUE IN SUCH DISTRICT.

IN THE EVENT THAT NO FEDERAL COURT HAS JURISDICTION WITH RESPECT TO
SUCH DISPUTE, THE PARTIES IRREVOCABLY CONSENT TO THE JURISDICTION OF
THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY IN
CONNECTION WITH SUCH DISPUTE AND WAIVE ANY OBJECTION TO VENUE IN THE
COUNTY OF NEW YORK.

THE PARTIES AGREE TO WAIVE ANY RIGHT TO SEEK ARBITRATION UNDER THE
FINRA RULES, INCLUDING RULE 13000 ET SEQ., OF ANY DISPUTE OR
CONTROVERSY BETWEEN CORRESPONDENT AND CLEARING BROKER RELATING
TO OR ARISING OUT OF OR RELATED IN ANY WAY TO THIS AGREEMENT.

**11.2  Waiver of Jury Trial and Class or Collective Actions.**  THE PARTIES AGREE TO
WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR
PROCEEDING RELATING TO THIS AGREEMENT.

EACH PARTY FURTHER AGREES THAT IT WILL NOT BRING ANY CLASS OR
COLLECTIVE ACTION AGAINST THE OTHER PARTY IN ANY FORUM, NOR JOIN ANY
CLASS OR COLLECTIVE ACTION BROUGHT AGAINST THE OTHER PARTY IN ANY
FORUM.

**11.3  Attorneys' Fees and Costs.**  THE PARTIES AGREE THAT IN THE EVENT A
PARTY MUST MOVE A COURT OR OTHER AUTHORITY TO COMPEL THE OTHER
PARTY'S COMPLIANCE WITH SECTIONS 11.1 AND 11.2 OF THIS AGREEMENT, THE
NON-MOVING PARTY SHALL BE RESPONSIBLE FOR ALL ATTORNEYS' FEES AND
COSTS INCURRED BY THE MOVING PARTY IN SEEKING SUCH RELIEF.

**11.4  Injunctive Relief.**  In the event of a breach or threatened breach of any of the provisions
of this Agreement by Correspondent or any employee or representative of Correspondent,
Correspondent acknowledges that Clearing Broker shall be entitled to seek preliminary and
permanent injunctive relief to enforce the provisions hereof.  In addition, Correspondent
acknowledges that a breach of the terms regarding confidentiality of information and ownership
of Clearing Broker's intellectual property would cause irreparable and incalculable damage to
Clearing Broker.  Nothing herein shall preclude the parties from pursuing any other remedy for
any breach or threatened breach of this Agreement, all of which shall be cumulative.

### Section 12. General Provisions

**12.1  Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws applicable to contracts made and to be performed within the State of New York.

**FOR THE AVOIDANCE OF DOUBT, THE CONSTRUCTION AND EFFECT OF EVERY PROVISION OF THIS AGREEMENT, THE RIGHTS OF THE PARTIES HEREUNDER, AND ANY QUESTIONS OR MATTERS ARISING OUT OF THE AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THEREOF.**

**12.2  Invalid Provisions.** To the extent any provision of this Agreement is inconsistent with or in violation of an Applicable Rule, that provision shall be deemed deleted as part of this Agreement and shall not otherwise affect any other provision of this Agreement. The parties shall use their best efforts to agree upon a valid and enforceable provision which shall be a reasonable substitute for such deleted provision in light of the tenor of this Agreement. Any provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, with respect      to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of that provision in any other jurisdiction.

**12.3  Notices.** Notices shall be in writing delivered to the party at the address set forth herein or such other address as each shall designate to the other and shall be deemed given when mailed by first class mail or courier, or by facsimile or email transmission.

**12.4  Assignment.** This Agreement shall be binding upon all successors, assigns or transferees of Clearing Broker or Correspondent, irrespective of any change with regard to the name, or the personnel, or the ownership of Clearing Broker or Correspondent. Any assignment of this Agreement shall be subject to the requisite review, approval and consent of any regulatory or self-regulatory agency or body whose review, approval and consent must be obtained prior to the effectiveness and validity of such assignment. No assignment of this Agreement by Correspondent shall be valid unless Clearing Broker consents to such an assignment in writing. Clearing Broker may assign this Agreement to any party that can provide the services agreed to hereunder without the consent of Correspondent.

**12.5  Amendments.** This Agreement represents the entire Agreement between the parties with respect to the subject matter contained herein. This Agreement may not be changed orally but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. This Agreement represents the entire agreement among the parties, and supersedes all prior agreements and understandings with respect to the subject matter contained herein. The waiver or failure to act by a party with respect to a breach by the other party of any provision of this Agreement shall not constitute a waiver of any subsequent breaches of that or any other provisions of this Agreement and shall not constitute an amendment of this Agreement.

