## <u>SYNOPSIS OF THE MAY 2, 2018 DEPOSITION OF AMY AUSDEMORE</u>

The following is a brief synopsis of the facts to which Amy Ausdemore testified at her deposition. COR Clearing, LLC ("COR") is offering excerpts from Ausdemore's deposition, attached hereto, as substantive evidence pursuant to the Court's Individual Rules and Practice, Rule 5.C.ii.

Ausdemore is a Training Development Coordinator at COR, and she held that position at all relevant times. P. 9:24-10:5. In that role, she trains onboarding broker-dealers on how to use COR's systems and clearing platform and how to run their book of business thereon. P. 13:11-25. As discussed below, Ausdemore testified about, *inter alia*, COR's efforts in connection with the conversion process related to First Standard Financial Co., LLC ("First Standard") and COR's processes and procedures concerning the training of new broker-dealers, such as First Standard.

In anticipation of training onboarding of broker-dealers, Ausdemore typically prepares a training plan for new broker-dealers towards the end of the conversion process, which is the process by which new firms integrates onto COR's clearing platform. *Id.* She typically begins training new firms after they have completed the conversion process. *Id.* In preparation for her training, she coordinates with members of COR's Conversions Department and participates in certain aspects of the conversion process, such as attending internal weekly conversion status meetings and attending conference calls with the new firms. P. 13:11-15, 19:11-25, 26:6-16, 29:22-25.

Ausdemore was involved in the conversion process in connection with First Standard Financial Co., LLC ("First Standard"), and attended meetings and conference calls related thereto, starting in December 2016. P. 22:4-23:13, 28:18-29:25. In February 2017, she learned that First Standard's conversion was put on hold and that First Standard was no longer going through with the conversion process. P. 35:23-36:2, 38:6-13, 42:22-43:8. She was not able to complete her training program or begin training First Standard because it failed to cooperate with COR during the conversion process by putting the process on hold. P. 46:20-25, 60:15-61:11.

COR was prepared to finalize and effectuate the conversion process in connection with First Standard, but due to First Standard's lack of cooperation, COR was prevented from completing the process. P. 60:15-61:11.

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 1:17-cv-02190(PAE)

x ----------------------------- x

COR CLEARING,

              Plaintiff,                DEPOSITION

              -v-                      OF:

FIRST STANDARD FINANCIAL         AMY AUSDEMORE

CO., L.L.C.,

              Defendants.

x ----------------------------- x


T R A N S C R I P T  of the stenographic notes of
the video-conference deposition of AMY AUSDEMORE
in the above-entitled matter as taken by and
before DEBRA-ANN BALSAMO, a Certified Shorthand
Reporter and Notary Public of New Jersey, at the
offices of SCARINCI & HOLLENBECK, L.L.C., One
River Centre, 331 Newman Springs Road, Building 3,
Suite 310, Red Bank, New Jersey on Wednesday, May
2, 2018 commencing at 9:15 in the forenoon.



Page 2

```
 1
 2
 3
 4
 5
 6              A P P E A R A N C E S
 7
 8
 9   ANDERSON KILL, P.C.
     BY:  JEREMY E. DEUTSCH, ESQ.,
10        1251 Avenue of the Americas
          New York, New York 10020
11   Attorneys for Plaintiff
12
     SCARINCI & HOLLENBECK, L.L.C.
13   BY:  PAUL A. LIEBERMAN, ESQ.,
          One River Centre
14        331 Newman Springs Road
          Building 3, Suite 310
15        Red Bank, New Jersey 07701
     Attorneys for Defendant
16
17
18
19
20
21
22
23
24
25
```



Page 3

```
 1

 2

 3

 4                         INDEX

 5

    WITNESS              DIRECT   CROSS   REDIR

 6

 7  AMY AUSDEMORE

       By Mr. Lieberman    4              64

 8     By Mr. Deutsch            60

 9

10

11

           EXHIBITS MARKED FOR IDENTIFICATION

12

    EXHIBIT          DESCRIPTION          PAGE

13

                  NOTHING MARKED

14

15

16

17

18                 REQUESTS MADE

19

20  PAGE                          LINE

21    49                          23

22

23

24

25
```



Page 4

1  A M Y   A U S D E M O R E, residing at 27566 Magnolia

   Road, Underwood, Iowa 51576, being first duly sworn,

2  testified as follows:

3

4  DIRECT EXAMINATION BY MR. LIEBERMAN:

5        Q.      Good morning, Miss Ausdemore.  Is it

6  Ausdemore.  Can you pronounce your last name?

7  A.          Ausdemore.

8        Q.      Ausdemore?

9  A.          Yes.  Perfect.

10       Q.      Thank you.  My name is Paul Lieberman.

11 I'm a partner in the securities and regulatory

12 practice and litigation groups of Scarinci and

13 Hollenbeck.  My firm represents First Standard and its

14 officers and employees in the defense of the lawsuit

15 that has been initiated by COR.  COR's lawyer and I

16 have coordinated on the scheduling of depositions.

