## SYNOPSIS OF THE MAY 1, 2018 DEPOSITION OF TODD HATTON

The following is a brief synopsis of the facts to which Todd Hatton testified at his deposition. COR Clearing, LLC ("COR") is offering excerpts from Hatton's deposition, attached hereto, as substantive evidence pursuant to the Court's Individual Rules and Practice, Rule 5.C.ii.

Hatton is a Conversion Coordinator at COR, and he held that position at all relevant times. P. 13:8-13. In that role, Hatton assists in the onboarding of broker-dealers, such as First Standard, onto COR's clearing platforms and systems. P. 19:24-20:22. As discussed below, Hatton testified about, *inter alia*, COR's efforts in connection with the conversion process related to First Standard, which refers to the conversion of First Standard Financial Co., LLC's ("First Standard") accounts and assets onto COR's clearing platform. First Standard was transitioning from its existing clearing firm, Hilltop Securities Inc. ("Hilltop") to COR.

COR had weekly internal conversion status meetings concerning First Standard. P. 56:24-57:14. COR also had weekly calls with First Standard concerning the conversion process from December 2016 until February 2017. P. 65:24-66:5. These weekly conversion status calls with First Standard ended in February 2017 when First Standard put the conversion process on hold. P. 65:24-66:5.

By February 2017, COR had completed almost every necessary step required to enable First Standard to transact new business on COR's platforms. P. 90:2-4, 225:23-24. First Standard stopped attending the weekly conversion status meetings. P. 65:15-66:5. First Standard frustrated the conversion process by refusing to cooperate in the completion of the remaining tasks, which prevented COR from performing its obligations under the FDCA. P. 226:3-7. COR was ready, willing, and able to perform under the FDCA and complete the conversion process, but First Standard's lack of cooperation prevented COR from doing so. P. 226:9-16.

While First Standard mentioned that an unspecified number of its brokers had expressed concerns about migrating to COR, John McCormack of First Standard downplayed the significance of this fact. P. 228:4-229:6. Hatton did not perceive the concerns of First Standard brokers to be a legitimate obstacle in connection with First Standard's migration to COR, and he understood that McCormack would alleviate the broker's concerns. P. 229:7-15. Further, no one ever mentioned to Hatton that FINRA expressed disapproval of First Standard switching clearing firms from Hilltop to COR. P. 227:24-228:3.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 1:17-cv-02190(PAE)

x ------------------------------ x

COR CLEARING,

    Plaintiff,      DEPOSITION

    -v-        OF:

FIRST STANDARD FINANCIAL  TODD HATTON

CO., L.L.C.,

    Defendants.

x ------------------------------ x


T R A N S C R I P T  of the stenographic notes of
the video-conference deposition of TODD HATTON in
the above-entitled matter as taken by and before
DEBRA-ANN BALSAMO, a Certified Shorthand Reporter
and Notary Public of New Jersey, at the offices of
SCARINCI & HOLLENBECK, L.L.C., One River Centre,
331 Newman Springs Road, Building 3, Suite 310,
Red Bank, New Jersey on Tuesday, May 1, 2018
commencing at 9:45 in the forenoon.



Page 2

```
 1
 2
 3                    A P P E A R A N C E S
 4
 5
 6   ANDERSON KILL, P.C.
     BY:   JEREMY E. DEUTSCH, ESQ.,
 7         1251 Avenue of the Americas
           New York, New York 10020
 8   Attorneys for Plaintiff
 9
     SCARINCI & HOLLENBECK, L.L.C.
10   BY:   PAUL A. LIEBERMAN, ESQ.,
           One River Centre
11         331 Newman Springs Road
           Building 3, Suite 310
12         Red Bank, New Jersey 07701
     Attorneys for Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
                                                              Page 3
 1                          INDEX
 2
     WITNESS                        DIRECT        CROSS
 3   TODD HATTON
       By Mr. Lieberman               5
 4     By Mr. Deutsch                               225
 5
 6
 7              EXHIBITS MARKED FOR IDENTIFICATION
 8   EXHIBIT             DESCRIPTION                 PAGE
 9
10   HATTON-1    Credit Committee Agenda dated
                 December 1, 2016                    110
11   HATTON-2    COR 4705                            111
     HATTON-3    COR 4921, two-page document         115
12   HATTON-4    First Standard documents 06434,
                 06444, 06454 and 06456              119
13   HATTON-5    FSF documents 6309 through 06381    121
     HATTON-6    E-mail dated January 20, 2018       128
14   HATTON-7    First Standard documents 06473
                 through 06483                       132
15   HATTON-8    COR document 1015341                139
     HATTON-9    COR documents 015398, 015399 and
16               015400                              147
     HATTON-10   COR documents 15699 through 15707   153
17   HATTON-11   COR documents 15708 through 15728   160
     HATTON-12   COR documents 15740, 15741, 15743
18               and 15745                           164
     HATTON-13   COR documents 1578 and 1579         168
19   HATTON-14   COR documents 15740-1, 15740-2 and
                 15740-3                             183
20   HATTON-15   COR documents 15846-1, 15846-2
                 15847, 15848, 15848-1, 15848-2,
21               15868 and 15868-1                   195
     HATTON-16   COR documents 15849, 15850,
22               15851, 15852 and 15853              203
     HATTON-17   COR documents 15869, 15879,
23               15871, 15888, 15889 and 15890       211
     HATTON-18   COR documents 16275 through 16311   215
24   HATTON-19   First Standard document 09016       219
25
```



