## SYNOPSIS OF THE MAY 3, 2018 DEPOSITION OF ROY DIMARIA

The following is a brief synopsis of the facts to which Roy DiMaria testified at his deposition.  COR Clearing, LLC ("COR") is offering excerpts from DiMaria's deposition, attached hereto, as substantive evidence pursuant to the Court's Individual Rules and Practice, Rule 5.C.ii.

DiMaria is a Director of Business Development at COR, and he held that position at all relevant times.  P. 7:21-8:12; 35:18-20.  In that role, he solicits broker-dealers to become new clients of COR.  P. 36:19-23. As discussed below, DiMaria testified about, *inter alia*, COR's projected profitability in connection with the Fully Disclosed Clearing Agreement and Schedule A between First Standard Financial Co., LLC ("First Standard") and COR (the "FDCA"), and First Standard's breach of the FDCA.

 John McCormack, of First Standard, provided DiMaria with a document that COR refers to as a Firm Profile Form.  P. 47:9-20.  DiMaria prepared an economic analysis (the "Economic Analysis") of FDCA, which projects the profitability of the FDCA to COR.  P. 107:13-109:21. COR's Credit Committee was also presented with the Economic Analysis.  P. 109:22-111:3. Michael Scaplen, of COR, also reviewed the Economic Analysis.  P. 107:13-109:21.  COR and First Standard engaged in the conversion process.  P. 83:3-14.

DiMaria received a call from McCormack on which he explained that First Standard could not go through with the transition to COR.  P. 126:8-24, 169:16-24, 171:15-19. McCormack was afraid that First Standard would lose its brokers if it followed through with the transition, but McCormack did not identify the names of these brokers.  *See id.*; *see also* P. 170:10-11.  On February 13, 2017, DiMaria participated on the call between COR and First Standard, and to his recollection, the call included DiMaria, Scaplen, Carlos Salas, the CEO and a Member of the Board of Managers of COR, McCormack, and Carmine Berardi, the CEO of First Standard.  P. 129:5-130:3.  While he did not have a detailed recollection of the call, he did recall that Berardi said that First Standard did not want to go through with the FDCA and offered to provide COR with remuneration for the time that it had spent in connection with First Standard.  P. 130:6-18.  During the call, Berardi became angry and hung up the phone.  *id*.

First Standard never mentioned to DiMaria that it was negotiating a new Fully Disclosed Clearing Agreement and Schedule A with Hilltop Securities, Inc.  P. 193:14-25.

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No.:  1:17-cv-02190(PAE)

----------------------------------------x

COR CLEARING, LLC,

                    Plaintiff,

      v.

FIRST STANDARD FINANCIAL CO., LLC,

                    Defendant.

----------------------------------------x


DEPOSITION OF ROY DiMARIA

New York, New York

Thursday, May 3, 2018



Reported by:

Amy A. Rivera, CSR, RPR, CLR

JOB NO. 402963



Page 2

 1

 2                                  May 3, 2018

 3                                  10:02 a.m.

 4

 5               Deposition of ROY DiMARIA held at the

 6    office of SCARINCI HOLLENBECK, 3 Park Avenue, 15th

 7    Floor, New York, New York, pursuant to Notice,

 8    before Amy A. Rivera, Certified Shorthand Reporter,

 9    Registered Professional Reporter, Certified LiveNote

10    Reporter, and a Notary Public of the States of New

11    York, New Jersey, and Delaware.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 3

```
 1
 2   A P P E A R A N C E S:
 3   ANDERSON KILL, PC
 4   Attorneys for Plaintiff
 5        1251 Avenue of the Americas
 6        New York, New York  10020
 7   BY:  JEREMY E. DEUTSCH, ESQ.
 8        CHRISTOPHER PAOLINO, ESQ.
 9
10   SCARINCI HOLLENBECK
11   Attorneys for Defendant
12        One River Centre
13        331 Newman Springs Road
14        Building 3, Suite #310
15        Red Bank, New Jersey  07701-5692
16   BY:  PAUL A. LIEBERMAN, ESQ.
17
18
19
20
21
22
23
24
25
```



```
 1                    ROY DiMARIA
 2     R O Y   D I   M A R I A, having been duly sworn,
 3     testified as follows.
 4     EXAMINATION
 5     EXAMINATION
 6       BY MR. LIEBERMAN:
 7          Q.    Good morning, Mr. DiMaria.
 8                My name is Paul Lieberman.  I'm a
 9     partner in the securities and regulatory
10     litigation practice group at Scarinci Hollenbeck.
11     My firm represents First Standard in the defense
12     of this lawsuit initiated by COR.  And we're going
13     to ask you today some questions and get your
14     answers.
15                Have you ever been deposed before in a
16     civil lawsuit?
17          A.    I don't think so, no.
18          Q.    Have you ever been deposed or had your
19     testimony taken in a FINRA or SEC regulatory
20     proceeding?
21          A.    I think I have.
22          Q.    When were those?
23          A.    I can't recall.
24          Q.    Within the past couple of years?
25          A.    Oh, no, much longer.
```



