## SYNOPSIS OF THE APRIL 23, 2018 DEPOSITION OF SCOTT MARTINSON

The following is a brief synopsis of the facts to which Scott Martinson testified at his deposition.  COR Clearing, LLC ("COR") is offering excerpts from Martinson's deposition, attached hereto, as substantive evidence pursuant to the Court's Individual Rules and Practice, Rule 5.C.ii.

Martinson was the Chief Compliance Officer of Standard Financial Co., LLC ("First Standard") from the fourth quarter of 2016 through January 2018.  P. 15:9-24.  Martinson testified that, *inter alia*, the Financial Industry Regulatory Authority ("FINRA") did not prohibit First Standard from changing clearing firms from Hilltop Securities Inc. to COR.  P. 37:7-10.  To Martinson's knowledge, no First Standard brokers threaten to quit if First Standard followed through in the clearing relationship with COR.  P. 73:15-20.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -x
COR CLEARING, LLC,

                        Plaintiff,
                              Case No.:
                              1:17-cv-02190(PAE)


            -against-
FIRST STANDARD FINANCIAL CO., LLC,
                  Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - -x
          Oral deposition of SCOTT MARTINSON,
taken pursuant to Order, was held at the Law
Offices of Anderson Kill, P.C., 1251 Avenue of
the Americas, 42nd Floor, New York, New York
10020, commencing April 26th, 2018, at 9:57 a.m.,
on the above date, before AMBRIA IANAZZI, a Court
Reporter and Notary Public in and for the State
of New York.


- - - - - - - - - - - - - - - - - - - - - - - - -x

MAGNA LEGAL SERVICES
(866) 624-6221



Page 2

```
 1
 2  A P P E A R A N C E S:
 3     ANDERSON KILL, P.C.
            Attorneys for Plaintiff
 4          1251 Avenue of the Americas
            New York, New York 10020-1182
 5
            BY:  CHRISTIAN CANGIANO, ESQ.
 6               JEREMY E. DEUTSCH, ESQ.
                 CHRISTOPHER PAOLINO, ESQ.
 7
 8     SCARINCI HOLLENBECK
            Attorneys for Defendant
 9          One River Centre
            331 Newman Springs Road
10          Building 3, Suite 310
            Red Bank, NJ 07701-5692
11
            BY:  PAUL LIEBERMAN, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

```
 1
 2              S T I P U L A T I O N S
 3                    IT IS HEREBY STIPULATED
 4       AND AGREED by and between the
 5       attorneys for the respective parties
 6       herein; that filing, sealing, and
 7       certification be and the same are
 8       hereby waived.
 9
10                    IT IS FURTHER STIPULATED
11       AND AGREED that all objections,
12       except as to the form of the question
13       shall be reserved to the time of the
14       trial.
15
16                    IT IS FURTHER STIPULATED
17       AND AGREED that the within deposition
18       may be signed and sworn to before any
19       officer authorized to administer an
20       oath, with the same force and effect
21       as if signed and sworn to before the
22       Court.
23
24
25
```



Page 4

1

2  S C O T T    M A R T I N S O N,

3  the WITNESS herein, after having been

4  first duly sworn by a Notary Public of the

5  State of New York, was examined and

6  testified as follows:

7  EXAMINATION BY

8  MR. PAOLINO:

9          THE COURT REPORTER:  State your

10         name for the record, please.

11         THE WITNESS:  Scott Martinson.

12         THE COURT REPORTER:  What is your

13         address?

14         THE WITNESS:  7 Nassau Avenue,

15         Glen Cove, New York 11542.

16         Q.    Good morning, Mr. Martinson.

17         A.    How are you?

18         Q.    Good.  How are you doing?

19         A.    Good.

20         Q.    My name is Chris Paolino, I'm

21     an attorney at Anderson Kill, P.C.,

22     Counsel for Plaintiff's COR Clearing,

23     LLC, in the matter.  Have you ever been

24     deposed before?

25         A.    No, I don't believe so.  I



Page 24

```
 1                    S. MARTINSON
 2      professional licenses, registrations, or
 3      certificates ever been suspended or
 4      revoked?
 5          A.     No.
 6          Q.     Okay.  When did you join First
 7      Standard?
 8          A.     Beginning of November of 2015.
 9          Q.     And can you identify all
10      positions that you held at First Standard
11      and any changes in those positions?
12          A.     Yeah, I was regional
13      supervisor.
14          Q.     Okay.
15          A.     And they brought me on because
16      of my experience with Brookstone.  Some
17      of the brokers with First Standard were
18      under my supervision at Brookstone, so it
19      was a natural fit.
20                 Then I became compliance
21      officer, in it was either November or
22      December of 2016, about a year later.
23          Q.     And Chief Compliance Officer?
24          A.     Chief Compliance Officer.
25          Q.     Okay.
```



Page 26

S. MARTINSON

1

2         A.      They told me no, but I have

3     less interactivity with FINRA than a did

4     before.

5         Q.      Did you experience a reduction

6     in your salary?

7         A.      No.

8         Q.      So, can you explain your role

9     in First Standard for -- in the context

10    of compliance over the course of your

11    time?

12        A.      Yeah, it was -- we, you know,

13    the firms go through what's called a

14    cycle exam, it's like an annual audit

15    with FINRA.  So, right after I took the

16    position, we started going through a

17    cycle exam almost immediately.

18               So, my activity was dealing

19    with FINRA, answering questions for them

20    via their secured firm gateway; in other

21    words, they'd give us question, we would

22    require a series of passwords to get in,

23    and then I would construct an answer, and

24    then upload it to them, and hopefully it

25    was acceptable and we could move on.


MAGNA
LEGAL SERVICES