**12.6  No Presumption.** Each party acknowledges and agrees that each has had the opportunity

through legal counsel to participate, and has participated, in the negotiation of the terms of this Agreement and drafting the language incorporating such terms into this Agreement. In the event that any ambiguity or question or intent, construction or interpretation of this Agreement arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of his role or participation in negotiating the terms of this Agreement or drafting any of the provisions of this Agreement.

**12.7 Headings.** The headings contained in this Agreement are for convenience only and shall not be deemed to be a part of the Agreement, or affect the meaning or interpretation of any provision of this Agreement.

**12.8 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement.

**12.9 Beneficiaries.** The imposition or allocation of any burden or duty on or to one or the other party by this Agreement does not and is not intended to impose or create any burden, right or duty in favor of or for the benefit of any person or entity not a party to this Agreement.

**12.10 Non-Solicitation of Employees.** During the term of this Agreement and for a period of three (3) years after its termination, unless approved in advance by the other Party, both Parties agree to refrain from directly or indirectly soliciting, or causing to be solicited, any employee of the other Party, or any affiliated entity or entities, for the purpose of inducing such person to become employed by or associated with soliciting Party or any affiliated entity in any capacity. Any breach of this Section shall be deemed a default entitling the other Party to terminate this Agreement pursuant to Section 10.3 above. In such event, the Soliciting Party shall pay the reasonable out-of-pocket expenses of the other Party in connection with converting and/or closing the Accounts.

**12.11 Insurance.** Correspondent agrees to maintain, and to provide Clearing Broker with written evidence (in the form of an insurance certificate) thereof, of a Financial Institution Bond for Broker-Dealers (Fidelity Bond), Standard Form No. 14, or its equivalent,

> (a) in the amount of the greater of (i) $250,000.00 and (ii) 3% of margin balances plus $75 per account covering any and all losses directly from any dishonest or fraudulent acts and/or omissions of Correspondent's employees and agents, and

> (b) issued by an insurance company with an A.M. Best rating of no less than A-.

**12.12 Citations.** Any reference to the rules or regulations of the SEC, FINRA, Exchange or any other regulatory or self-regulatory organization are current citations. Any changes in the citations (whether or not there are any changes in the text of such rules or regulations) shall be automatically incorporated herein.

**12.13 Audio Taping of Telephone Conversations.** Correspondent understands that for quality control, dispute resolution or other business purposes, the Clearing Broker may record some or all telephone conversations between them. Each party hereby consents to such recording and will inform its employees, representatives and agents of this practice. It is further understood

that all such conversations are deemed to be solely for business purposes.

**12.14    Business Continuity**. Each party agrees to maintain a written business continuity plan identifying procedures relating to an emergency or significant business disruption in accordance with Applicable Rules.

**12.15    Clearing Broker's Right to Compete**. Nothing in this Agreement shall be deemed to restrict Clearing Broker or affiliates, in any way or manner, from competing with Correspondent in any or all aspects of Correspondent's business or from offering substantially similar products, services, technology solutions or software as that offered by Correspondent.

**12.16    Restriction on Advertising**. Neither Clearing Broker nor Broker shall utilize the name of the other in any way without the other's prior written consent except to disclose the relationship between the parties. Neither party shall employ the other's name in such a manner as to create the impression that the relationship between them is anything other than that of clearing broker and introducing broker. Broker shall not hold itself out as an agent of Clearing Broker or as a subsidiary or company controlled directly or indirectly by or affiliated with Clearing Broker, except as provided in this Section.

**12.17    Credit Reports.** Clearing Broker shall have the right to investigate, or arrange for an appropriate party to investigate, Correspondent's credit; provided, however, that Correspondent may make a written request for disclosure of the nature of such investigation within a reasonable time. Nothing in this paragraph shall be construed to relieve Correspondent of its obligation to oversee its financial integrity.

**12.18    Survival**. Termination of this Agreement in any manner shall not release Correspondent from any liability or responsibility with respect to any representation or warranty or transaction effected on the books of Clearing Broker.  Section 5.5 (Confidentiality) and Section 9 (Indemnification) shall survive termination of this Agreement.

BOTH PARTIES HERETO REPRESENT THAT THEY HAVE READ THIS AGREEMENT, UNDERSTAND IT, AGREE TO BE BOUND BY ALL TERMS AND CONDITIONS STATED HEREIN, AND ACKNOWLEDGE RECEIPT OF A SIGNED, TRUE, AND EXACT COPY OF THIS AGREEMENT.

Page 38 of 39

**IN WITNESS WHEREOF**, the parties have hereto affixed their signatures by their duly authorized officers on the date below written

**COR CLEARING LLC**

By: _Jeffrey N Sime_

Its: _President & CEO_

Signature: _[signature]_
_December 1, 2014_

**FIRST STANDARD FINANCIAL COMPANY LLC**

By: _Carmine Berardi_

Its: _CEO_

Signature: _[signature]_

Dated: _11/18/16_

Minimum Deposit Amount: See Schedule A.

Page 39 of 39

Schedule A – Fee Schedule (Attached Separately and Incorporated Herein)