17 I'm sure you're familiar with those communications.

18 Have you ever been deposed before in any manner?

19 A.          No, I have not.

20       Q.      Okay.  Have you ever testified as a

21 witness in a regulatory proceeding; SCC, FINRA?

22 A.          No, I have not.

23       Q.      I'm going to provide some ground rules

24 for our testimony today so you can get a sense of how

25 we're going to work out the process.  You're under



1                    MR. LIEBERMAN:  Okay.

2          Q.     Separate from the documents that you

3    received from Mr. McComb, have you spoken either

4    individually or as part of a group with other COR

5    employees about your testimony today?

6    A.          No, I have not.

7          Q.     Okay.  Have you had communications

8    separately or in a group with Mr. McComb about this

9    case?

10   A.          Just when he told me that I was being

11   deposed and that more information was coming.

12         Q.     Okay.  Did you have any conversations

13   concerning your testimony today with Mr. Hatton?

14   A.          No, I have not.

15         Q.     Mr. Hatton didn't give you any

16   information about his deposition that was conducted

17   yesterday?

18   A.          No.

19         Q.     Were you asked to provide any corporate

20   records or the records that you would normally

21   maintain in the course of your business function at

22   COR to anyone in this matter?

23   A.          No.

24         Q.     What is your current title here at COR?

25   A.          I am the trainer.  My title would be



Page 10

1    training development coordinator.

2           Q.     And how long have you been in that role?

3    A.          I've been in that role actually since the

4    beginning since I've been here with COR Clearing for

5    13 years.

6           Q.     Okay.  And prior to that, assuming that

7    function at COR approximately 13 years ago, did you

8    have prior employment?

9    A.          I did.

10          Q.     And do you recall what the next

11   preceding job was before joining COR?

12   A.          I was a client services representative.

13          Q.     For whom?

14   A.          Ameritrade.

15          Q.     Also in Nebraska?

16   A.          Correct.

17          Q.     And how long were you there?

18   A.          Six years.

19          Q.     Okay.  Was that as a client service

20   representative in a retail sales office?

21   A.          Correct.

22          Q.     Were you licensed as a sales assistant?

23   A.          I became licensed in 2003.

24          Q.     And did you have any employment prior to

25   the role at did you say TD Ameritrade?



1  A.          And I do not have any direct reports.

2          Q.     In operations, who do you report to?

3  A.          My direct report would be Darren Parsons.

4          Q.     Is he also in Nebraska?

5  A.          Correct.

6          Q.     How does the operations area in which

7  you are in integrate with the conversion coordinators,

8  Todd Hatton and Josh Mechals?

9                    MR. DEUTSCH:   Objection.   You can

10  answer the question.

11          Q.     Let me rephrase it.   Does your

12  operations area and your specific job function

13  coordinate with Todd Hatton or Josh Mechals in the

14  conversion coordination area?

15  A.          Yes, it does.

16          Q.     And how does it do that?

17  A.          Once the conversion process is complete,

18  then my role begins.

19          Q.     Okay.   What do you know as the

20  completion of the conversion process?

21  A.          Once accounts have been converted and assets

22  and balances are on our books and systems have been

23  established, then I come in as the trainer and I show

24  them how to run their book of business; how to work

25  the system.



1                       (The pending question is read

2    back by the Reporter as follows:  "Was there e-mails

3    or communications between, you know, you and your

4    department and others in the conversion coordination

5    team with respect to issues involving the First

6    Standard conversion so that you could plan your

7    schedules?")

8                       MR. LIEBERMAN:  Let me rephrase

9    that.

10                      MR. DEUTSCH:  Thank you.

11       Q.     If the First Standard actual conversion

12   date was May of 2017, would you have been engaged in

13   participating in the weekly conversion meetings as far

14   back as January of 2017?

15   A.        Yes.

16       Q.     Would it be the case that you actually

17   attended each of the Tuesday weekly conversion status

18   meetings?

19   A.        Yes.

20       Q.     Okay.  And is that because there are

21   multiple conversion clients discussed at these

22   meetings?

23   A.        I am also involved in the weekly meetings

24   for a particular firm as they are coming onto the COR

25   platform.  So I am included in those meetings.