Page 4

```
 1
 2
 3
 4
 5
 6
 7
 8
 9                    REQUESTS MADE
10
11
12
13     PAGE                        LINE
14
15     27                            4
       41                           19
16     56                            5
17
18
19
20
21
22
23
24
25
```



Page 5

1   T O D D    H A T T O N, residing at 19316 Ruggles

    Circle, Elkhorn, Nebraska 68022, being first duly

2   sworn, testified as follows:

3

4   DIRECT EXAMINATION BY MR. LIEBERMAN:

5        Q.    Good morning, Mr. Hatton.  You've now

6   been sworn.  My name is Paul Lieberman.  I'm a partner

7   in the securities regulatory litigation practice of

8   Scarinci & Hollenbeck here in New York and New Jersey

9   and I represent First Standard as well as its officers

10  and employees in the defence of the lawsuit that has

11  been asserted by your employer, COR.

12             COR's lawyers and I have coordinated on

13  the scheduling of this deposition via video.  Have you

14  ever been deposed before in a matter?

15  A.         I have not.

16       Q.    Okay.  Have you ever testified as a

17  witness in a regulatory proceeding?

18  A.         I have not.

19       Q.    So let me provide you with a few ground

20  rules for how we're going to conduct our testimony

21  today.  Number one, is you're under oath.  I'll ask

22  you questions and you're going to answer them.  If you

23  don't understand my question, tell me that and I'll

24  rephrase it.  You have to answer verbally.  Shaking

25  your head is not acceptable.  The Court Reporter can't



1    written communication?

2                        MR. DEUTSCH:  Objection.  Can I

3    just have the timeframe, please, Paul.

4                        MR. LIEBERMAN:  Yes.  Since this

5    litigation began.

6                        MR. DEUTSCH:  Thank you.

7    A.        No.

8        Q.       Thank you.  Mr. Hatton, what is your

9    title?

10   A.        Conversion coordinator.

11       Q.       And how long have you been in that

12   position on behalf of COR?

13   A.        Since October 2015.

14       Q.       And before that during 2014 what was

15   your title?

16   A.        I was out of the securities industry.

17       Q.       Have you looked at your linkedin website

18   recently?

19   A.        Not recently.

20       Q.       Okay.  Because that lists your status as

21   a conversion coordinator at COR since October of 2014

22   and, so, a period of employment being three years and

23   seven months.  Which is accurate, 2014 or 2015?

24   A.        I believe it's 2015.

25       Q.       Okay.  And where were you employed prior



Page 19

1   have experience in the securities industry?

2   A.        No, I did not.

3        Q.        And when did you graduate from Nebraska

4   Wesleyan University?

5   A.        1990.

6        Q.        And what was your degree in?

7   A.        Psychology.

8        Q.        Do you have a minor in anything?

9   A.        Business administration.

10        Q.        And did you do anything between 1990

11   graduation and April of '92 when you started with TD

12   Ameritrade?

13   A.        I sold life insurance.

14        Q.        And who were you appointed as an agent

15   of?

16   A.        The National Institute for the

17   Self-Employed.  National Association for the

18   Self-Employed, excuse me.

19        Q.        Do you currently hold any securities

20   licenses?

21   A.        Series 7.

22        Q.        Is that the only one?

23   A.        It is.

24        Q.        Now as the conversion coordinator, what

25   are your primary duties?



Page 20

1  A.          To onboard new correspondent firms.

2          Q.      And what does on-boarding involve?

3  A.          Establishing the correspondent firm in our

4  back office systems, coordinate and execute the

5  conversion of the client assets.