                         ROY DiMARIA

1

2    I graduated with a teaching degree there.  And

3    then I completed my bachelor in the States.

4         Q.    And did you attend City University of

5    New York?

6         A.    Yes, College of Staten Island.

7         Q.    Do you have any licenses, you know, or

8    designations or other professional society?

9         A.    I have FINRA license 7 and 63.

10        Q.    In connection with your work at COR

11   and any prior clearing firm, have you had any

12   special training in clearing or securities

13   matters?

14        A.    No.

15        Q.    Do you complete -- take and complete

16   continuing education with respect to your

17   licensing?

18        A.    Yes.

19        Q.    Is that through COR?

20        A.    Yes.

21        Q.    And what is your current title at COR?

22        A.    Director.

23        Q.    You have a particular area of

24   specialty as a director?

25        A.    Business development.



```
 1                    ROY DiMARIA
 2   knew?
 3        A.    Steve Dripchak.
 4        Q.    How do you spell that?
 5        A.    D-R-I-P-C-H-A-K.  Go with that.
 6        Q.    Okay.  That's good.
 7              Is he still there?
 8        A.    No.
 9        Q.    Did you know Mr. Scaplen at COR before
10   you joined?
11        A.    No.
12        Q.    And how long did it take between the
13   solicitation call, the interview process, and
14   employment offer being made?
15        A.    I'm not sure, not -- not that long.
16        Q.    Weeks and months?
17        A.    Yeah.
18        Q.    And since you joined COR in 2013, have
19   you remained in the same role and function?
20        A.    Yes.
21        Q.    Do you know if there's an org chart
22   within COR?
23        A.    I'm not sure.
24        Q.    Okay.  Who do you currently report to?
25        A.    Michael Scaplen.
```



Page 36

1                        ROY DiMARIA

2         Q.    And how long have you been reporting

3    to Mr. Scaplen?

4         A.    Since he started.

5         Q.    Which was when, if you know?

6         A.    I don't.  Maybe four years ago.

7         Q.    Okay.  Do you and Mr. Scaplen work out

8    of the same office?

9         A.    Yes.

10        Q.    Do you have any individuals that

11   report to you?

12        A.    No.

13        Q.    Do you know who Mr. Scaplen reports

14   to?

15        A.    Not sure.

16        Q.    Do you know the difference between a

17   solid- and a dotted-line report?

18        A.    No.

19        Q.    Can you describe your function and

20   role at COR as the director of business

21   development?

22        A.    My job was to bring new business to

23   COR.

24        Q.    And you previously identified how you

25   did that when at Sterne Agee.



Page 47

1                              ROY DiMARIA

2     I'll do it.

3               MR. DEUTSCH:   Objection.

4               Please do not comment on

5          Mr. Lieberman's assumptions.

6               MR. LIEBERMAN:   Well, I will slim it

7          down.

8      BY MR. LIEBERMAN:

9          Q.    With respect to the solicitation of

10    First Standard, do you recall whether at the time

11    that you sent the profile and questionnaire the

12    FDCA was sent with it?

13         A.    I don't recall.

14         Q.    Who did you send the profile

15    questionnaire to?

16         A.    McCormack, possibly, yeah, I'm pretty

17    sure.

18         Q.    Do you recall how you sent the profile

19    questionnaire to McCormack?

20         A.    E-mail.

21         Q.    And with that e-mail were there

22    instructions on what to do with it?

23         A.    I usually write a line, complete it

24    and send it back.

25         Q.    And before it is e-mailed was there



Page 83

 1                         ROY DiMARIA

 2          A.    Typically.

 3          Q.    Okay.  At what point in the process --

 4    it sounds like there's a handoff, so you're no

 5    longer involved and the conversion coordinators

 6    take over.

 7                When did that occur with respect to

 8    First Standard, if you know?

 9          A.    They take over once the contracts are

10    signed and the firm's been approved.