```
 1                    S. MARTINSON
 2               So, that was a lot of my -- I
 3     also helped formulate policy, like the
 4     written supervisory conspiracy, and I --
 5     I apologize, I don't -- I can't come up
 6     with any other -- really, that's what
 7     enveloped my time, but the cycle exams,
 8     was the cycle exams.
 9          Q.    All right.  And did anyone
10     assist you in the cycle exams?
11          A.    Mr. McCormack, and, I guess
12     each supervisor I would be in touch with
13     to find to ask them specific questions to
14     their branches.
15          Q.    All right.  So, what was your
16     role in the context with AML at First
17     Standard?
18          A.    Anti-money laundering is part
19     of a compliance function to make sure
20     that the brokers understand what the
21     rules are, that they take continuing ed
22     to learn the rules, if they don't know
23     it, and then I go in and check to make
24     sure that there's no questionable
25     activity; in other words, one of the big
```



Page 36

1                          S. MARTINSON

2        reviews, exception report reviews, things

3        like that.  I'm sorry, off the top of my

4        head it's --

5            Q.      That's okay.  Did Mr. White

6        ever instruct you not to change clearing

7        firms?

8            A.      No.  There was a discussion

9        with Bill -- Bill Jakob, I'm sorry.

10       During one of the phone calls that I said

11       I was on, a conference call, and one of

12       the conference calls was with Bill Jakob.

13           Q.      Okay.

14           A.      And it was Mr. McCormack

15       telling them that we were thinking about

16       changing firms, changing clearing firms.

17           Q.      Okay.  And what did Mr. Jakob

18       say?

19           A.      Well, I can't tell you

20       word-for-word, it was a long time ago.

21           Q.      Sure.

22           A.      But there was apprehension in

23       his voice, and he was reminding us that

24       we were in a cycle exam and to try to

25       elaborate why that would be a concern,



```
 1                    S. MARTINSON
 2     all the information that they were asking
 3     us for comes from a clearing firm.  If we
 4     sever ties with that clearing firm during
 5     that, some of the information might not
 6     be as easy to get.
 7         Q.    Did Mr. Jakob say that you
 8     were prohibited from changing clearing
 9     firms?
10         A.    No.
11         Q.    Okay.  So, it was more of a
12     suggestion?
13         A.    Yeah, I guess you could it
14     was -- I mean, a suggestion would be, "I
15     don't think you should," he didn't say it
16     that way.  He was just, again,
17     apprehensive.  He said, "it would make
18     things difficult if you changed clearing
19     firms now."
20         Q.    Was that position ever
21     documented in writing?
22         A.    No, it was a phone
23     conversation.  And keep in mind, I was
24     not aware or made privy to most of the
25     discussions with Bill Jakob or COR.
```



Page 73

1                        S. MARTINSON

2          Q.      -- generates?

3          A.      -- I don't know the actual

4    number.

5          Q.      Roughly?

6          A.      It would be speculative.  I

7    mean, I wouldn't even know.

8          Q.      I don't want you to guess.

9          A.      I mean, yeah, it would truly

10   be a guess.

11         Q.      Were there any other

12   complaints from any other individuals at

13   First Standard besides Bill?

14         A.      Nothing that came my way.

15         Q.      Did anyone -- to your

16   knowledge, did anyone at First Standard

17   ever threaten to quit if First Standard

18   followed through in the clearing

19   relationship with COR?

20         A.      No.

21         Q.      Did anyone ever bring that to

22   your attention?  Did anyone ever bring a

23   threat --

24              MR. LIEBERMAN:  Listen to the

25         question.



Page 109

```
 1
 2                    C E R T I F I C A T E
 3         I, AMBRIA IANAZZI, a Shorthand Reporter
 4    and Notary Public of the State of New York, do
 5    hereby certify:
 6    That the WITNESS whose examination is
 7    hereinbefore set forth, was duly sworn, and
 8    that such examination is a true record of the
 9    testimony given by such WITNESS.
10    I further certify that I am not related to any
11    of the parties to this action by blood or
12    marriage; and that I am in no way interested in
13    the outcome of this matter.
14
15
16
17
18
19
20
21
22                    AMBRIA IANAZZI
23
24
25
```