1    your group to be working on multiple conversions at

2    the same time?

3    A.       Yes.

4            Q.      Now you also mentioned that there were

5    separate meetings.  Can I identify them as separate

6    meetings for a particular correspondent, is that what

7    you indicated?

8    A.       Correct.

9            Q.      And do you recall meetings for First

10   Standard?

11   A.       I do.

12           Q.      Do you recall how many there were?

13   A.       No, I cannot recall.

14           Q.      Do you recall when the first one

15   involving First Standard that you became aware of,

16   when that was?

17   A.       I want to say maybe back in December of

18   2016.

19           Q.      Okay.  And are those meetings with a

20   particular correspondent called something, would that

21   have been like a kickoff meeting?

22   A.       Correct.

23           Q.      Okay.  And did you participate in the

24   First Standard kickoff meeting?

25   A.       I did.



Page 23

1          Q.      What was on the menu for that day?

2     A.        Well, basically just getting started and

3     kind of an outline of what to expect.  I'm not heavily

4     involved in the meetings, but I'm there for more of a

5     meet and greet and introduction.

6          Q.      Is the actual correspondent a

7     participant in that meeting?

8     A.        They are.

9          Q.      Is it a telephonic meeting?

10    A.        It's just a conference call.

11         Q.      And who would setup the kickoff

12    conference call?

13    A.        Todd Hatton.

14         Q.      And I assume it utilizes the typical

15    meeting invites through Microsoft Office or some other

16    electronic means?

17                    MR. DEUTSCH:  Objection.

18                    MR. LIEBERMAN:  Let me rephrase

19    the question.

20         Q.      How are the invitations for the kickoff

21    conference call sent out by Mr. Hatton, if you know.

22    A.        Through e-mail.

23         Q.      Okay.

24    A.        E-mail invitations.

25         Q.      And how long are the kickoff conference



Page 26

```
 1          Q.      Okay.  Do you recall who was on the call
 2    from First Standard?
 3    A.          I think Jonathan, I don't remember the last
 4    name.  That's all I can recall.  There may have been
 5    more.
 6          Q.      Got it.  And given your knowledge and
 7    experience of COR's conversion process and your role
 8    in that process, what would be the next thing that
 9    would occur after the kickoff conference call?
10    A.          We would establish weekly meetings to
11    discuss the process and the progress of the conversion
12    and to answer any questions they have with the
13    conversion packet.  Many times the packet is sent
14    piecemeal, it's rather large, so firms, you know,
15    sometimes have questions and need a little guidance in
16    completing that packet.
17          Q.      Okay.  With respect to the conversion
18    packages and your experience in this process over the
19    past more than a decade, is it accurate to say that
20    correspondent firms have, take a lot of time in
21    completing and preparing the conversion package based
22    upon the amount of information being requested?
23                        MR. DEUTSCH:  Objection.  Go
24    ahead.
25    A.          It varies.
```



Page 28

1                          MR. DEUTSCH:   Objection.   Go

2    ahead.

3    A.          I think he has a checklist, but I don't know

4    the details of how he tracks the progress.

5          Q.     You don't receive a copy of his

6    checklist?

7    A.          I do not.

8          Q.     Okay.  But you keep your own checklist

9    for your training department's role and functions,

10   correct?

11   A.          That is correct.

12         Q.     At the weekly conversion status

13   meetings, are there references to the progress or lack

14   of progress being made on the conversion?

15                         MR. DEUTSCH:   Objection.

16                         MR. LIEBERMAN:   Let me rephrase

17   the question.

18         Q.     With respect to the weekly status

19   conversion meetings, do you attend those?

20   A.          I do.

21         Q.     Okay.  Do you receive any information

22   relating to the meeting itself, like an agenda?

23   A.          Not prior to the meetings.

24         Q.     Do you receive the agenda at the

25   meeting?



1  A.          Correct.

2          Q.     Okay.  And then could you just generally

3  describe what occurs at the weekly conversion status

4  meetings?

5  A.          Yes.  Todd and Josh will both explain where

6  we are in the process in terms of setups in the system

7  for the firm.  There's quite a bit of parameters in

8  the beta system that must be completed.  If there's

9  any deliverables from the firm, if we're waiting for

10  any information, perhaps a name and address file to

11  send out the NCL, you know, we'll touch base upon

12  certain deliverables that must be met to meet certain

13  deadlines.  And, again, it's just a matter of

14  discussing kind of where we're at in the process and

15  dates to be met, deadlines to meet.