6          Q.      And what are the typical client assets

7  that are converted?

8  A.          Please clarify the question.

9          Q.      Yes.  You mention that you coordinate

10 the conversion of client assets.  How do you define

11 client assets?

12 A.          Cash and securities, equities, fixed income,

13 mutual funds.

14         Q.      Corporate bonds?

15 A.          Possibly.

16         Q.      Municipal securities?

17 A.          Possibly.

18         Q.      Alternative investments?

19 A.          Possibly.

20         Q.      Basically, the assets that are being

21 converted are the assets of the correspondent clearing

22 firm customers; isn't that right?

23 A.          That is correct.

24         Q.      Are you also converting matters relating

25 to the licenses and registration of the correspondent


MAGNA
LEGAL SERVICES

Page 56

1    A.          I do not.

2          Q.      Okay.

3                      MR. LIEBERMAN:  I'm going to make

4    a request for access and copies to the Confluence

5    postings and I've asked the Court Reporter to note

6    that for you, Jeremy.

7                      MR. DEUTSCH:  Okay.  And you

8    believe that those have not been produced to this

9    point?

10                     MR. LIEBERMAN:  I believe so.

11                     MR. DEUTSCH:  I'm not sure that

12   that's true.  I think we've produced those, but we'll

13   take your request under advisement.

14                     MR. LIEBERMAN:  Yep.  If you

15   think you have, you'll tell me where they are.  No

16   problem.  Let's move on.

17         Q.      Does the correspondent firm such as

18   First Standard have access to the Confluence system

19   for its own postings?

20   A.          They do not.

21         Q.      So it's strictly internal to the

22   clearing firm?

23   A.          Yes, it is.

24         Q.      Okay.  With respect to the conversion

25   process in general, are there periodic all-hands



Page 57

1    meetings?

2    A.        Internally, yes.

3         Q.        And when do the, I call them all-hands

4    meetings, is there a specific nomenclature used at COR

5    for those?

6    A.        We have weekly conversion status meetings

7    internally.

8         Q.        And who is responsible for setting up

9    the meetings and the agendas?

10   A.        Myself.

11        Q.        Okay.  And did you setup the weekly

12   conversion status meetings and agendas for the First

13   Standard process?

14   A.        Yes.

15        Q.        Do you recall being requested to provide

16   the weekly conversion status meetings in connection

17   with the discovery in this case?

18   A.        No.

19        Q.        Do you know who provided copies of the

20   weekly conversion status meetings in discovery in this

21   case?

22   A.        No.

23        Q.        Do you know why certain things in the

24   weekly conversion status meetings summaries would be

25   redacted?



Page 65

1   advance of this meeting, did you elevate the

2   conversion status notes to identify this hold

3   situation for this particular conversion?

4   A.       Elevate to legal?

5        Q.       No, elevate the status of the whole

6   situation in your weekly conversion status meeting as

7   by making a notation on the various items of the form;

8   vis-à-vis, status, timeline, deliverables and ongoing

9   conversations areas?

10  A.       I do not recall.

11       Q.       Do you recall having individual

12  telephone conversations or face-to-face meetings with

13  anyone with respect to this on hold situation?

14  A.       I do not recall.

15       Q.       Did you setup any or attempt to setup

16  any conference calls with your counterpart at Hilltop?

17  A.       I do not recall.

18       Q.       If you had, would you have done that via

19  an e-mail request prior to scheduling an actual call

20  invite on a Microsoft office kind of scenario?

21  A.       Yes, most likely.

22       Q.       Do you recall whether you setup a call

23  with someone at First Standard?

24  A.       We had weekly calls established with First

25  Standard which commenced in early December 2016 and



Page 66

1   continued through early to mid February of 2017.

2           Q.      Right.  And, so, it continued until the

3   time of the on hold, but they did not continue after

4   that period in February of 2017; isn't that right?

5   A.          I believe so, correct.

6           Q.      Okay.  So once they stopped attending

7   the weekly conversion status meetings, did you reach

8   out in any way to your contact at First Standard about

9   the hold situation?

10  A.          I do not recall doing so.

11          Q.      Had you ever had a situation where the

12  correspondent clearing firm stopped attending the

13  conversion status meetings prior to the conversion

14  start date?

15  A.          It's not abnormal for a correspondent firm

16  to miss a meeting occasionally.  But to my knowledge

17  we have not had anybody, you know, as you put it, put

18  on hold and just stop attending altogether.