11          Q.    When you say, contract's been signed,

12    the contract's been signed by both COR and First

13    Standard?

14          A.    Yeah.

15          Q.    And not before that?

16          A.    No.

17          Q.    Do you recall when the contract, the

18    FDCA and Schedule A involving First Standard, was

19    signed by both parties?

20          A.    I don't.  I'm sorry.  I do not.

21          Q.    And so after the contract is signed by

22    both parties and either Todd or Josh take over as

23    the conversion coordinators, your role is over and

24    done?

25          A.    Typically, yes.



1                          ROY DiMARIA

2    requested?

3          A.     Yeah, we request the FOCUS reports.

4          Q.     Anything else besides the FOCUS

5    reports?

6          A.     There's a whole list.  Off the top of

7    my head, I remember FOCUS and U4s and -- I don't

8    know -- it's a copy of the BD, etc.

9          Q.     Got it.

10                With respect to your role in the

11   conversion -- in soliciting clients to become

12   clients of -- I'm sorry.  Let me rephrase it.

13                In connection with your role to

14   solicit prospects to become clients of COR, do you

15   have a discussion with Mr. Scaplen as to the

16   profitability of each potential clearing

17   relationship?

18         A.     Yes.

19         Q.     And when does that discussion about

20   profitability occur?

21         A.     It's after we receive the profile

22   questionnaire that provides us with the data and

23   we can start analyzing the numbers.

24         Q.     Are you involved in the number

25   analytics?



```
 1                          ROY DiMARIA

 2               MR. DEUTSCH:  Objection.

 3      Q.     In other words, you said we --

 4               MR. LIEBERMAN:  I'm sorry.  Could you

 5      read back his answer?

 6               (Record read.)

 7      Q.     What do you mean when you say that we

 8   can start analyzing the number?  Who's the "we"?

 9      A.     Myself and my discussion with Michael

10   Scaplen.

11      Q.     All right.  And can you describe for

12   me the analytical discussions that you and

13   Mr. Scaplen have?

14      A.     Part of the discussion is to look at

15   the information that is provided to us, then we

16   can start formulating potential fees that we're

17   going to charge and come up with a projected P&L.

18      Q.     And in general, is there a number of

19   years that COR wants to have with a correspondent

20   by contract, a term of years?

21      A.     There is.  The preference would be for

22   the contract to be for five years at least.

23      Q.     And is there some rationale for a

24   minimum of five years that you're aware of?

25      A.     Well, it's just a commitment from both
```



```
 1                      ROY DiMARIA
 2  sides.
 3          Q.    Do you recall your discussions with
 4  Mr. Scaplen concerning the analytical numbers
 5  concerning the First Standard profitability and,
 6  therefore, the pricing schedule?
 7          A.    I don't specifically recall the
 8  discussion.
 9          Q.    Are these discussions extensive
10  requiring, you know, hours and careful review of
11  the information provided?
12          A.    No, they don't take that long.
13          Q.    Is there some basic percentage of
14  profitability or number of profitability, BOGI, if
15  you will, that both you and Mr. Scaplen are
16  looking for?
17          A.    Not really.
18          Q.    Do you -- do you and/or Mr. Scaplen
19  have the discretion to set a profitability number
20  for each and every deal?
21          A.    To a limited extent, I mean ...
22          Q.    Who else is involved in making
23  decisions with respect to both the numbers that
24  you and Mr. Scaplen have identified -- and
25  analyzed, rather, and the price Schedule A?
```



Page 110

1                          ROY DiMARIA

2          A.    Well, it's one of the things the

3    credit committee approves, so they're definitely

4    involved.

5          Q.    Is there a particular person within

6    the credit committee?

7          A.    No.

8          Q.    There are enough integral people so

9    they can plug and play with whatever is necessary,

10   who is available, if you know?

11               MR. DEUTSCH:   Objection.

12         A.    I don't.

13         Q.    Do you know what actual role the

14   committee plays?

15               I mean, are there discussions with you

16   and Mr. Scaplen in particular?

17         A.    The committee has the power to approve

18   or not the relationship.

19         Q.    Do you and Mr. -- and/or Mr. Scaplen

20   have to send up a memo in writing to the credit

21   committee outlining the proposal for an approval?

22         A.    We typically send out some sort of an

23   e-mail reminder to everyone that we have received

24   all of the necessary documentation, everything is

25   up on SharePoint, and we ask people to review the



Page 111

1                          ROY DiMARIA

2    information in preparation for the credit

3    committee approval process.