16          Q.     Right.  Are there deadlines for the

17  correspondent firm to meet or are the deadlines for

18  COR to meet in its beta process?

19                       MR. DEUTSCH:  Objection.  Go

20  ahead.

21  A.          Both.

22          Q.     And you know that because of your

23  participation in these over the course of more than a

24  decade?

25  A.          Correct.



Page 35

1    Mr. Hatton's disclosure about the fact that everything

2    is on hold and to stand down?

3    A.          There was perhaps some speculation, you

4    know, and discussion about, you know, why the firm is

5    on hold, but I don't recall specific conversations as

6    to any additional information on that.

7          Q.     Do you recall whether or not someone had

8    identified a particular deficiency of COR's as the

9    reasons for First Standard's decision to be placed on

10   hold, for example?

11   A.          Can you repeat the question?

12        Q.     Sure.  Let me rephrase and try to make

13   it simpler.

14                Did anyone voice the view that First

15   Standard had stated they were dissatisfied with the

16   COR performance on the conversion?

17   A.          I don't recall.

18        Q.     Okay.

19                MR. DEUTSCH:  Paul, hang on one

20   second.  Now that we just got an answer out, we just

21   got bounced off the video connection so just let her

22   try to log on real quick.

23        Q.     At the time you heard Mr. Hatton's

24   disclosure, do you recall how you interpreted his

25   phrase of, quote, standing down?



1    A.          I thought that they had changed their minds

2    and determined not to see the conversion through.

3          Q.    Okay.  And do you recall whether that

4    particular disclosure came during February or March or

5    any specific time?

6    A.          I don't recall the dates.

7          Q.    Okay.  After that disclosure by Todd,

8    were there subsequent weekly conversion status

9    meetings where First Standard was still on the agenda?

10   A.          I don't believe so.

11         Q.    Is it your recollection that after that

12   disclosure by Todd, First Standard had come off the

13   weekly conversion meeting reports and agendas?

14   A.          No, I think they were still on the agenda as

15   a pending item and I believe that's when the

16   relationship manager was more involved and we were

17   pending additional information.

18         Q.    And who was the relationship manager to

19   your knowledge?

20   A.          I believe it was Roy Di Maria.

21         Q.    Did you have an understanding at the

22   time of what Mr. Di Maria's role was with respect to

23   becoming more involved in a situation with First

24   Standard?

25                    MR. DEUTSCH:  Objection.  Form.



Page 38

1   A.        I don't recall.

2        Q.     Do you recall receiving any additional

3   information in a written form from anyone in the

4   relationship management team?

5   A.        No.

6        Q.     And you don't recall receiving any

7   verbal information that was disclosed at a weekly

8   conversion status meeting?

9                     MR. DEUTSCH:  Objection.  Go

10  ahead.

11  A.        The only thing I recall was that the firm

12  decided to no longer, you know, go through with the

13  conversion to COR Clearing.

14       Q.     And your area, which is the training,

15  would not have been impacted at all by the failure to

16  complete the conversion at this point in time, is that

17  true?

18  A.        That is correct.

19       Q.     Okay.  Do you know what areas if at all

20  within COR would have been affected by a decision by

21  the correspondent not to complete the conversion?

22                     MR. DEUTSCH:  Objection.

23  Foundation and form.

24                     MR. LIEBERMAN:  I'll rephrase the

25  question.



Page 42

1    A.          I'm sorry, could you repeat that one more

2    time.  I'm sorry.

3             Q.      That's alright.  No worries.

4                     (The pending question is read

5    back by the Reporter as follows:  "Okay.  Do you

6    recall in connection with the written materials about

7    the weekly conversion status meetings any additional

8    information concerning the reasons why First Standard

9    has decided not to proceed with the conversion?"

10   A.          I do not recall anything written.

11            Q.      Do you recall receiving any verbal

12   communications from anyone on the conversion team

13   providing additional information as you've described,

14   I took your description to mean that someone within

15   relationship management was tasked with the objective

16   of getting some additional information about the

17   reasons why First Standard was not proceeding.  Do I

18   have that right?

19                    MR. DEUTSCH:  Objection.

20            Q.      You can answer.

21   A.          I'm so sorry, can you repeat the question?

22            Q.      Yeah.  Let me go back.  You previously

23   stated that at a particular meeting which you cannot

24   identify as to a point in time that the relationship

25   management team was to find out more information about



1    what was involved in the First Standard decision not

2    to proceed with the conversion; is that right?

3                        MR. DEUTSCH:  Objection.  Go

4    ahead.