19          Q.      Okay.  So that's a pretty unusual

20  situation, right?

21  A.          In my experience, yes.

22          Q.      And, so, in response to that very

23  unusual situation, who did you elevate the

24  circumstance to?

25  A.          I do not recall.



1    system prior to converting the assets.  My

2    recollection is we were very close to having First

3    Standard live in our system with the ability to

4    transact new business.

5             Q.    Okay.  Even without any transference of

6    customer data?

7    A.             Correct.  Once they are live in our system

8    they are able to open new accounts or transfer

9    existing accounts outside of the conversion process

10   and transact on those accounts.

11            Q.    Did any of that occur to your knowledge?

12   A.             No, sir.

13            Q.    So you were talking about the internal

14   efforts that were completed by COR, as you say, you

15   talk about the back office parameters, did that

16   include the WAAM parameters?

17   A.             There are certain screens that are specific

18   to WAAM, yes.

19            Q.    Were those completed?

20   A.             To my knowledge.

21            Q.    Okay.  And how would you get such

22   knowledge?

23   A.             Through direct communication from the WAAM

24   manager.

25            Q.    Any other internal efforts that you are



Page 139

1   Reporter, please note my silence does not connote

2   agreement.

3                        MR. LIEBERMAN:  Let's mark this

4   as 8.

5                        (COR document 1015341 is received

6   and marked Hatton-8 for identification.)

7        Q.    Mr. Hatton, do you have what's now be

8   mark as Hatton number eight in front of you which is

9   COR 1015341?

10  A.        Yes, I do.

11       Q.    And are you familiar with Mr. Mechals

12  title and e-mail address?

13  A.        I am.

14       Q.    And in connection with this particular

15  document, it is coming from conversions and the e-mail

16  is COR conversions at COR Clearing.com.  Is it correct

17  to state that both you and Josh can use that same

18  e-mail address?

19  A.        That is correct.

20       Q.    Okay.  And are you familiar with this

21  e-mail that came from Mr. Mechals, in this case, to

22  Kelli?

23  A.        I am.

24       Q.    Okay.  Have you read this document now?

25  A.        I have.



Page 196

1   currently on hold; is that correct?

2   A.        That is correct.

3        Q.        And then there's a new bullet.  "It kick

4   started again.  We lose our place in line as it

5   pertains to the taped conversion dates."  Do you know

6   what that latter bullet means?

7   A.        Yes.  We would have locked in the dates, and

8   I don't recall the exact date, the May date with the

9   beta systems, they maintain a fairly rigid timeline

10  where a number of milestones or deliverables have to

11  be met.  And any delay in any particular deliverable

12  or milestone jeopardizes meeting the ultimate

13  conversion date.

14       Q.        Right.

15  A.        So at this point we would have made that

16  determination that if we did kickback up, we would not

17  have made that original date.

18       Q.        So the May 6th prospective conversion

19  date would be moved possibly?

20  A.        That's correct.  That's correct.

21       Q.        Do you know was there any discussion or

22  determination of how long the loss of place in line

23  would have accrued, in other words, how many days,

24  weeks, months, years?

25  A.        Not to my recollection.  We would have had



Page 225

1    Hatton.  You've been very helpful.  I appreciate all

2    your time.

3                         THE WITNESS:  Thank you.

4                         MR. DEUTSCH:  Paul, I have a

5    couple of questions for Mr. Hatton.  Is it okay if I

6    just go ahead now.

7                         MR. LIEBERMAN:  Yeah, why not.

8                         MR. DEUTSCH:  Okay.

9                         Miss Reporter, are you able to

10   hear me okay?

11                        THE REPORTER:  Yes.  Perfectly.

12

13   CROSS EXAMINATION BY MR. DEUTSCH:

14        Q.    Mr. Hatton, you were asked about forging

15   ahead after things were placed on hold.  Why were you

16   forging ahead?

17   A.        We were --

18                        MR. DEUTSCH:  I'm sorry, did you

19   say something, Paul?

20                        MR. LIEBERMAN:  Yeah, I was about

21   to object to the question.

22        Q.    You can answer.

23   A.        We were moving forward because we were so

24   close to turning First Standard live for new business

25   and, at the time, in review, it looked like there was

Page 226

1    still hope that a resolution could be made with First

2    Standard.

3           Q.     But you never really actually got to a

4    COR live date with First Standard, correct?

5    A.          That is correct.

6           Q.     Why is that?

7    A.          First Standard frustrated the process.

8                          MR. LIEBERMAN:  Hah.

9           Q.     Did First Standard prevent your

10   performance of the contract?