4         Q.    Do you and/or Mr. Scaplen attend the

5    committee meeting?

6         A.    Yes.

7         Q.    Do you recall approximately when you

8    sent the reminder notice for the credit committee

9    scheduling of the call -- of their meeting?

10        A.    I don't.

11        Q.    Do you recall that there was a credit

12   committee meeting concerning First Standard?

13        A.    I'm sure.

14        Q.    Do you recall participating?

15        A.    Yes.  I was there.  I don't recall the

16   specifics, but I was definitely there.

17        Q.    Are minutes taken of the meeting?

18        A.    Yes.

19        Q.    Who's the minute taker or the

20   secretary of the meeting?

21        A.    I don't know.

22        Q.    Are the minutes of the meeting

23   uploaded to SharePoint?

24        A.    Not sure.

25        Q.    Is the meeting in person or via



Page 126

1                    ROY DiMARIA

2         A F T E R N O O N   S E S S I O N

3              (Time noted:  1:29 p.m.)

4              MR. LIEBERMAN:  Let the record

5         reflect, while we were off, there were no

6         substantive discussions between the parties.

7    BY MR. LIEBERMAN:

8         Q.    Mr. DiMaria, did you have any role or

9    involvement in February of 2017 in setting up a

10   conference call between Mr. Salas and Mr. Berardi

11   and Mr. McCormack?

12        A.    Yes, Michael and I set up that call.

13        Q.    Why -- how did that come to pass?

14        A.    I think, if I recall, John called and

15   said that they had second thoughts, or they had

16   some issues about moving forward, and that they

17   couldn't go through with the conversion, that they

18   would lose a lot of the brokers or some of the

19   brokers, but it was a big portion of the business.

20              So, basically, there's not much I

21   could do, nor Michael.  So the only thing we could

22   do, we just set up the call with Carlos, and -- so

23   that's -- we suggested that that's probably the

24   only thing we can do.

25        Q.    Between the time Mr. McCormack called



```
 1                        ROY DiMARIA
 2     or --
 3            A.     Not that I'm aware of.
 4            Q.     Okay.   Thank you.
 5                   Did there come a point in time where
 6     there was actually a call between Mr. Salas and
 7     Mr. Berardi?
 8            A.     Yeah.
 9            Q.     Were you on that call?
10            A.     Yes.
11            Q.     Do you recall where -- where you were
12     in order to get on the call, physically located?
13            A.     We were in the Edison office.
14            Q.     And when you say, "we," that included
15     Michael Scaplen?
16            A.     Mike.
17            Q.     Anybody else there with you?
18            A.     No, just the two of us.
19            Q.     And was it a dial-in kind of
20     conference call situation?
21            A.     Can't remember.
22            Q.     And who else was on the call, if you
23     can remember?
24            A.     Carlos and Mr. Berardi.
25            Q.     John?
```


MAGNA
LEGAL SERVICES

Page 130

                         ROY DiMARIA

 1

 2        A.    I'm assuming John.  I don't know who

 3   else.

 4        Q.    Mr. McComb on the call, if you recall?

 5        A.    I don't know for sure.

 6        Q.    Can you describe the call from

 7   beginning to end, or is it too hard to recollect?

 8        A.    Well, I can tell you it was a short

 9   call.  It was not long.  But -- and effectively,

10   it didn't go very well.

11             There was some discussion about

12   Berardi wanting to provide some remuneration for

13   time spent, but he didn't want to go through with

14   the contract.

15             And I'm not sure what Carlos answered

16   or how it went on, but Mr. Berardi was very upset

17   on the call and I remember him hanging up.  It

18   wasn't a long call at all.

19        Q.    Do you recall any profanities uttered

20   by Mr. Salas?