5    A.        That is correct.  They were tasked to confer

6    with the firm and find out additional information as

7    to why they were no longer going along with the

8    process to convert to COR Clearing.

9         Q.    So now what I want to know and what I'm

10   asking you is knowing that that task had been given to

11   the relationship management team, did you have any

12   written or verbal information back from the

13   relationship management team?

14                       MR. DEUTSCH:  Objection.  Go

15   ahead.

16   A.        Verbally I recall a conversation with both

17   the relationship management team and with the

18   conversion team that the firm had brokers that were

19   not favorable for moving to COR Clearing and that is

20   all I recall in terms of a possible reason why they

21   did not move to COR Clearing.

22        Q.    Very good.  Thank you.  Do you recall

23   which specific person on the relationship management

24   team made those statements, made that statement that

25   you recall?



Page 46

1  spoken about the post meeting discussions with risk,

2  I'm sorry with relationship management and the

3  conversion team about the First Standard brokers.

4  After that communication, do you recall any other

5  communications, either written or oral, about that

6  same topic?

7  A.        No, I do not.

8       Q.      Okay.  As part of the conversion team,

9  if there were such discussions, do you believe that

10 Mr. Hatton would have been the person to have included

11 additional information in the weekly conversion status

12 meeting agenda or discussions?

13 A.        Yes, he would have communicated additional

14 information if he had any.

15      Q.      Do you recall receiving any such

16 additional communications from Mr. Hatton at a

17 subsequent weekly conversion status meeting about the

18 First Standard situation?

19 A.        No.

20      Q.      Did you receive any information

21 concerning when or if you should start the training

22 program for First Standard?

23 A.        Because everything was on hold, my training,

24 there was just no time.  I was not able to do my job

25 because the conversion was on hold.



Page 60

1   prospect off?

2                        MR. DEUTSCH:  Objection.

3   A.        I don't know the answer to that.

4        Q.     Okay.

5                        MR. LIEBERMAN:  I think that's

6   all we're going to have for you this morning.  Thank

7   you.

8                        MR. DEUTSCH:  Paul, I just have a

9   couple of quick questions for her.

10                       Miss Reporter, can you hear me

11  okay?

12                       THE REPORTER:  Yes.

13

14  CROSS EXAMINATION BY MR. DEUTSCH:

15       Q.     Miss Ausdemore, you were asked about

16  whether you had finalized the First Standard training

17  plan.  Do you recall being asked questions about that?

18  A.        I do.

19       Q.     Why didn't you finalize the First

20  Standard training plan?

21                       MR. LIEBERMAN:  Objection.

22       Q.     Go ahead.

23  A.        I was unable to finalize the First Standard

24  training plan because the firm failed to cooperate.

25       Q.     When you say "the firm" who do you mean?



Page 61

1    A.         First Standard.

2         Q.      You were asked about whether you

3    coordinated with your other department managers for

4    the purpose of conducting the First Standard training.

5    A.         Mm-hmm.

6         Q.      Why didn't you coordinate with those

7    department managers?

8    A.         I was not able to coordinate with the

9    managers because we didn't get to that point in the

10   conversion process for the firm to come onboard for me

11   to properly train them.

12        Q.      Were you prepared to perform your role

13   in the conversion process --

14                      MR. LIEBERMAN:  Object.

15        Q.      -- to finalize -- I'm sorry, Paul.  I

16   tried to give you the courtesy of not objecting over

17   your actual voice.  I will request that you will give

18   me the same courtesy.

19                      MR. LIEBERMAN:  I thought you

20   actually ended your question just like you did with

21   me.  It's very difficult on this process.  So your

22   snarkiness is not necessary.

23                      MR. DEUTSCH:  I'm not being

24   snarky, but if you're overly sensitive I can't assist

25   you with that.



Page 69

```
 1
 2                        CERTIFICATE
 3
 4
 5           I, DEBRA-ANN BALSAMO, a Certified
 6  Shorthand Reporter and Notary Public of the State of
 7  New Jersey, certify that the foregoing is a true and
 8  accurate transcript of the deposition of AMY AUSDEMORE
 9  who was first duly sworn by me.
10           I further certify that I am neither
11  attorney or counsel for, nor related to or
12  employed by any of the parties to the action in
13  which the deposition is taken and that I am not a
14  relative or employee of any attorney or counsel
15  employed in this case, nor am I financially
16  interested in the action.
17
18
19
                    _____
20                      DEBRA-ANN BALSAMO
                    CERTIFIED SHORTHAND REPORTER
21
22
    Dated: May 8, 2018
23  My commission expires on:
    December 6, 2020
24  License No. X101161
25
```