11                         MR. LIEBERMAN:  Objection.

12   A.          Yes, they did.

13          Q.     Were you ready, willing and able to

14   perform this contract?

15                         MR. LIEBERMAN:  Objection.

16   A.          Yes, we were.

17                         MR. DEUTSCH:  What are the

18   grounds for that objection, Paul.  I might reconsider

19   my question.

20                         MR. LIEBERMAN:  No foundation.

21   It calls for a conclusion of legal basis.  This

22   witness is not a lawyer.  There's been no discussion

23   about frustration at all during my questioning.

24   Anything else you need?

25                         MR. DEUTSCH:  No.  I got it.  And



Page 227

1    thank you for explaining your objection.  I stand on

2    my question.

3                          MR. LIEBERMAN:  Of course you

4    would.

5                          MR. DEUTSCH:  Your objection was

6    merit less.

7                          MR. LIEBERMAN:  That's your

8    opinion.

9         Q.     Let me ask you, sir --

10                         MR. DEUTSCH:  We lost the phone

11   for some reason.

12

13   By MR. DEUTSCH:

14        Q.     Mr. Hatton, you were asked about

15   stumbling blocks on the milestones that you had setup

16   and you gave and identified various things including

17   the terminal selection.  Do you remember being

18   questioned about that by Mr. Lieberman?

19   A.        I do.

20        Q.     Were you ever told by anyone that FINRA

21   prohibited First Standard from switching clearing

22   firms from Hilltop to COR?

23   A.        No, I was not.

24        Q.     Were you ever told by anyone that FINRA

25   expressed disapproval of the idea of First Standard



Page 228

1  switching clearing firms from Hilltop to COR?

2                     MR. LIEBERMAN:  Objection.

3  A.        No.

4        Q.    Did you ever have a conversation with

5  Mr. McCormack in which Mr. McCormack identified to you

6  problems he claimed to be having on his end with

7  respect to certain of his brokers who objected to

8  switching from Hilltop to COR?

9                     MR. LIEBERMAN:  Objection.

10 A.        Yes.

11       Q.    And what did Mr. McCormack say to you in

12 that conversation and what did you say to him?

13                    MR. LIEBERMAN:  Objection.

14 A.        He stated that, he stated that he had

15 representatives, brokers that did not want to move

16 their business to COR Clearing.

17       Q.    How many brokers did he say?

18 A.        He did not say, I believe it was plural,

19 though.

20                    MR. LIEBERMAN:  Objection.

21       Q.    And what did he tell you about what was

22 going to take place with respect to those objecting

23 brokers?

24                    MR. LIEBERMAN:  Objection.

25 A.        He said that he would handle it.



Page 229

1          Q.      And did he identify this to you as a

2    stumbling block in the conversion process?

3                         MR. LIEBERMAN:  Objection.

4    A.          No, he did not.  He downplayed it.

5          Q.      He downplayed the significance of this?

6    A.          He did.

7          Q.      So did you regard, were you given to

8    understand that any problems he was experiencing with

9    his brokers was going to be a stumbling block in terms

10   of getting First Standard converted over to COR?

11                        MR. LIEBERMAN:  Objection.

12   A.          I did not read it that way.

13         Q.      How did you read it?

14                        MR. LIEBERMAN:  Objection.

15   A.          That he was going to handle these brokers.

16                        MR. DEUTSCH:  Okay.  I have no

17   further questions.

18                        MR. LIEBERMAN:  We'll close the

19   record.  Thank you, Mr. Hatton.

20                        (Deposition of TODD HATTON is

21   concluded at 5:15 P.M.)

22

23

24

25



Page 230

 1

 2                          CERTIFICATE

 3

 4

 5              I, DEBRA-ANN BALSAMO, a Certified

 6  Shorthand Reporter and Notary Public of the State of

 7  New Jersey, certify that the foregoing is a true and

 8  accurate transcript of the deposition of TODD HATTON

 9  who was first duly sworn by me.

10              I further certify that I am neither

11  attorney or counsel for, nor related to or

12  employed by any of the parties to the action in

13  which the deposition is taken and that I am not a

14  relative or employee of any attorney or counsel

15  employed in this case, nor am I financially

16  interested in the action.

17

18

19

                    _____

20                      DEBRA-ANN BALSAMO

                    CERTIFIED SHORTHAND REPORTER

21

22

    Dated: May 7, 2018

23  My commission expires on:

    December 6, 2020

24  License No. X101161

25