21        A.    I don't think so.

22        Q.    And after Mr. Berardi hung up the

23   phone were there conversations between yourself,

24   Mr. Salas, and Mr. Scaplen?

25        A.    I don't -- I don't believe we had a



```
 1                    ROY DiMARIA
 2  it's obvious that Michael was trying to set up a
 3  call to understand what was going on.
 4       Q.    And on page 15320 at the bottom is the
 5  e-mail from Mr. McCormack to both you and
 6  Mr. Scaplen?
 7       A.    Yes.
 8       Q.    And do you see bullet points on the
 9  e-mail?
10       A.    I do.
11       Q.    And is Mr. McCormack responding to
12  some of the problems that have been identified and
13  apparently raised already?
14       A.    He's just making a list of things that
15  he heard.
16       Q.    My question is:  Prior to the e-mail
17  being sent had Jonathan and you spoken over the
18  phone about either these same problems that are
19  bulletized in the e-mail or some of them or more
20  of them that are identified?
21       A.    The answer is the only thing I recall
22  was Jonathan mentioning that they were going to
23  lose a bunch of brokers and they couldn't go
24  through with the contract.
25       Q.    Got it.
```



 1                          ROY DiMARIA

 2         A.    I don't remember any of the specific

 3    bullets.

 4         Q.    Do you recall whether the losing a

 5    number of brokers was related to the fixed income

 6    relationships?

 7         A.    No.

 8         Q.    Did he mention a specific broker by

 9    the name of Gus Zillo?

10         A.    No, he did not.  He mentioned several

11    brokers.  He didn't give us the names.

12         Q.    With respect to Mr. McCormack's bullet

13    about a poor reputation, do you have any idea what

14    he was talking about?

15         A.    No.

16         Q.    Was he talking about First Standard's

17    reputation or COR's reputation, if you know?

18               MR. DEUTSCH:  Objection.

19         A.    I don't know.

20         Q.    What about poorly capitalized, was he

21    concerned about COR's capitalization?

22               You don't know?

23         A.    I don't want to guess.

24         Q.    Okay.

25               All right.  So upon receiving this



         1                    ROY DiMARIA

     2   response from Mr. McCormack, did you and

     3   Mr. Scaplen have a conversation?

     4       A.    Well, we -- I don't recall the

     5   specifics, but I'm sure we looked at the list and

     6   probably didn't understand what was going on.

     7       Q.    Had you informed Mr. Scaplen about

     8   Jonathan's advice to you about the potential loss

     9   of a whole bunch of brokers if the conversion

    10   continued?

    11            MR. DEUTSCH:  Objection.

    12       Q.    I think that's what you testified

    13   before.  I just wanted to confirm it.

    14            MR. DEUTSCH:  Objection.

    15       A.    I remember when we got the call, I

    16   think I got the call, and I mentioned to Michael

    17   that, you know, Jonathan was raising some problems

    18   and they wanted to pull out of the contract, blah,

    19   blah, blah.

    20       Q.    Okay.  Had you ever had that situation

    21   arise before during your tenure at COR, where

    22   someone wants to pull out of a contract?

    23       A.    I don't -- not once the contract is

    24   signed.

    25       Q.    Did you and Mr. Scaplen think that



Page 193

1                        ROY DiMARIA

2   shared hard drive?

3         A.    That's all it is.

4         Q.    Okay.

5         A.    That's all it is.

6         Q.    It's not a communication system?

7         A.    No, absolutely not.

8               MR. LIEBERMAN:  Objection.  Leading.

9               MR. DEUTSCH:  I'm trying to clear it

10        up for you.

11              THE WITNESS:  I may have stated --

12              MR. LIEBERMAN:  I don't need the

13        clearing of the record.

14        Q.    You spoke with Mr. Lieberman about a

15   phone call that you received from Mr. McCormack in

16   which he relayed to you a question about -- he had

17   about broker complaints.

18              Did he at any point tell you anything

19   about his negotiations with Hilltop Securities for

20   a new clearing agreement or a new Schedule A?

21        A.    No.

22        Q.    Did you know that First Standard in

23   the period of January through February 2017 was

24   negotiating a new arrangement with Hilltop?

25        A.    No.



1

2                    CERTIFICATE

3          I, AMY A. RIVERA, a Certified Shorthand

4    Reporter, Registered Professional Reporter,

5    Certified LiveNote Reporter, and Notary Public of

6    the State of New York, do hereby certify that prior

7    to the commencement of the examination ROY DiMARIA ,

8    was duly sworn by me to testify the truth, the whole

9    truth and nothing but the truth.

10         I DO FURTHER CERTIFY that the foregoing is

11   a true and accurate transcript of the testimony as

12   taken stenographically by and before me at the time,

13   place and on the date hereinbefore set forth.

14         I DO FURTHER CERTIFY that I am neither a

15   relative nor employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney or

18   counsel, and that I am not financially interested in

19   the action.

20   _____

21         Notary Public of the State of New York

22         My commission expires December 6, 2021

23         License No. XI00939

24   Dated:  May 14, 2018

25

