## SYNOPSIS OF THE MAY 17, 2018 DEPOSITION OF TIMOTHY FEIL

The following is a brief synopsis of the facts to which Timothy Feil, Esq. testified at his deposition.  COR Clearing, LLC ("COR") is offering excerpts from Feil's deposition, attached hereto, as substantive evidence pursuant to the Court's Individual Rules and Practice, Rule 5.C.ii.

Feil represented Standard Financial Co., LLC ("First Standard") as counsel, and was retained in the middle of 2016.  P. 10:9-14.  The scope of Feil's retention with First Standard encompassed panoply of issues and matters, including customer-related issues, independent contractor issues, regulatory issues, arbitrations, SRO responses, and lease matters.  P. 11:19-12:18.  First Standard did not inform Feil that FINRA directed First Standard not to change clearing firms from Hilltop Securities Inc. to COR.  P. 47:5-48-11.

Page 1

UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

COR CLEARING, LLC,

    Plaintiff,

  -against-    Case No.

       1:17-cv-02190(PAE)

FIRST STANDARD FINANCIAL CO., LLC,

    Defendant.

- - - - - - - - - - - - - - - - - - - -x


Anderson Kill, P.C.
1251 Avenue of the Americas, 42nd Floor
New York, New York 10022


May 17, 2018
11:00 a.m.


  VIDEO CONFERENCE EXAMINATION BEFORE
TRIAL of TIMOTHY FEIL, the Witness
herein, held at the above-mentioned time
and place, pursuant to Subpoena, before
Ilysa A. Linzer, a Notary Public in and
for the State of New York.


    MAGNA LEGAL SERVICES
  320 West 37th Street, 12th Floor
   New York, New York 10018
    (866) MAGNA-21



Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   ANDERSON KILL, P.C.
            Attorneys for Plaintiff
 5          1251 Avenue of the Americas
            42nd Floor
 6          New York, New York  10020
     BY:  CHRISTIAN CANGIANO, ESQ.
 7          JEREMY DEUTSCH, ESQ.
 8
 9   ROBERT BURSKY, ESQ.
            Attorney for Witness
10          68 South Service Road
            Suite 100
11          Melville, New York 11747
     BY:  ROBERT BURSKY, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



1

2                  FEDERAL STIPULATIONS

3

4      IT IS HEREBY STIPULATED AND AGREED

5   by and between the attorneys for the

6   respective parties herein, that filing

7   and sealing be and the same are hereby

8   waived.

9

10        IT IS FURTHER STIPULATED AND AGREED

11   that all objections, except as to form of

12   the question, shall be reserved to the

13   time of the trial.

14

15        IT IS FURTHER STIPULATED AND AGREED

16   that the within deposition may be sworn

17   to and signed before any officer

18   authorized to administer an oath, with

19   the same force and effect as if signed

20   and sworn to before this Court.

21

22

23                      -oOo-

24

25



Page 4

1

2  T I M O T H Y   F E I L,

3       the Witness herein, having

4       been duly sworn by the Notary

5       Public, was examined and testified

6       as follows:

7  EXAMINATION BY

8  MR. CANGIANO:

9       Q.   State your name for the record,

10 please.

11      A.   Timothy Feil.

12      Q.   State your address for the

13 record, please.

14      A.   3920 Veterans Memorial Highway,

15 Suite 8, Bohemia, New York 11716.

16            MR. DEUTSCH: Before we

17            question Mr. Feil, very

18            quickly I am going to put a

19            statement on the record.  We

20            are -- my name is Jeremy

21            Deutsch.  I am an attorney

22            with the law firm of Anderson

23            Kill.

24                We are here for

25            Mr. Feil's deposition.  The



Page 5

```
 1                    T. FEIL
 2          time for this was set by
 3          e-mails that we exchanged
 4          with Mr. Lieberman, who was
 5          included on every one of the
 6          e-mails.  And as of May 14,
 7          2018, at 2:41 Mr. Bursky
 8          proposed that we have the
 9          deposition on Thursday or
10          Friday of this week, and
11          asked us to advise.
12               We heard further from
13          Mr. Bursky later that same
14          day at 6:55 p.m. on another
15          e-mail in which he copied
16          Mr. Lieberman, who is counsel
17          for First Standard, and
18          proposed 11:00 a.m. for the
19          deposition.  I confirmed for
20          11:00 a.m. on May 15th at
21          9:29 a.m., also including
22          Mr. Lieberman for a video
23          deposition.  We heard nothing
24          further from Mr. Lieberman.
25               On Tuesday May 15th at
```



Page 6

```
 1                    T. FEIL
 2          7:50 p.m. Mr. Bursky sent us
 3          a PDF file with a document
 4          production.  We received
 5          that.  Mr. Lieberman was on
 6          those, and never responded.
 7              This morning -- I am
 8          sorry, we -- this morning we
 9          also had a correspondence
10          with Mr. Lieberman in which
11          we sent him the video link
12          that we were using for today.
13          So we sent the zoom meeting
14          info invitation out on
15          Tuesday at -- Tuesday,
16          May 15th at 9:50 a.m., we
17          have included Mr. Lieberman.
18          We asked Mr. Lieberman in
19          that e-mail if he would be
20          joining us here at Anderson
21          Kill or if he would be
22          attending remotely.  We did
23          not receive a reply from
24          Mr. Lieberman from that
25          e-mail, although we have no
```



1                     T. FEIL

2          reason to believe he did not

3          receive it.

4              We re-forwarded the

5          invitation this morning at

6          10:00 to Mr. Bursky and

7          Mr. Lieberman, and noted to

8          Mr. Lieberman that we were

9          proceeding at 11 today having

10         not had a response from you

11         at all.

12             We then at -- this

13         morning at 10:55 wrote to

14         Mr. Lieberman again and said

15         that we were commencing the

16         examination, that he had not

17         responded, and that we were

18         proceeding to the examination

19         without him.  We wrote to him

20         and said -- at 10:57 and

21         said, "Paul, you have not

22         responded to any of the many

23         e-mails concerning the

24         conduct or scheduling of this

25         deposition over the last two



Page 8

```
 1                    T. FEIL
 2          weeks.  We intend to proceed
 3          with or without you at 11.
 4          You can appear remotely at
 5          any time through the link
 6          that I provided to you
 7          earlier in the week, and
 8          which I re-sent this morning
 9          to you and Mr. Bursky.  Thank
10          you."  No response was
11          received to that.
12              Mr. Bursky has telephoned
13          Mr. Lieberman's office, and
14          has learned that
15          Mr. Lieberman is out of the
16          office today at a hearing.
17          We will be proceeding with
18          the deposition in his
19          absence.  This was the
20          deposition pursuant to
21          Subpoena, which has been
22          scheduled by consent.
23              We are ready to -- I'm
24          sorry, Mr. Feil, for having
25          to make you sit through that.
```



Page 9

```
 1                    T. FEIL
 2              THE WITNESS:  No
 3        worries.  Thank you.
 4              MR. CANGIANO:  Did you
 5        want to add anything, Rob?
 6              MR. BURSKY:  No.  We are
 7        ready to go, and let's
 8        proceed.
 9    Q.   Good morning, Mr. Feil.  My
10  name is Chris Cangiano.  I am going to be
11  asking you some question this morning.
12    A.   Good morning.
13    Q.   Have you been deposed before?
14    A.   I have.
15    Q.   Okay.  So you know that all of
16  your answers have to be yeses and nos,
17  and not shaking of heads, and "uh-huhs,"
18  and grunts, and that sort of thing;
19  right?
20    A.   Yes.
21    Q.   Particularly since we are
22  appearing over Skype, or video messenger
23  it will probably make it even more
24  difficult to understand.  You are an
25  attorney?
```



1                     T. FEIL

2        A.    I am.

3        Q.    You are admitted into practice

4   in the State of New York?

5        A.    I am.

6        Q.    How long have you been admitted

7   to practice in New York?

8        A.    Approximately 17 years.

9        Q.    Did there come a point in time

10   when you came to represent a company

11   called First Standard?

12        A.    Yes.

13        Q.    Okay.  When was that?

14        A.    Approximately mid 2016.

15        Q.    Mid 2016.  Had you ever

16   represented a company called Carl

17   Standard?

18        A.    I don't recall.

19        Q.    Is there anything that you

20   think would refresh your recollection?

21        A.    There might be.  I just at the

22   moment don't know what that is.

23        Q.    Okay.  Has there ever come a

24   point in time when you represented

25   personally a man called Carmine Berardi?



Page 11

```
 1                      T. FEIL
 2      A.   I don't believe so personally.
 3      Q.   Okay.  Has there ever been a
 4  time when you have personally represented
 5  a man named John McCormick, or Jonathan
 6  McCormick?
 7      A.   Yes.
 8      Q.   Okay.  When was that?
 9      A.   In, I believe, 2016 time-frame.
10      Q.   Okay.  Did it have anything to
11  do with his employment by First Standard?
12      A.   Yes.
13      Q.   Can you tell me generally what
14  the subject matter of the retention was?
15      A.   It was involving his employment
16  agreement with the firm.
17      Q.   With First Standard?
18      A.   Yes.
19      Q.   Okay.  Can you tell me what,
20  generally, what the scope of your
21  employment by First Standard was?
22                MR. BURSKY:  You mean
23           retention, not employment?
24                MR. CANGIANO:  Yes, I'm
25           sorry, retention.
```



Page 12

```
 1                    T. FEIL
 2      A.   Since mid 2016 it has covered a
 3  panoply of issues and matters;
 4  customer-related issues for the firm,
 5  independent contractor issues related to
 6  the firm, regulatory issues relative to
 7  the firm and/or brokers, arbitrations,
 8  SRO responses, lease matters.
 9      Q.   Do you have an engagement --
10  I'm sorry, were you finished?
11      A.   I am finished insofar as that's
12  all I can remember at the moment.
13      Q.   Okay.  I will do my best to not
14  speak over you, and likewise I ask that
15  you not speak over me if I am talking.  I
16  know it is hard because we are appearing
17  remotely, so there may be a little lag,
18  but hopefully we can work together on it.
19           Do you have an engagement
20  letter with First Standard?
21      A.   I have a retainer agreement for
22  specific matters.
23      Q.   So are you saying that each
24  matter that you have asked them to --
25  they have asked you to represent them on
```



Page 13

```
 1                    T. FEIL
 2  you have had a specific retainer relating
 3  to that matter?
 4       A.   Not for all matters, but, for
 5  example, an arbitration proceeding.
 6  Smaller matters, no, but matters that
 7  require a retainer receive a retainer.
 8       Q.   Okay.  What matters were you
 9  representing them as to in 2016?
10                 MR. BURSKY:  Are you
11             asking for types -- I mean --
12                 MR. CANGIANO:  Sure.
13                 MR. BURSKY:  Are you
14             asking for types of matters?
15                 MR. CANGIANO:  Yes.
16                 MR. BURSKY:  I thought
17             we just went over that, what
18             he represented them on since
19             inception.
20                 MR. CANGIANO:  Right.  I
21             am asking specifically in
22             2016, though.
23                 MR. BURSKY:  Oh.  Okay.
24             Do you understand?
25                 THE WITNESS:  I believe
```



Page 14

```
 1                    T. FEIL
 2           I do.
 3                MR. BURSKY:   Okay.
 4      A.   Generically there was an
 5  arbitration proceeding, a customer
 6  arbitration proceeding that we were
 7  defending the firm's interest, the firm
 8  et al.'s interest.  I believe at that
 9  time there was also a lease negotiation
10  for an out of state office location, and
11  some regulatory related inquiries.
12      Q.   Okay.  Were those with FINRA?
13      A.   Some.  Yes, I believe one was
14  FINRA.
15      Q.   Do you have direct contact with
16  FINRA examiners on behalf of the firm?
17      A.   I did not have the direct
18  contact.
19      Q.   Okay.  Can I ask you if those
20  matters changed at all in the first part
21  of 2017, say, in the first two quarters?
22      A.   Excuse me for clarity, when you
23  say did they change --
24      Q.   Were there further matters,
25  yeah, I mean, were there any additional
```



Page 15

```
 1                     T. FEIL
 2  matters that you represented them on in
 3  the first two quarters of, say, 2017?
 4       A.   Not by specific retention --
 5  just for clarity of the record, not by
 6  specific retainer agreement.  There may
 7  have been ancillary matters that were
 8  brought to my attention where our counsel
 9  was sought.
10       Q.   Okay.  Can you remember what
11  any of those ancillary matters were,
12  generally?
13       A.   One was the matter of COR
14  Clearing.
15       Q.   Okay.  Specifically were you
16  asked to represent them, or what were you
17  asked to give them advice on in relation
18  to COR Clearing?
19       A.    In general terms there was an
20  issue involving the clearing firm
21  agreement.
22       Q.   Okay.  Do you recall what the
23  issue was?
24       A.    I do recall what it was, I just
25  don't know if I can go into detail on
```



Page 16

1                         T. FEIL

2    that.

3         Q.    Okay.   Generally -- by the way,

4    just so I can clarify the record, when

5    you say there was an issue with the

6    clearing firm agreement, which clearing

7    firm are you referring to?

8         A.    Thank you for that clarifying

9    question.   There was COR Clearing, there

10   was a COR Clearing agreement, and I think

11   the predecessor agreement was Hilltop

12   Securities.

13        Q.    Okay.   So generally, what

14   can -- can you tell me what the issue was

15   that you were being --

16        A.    Generally there was a -- there

17   was a conversation about transitioning

18   from one firm to another.

19        Q.    Okay.   Mr. Feil, do you know

20   why you are here today?

21        A.    Not completely.

22        Q.    Okay.

23        A.    To be frank, not completely.

24        Q.    That's fine.   You have an

25   Exhibit 42 there previously marked?



Page 17

```
 1                    T. FEIL
 2        A.   Can you bear with me one
 3   moment?
 4        Q.   Absolutely, sir.
 5        A.   Yes, I do.
 6        Q.   Okay.  If you look at
 7   Exhibit 42 you will see that it is a
 8   legal document titled "Amended Initial
 9   Disclosures Pursuant to Federal Rule
10   Civil Procedure 26(a)(1) made by First
11   Standard Financial Company, LLC."
12        A.   Yes.
13        Q.   Okay.  If you go to the last
14   page of the document, page six --
15        A.   Yes.
16        Q.   -- do you see that it is signed
17   on August 1, 2017, by Paul A. Lieberman
18   on behalf of the firm Eaton and Van
19   Winkle, LLP?
20        A.   Yes.
21        Q.   They sign as attorneys for
22   Defendants, First Standard Financial
23   Company, LLC?
24        A.   Yes.
25        Q.   Do you know what an initial
```



Page 18

```
 1                    T. FEIL
 2  disclosure pursuant to Federal Rule of
 3  Civil Procedure 26(a)(1) is generally?
 4      A.   Yes.
 5      Q.   Can you explain for the record,
 6  please?
 7      A.   Generally it is the FRCP
 8  mandate by a party to disclose the
 9  identity of all witnesses that may have
10  knowledge or information concerning the
11  claims or defenses in a civil action in
12  Federal Court.
13      Q.   Great.  If you will turn to
14  page four, sir.
15      A.   Yes.
16      Q.   You will see that there is a
17  chart at the top of the page?
18      A.   Yes.
19      Q.   Your name is listed in that
20  chart?
21      A.   Yes.
22      Q.   You are listed as counsel
23  for -- counsel.  Do you see that?
24      A.   Yes.
25      Q.   Your address, if you look back
```



```
 1                    T. FEIL
 2  at page three you will see the title
 3  headings, they didn't carry them over.
 4  Your address is listed as First Standard
 5  Financial, FSF?
 6       A.   I do see that, yes.
 7       Q.   It further goes on to say, "may
 8  by contacted through the undersigned
 9  counsel."  Do you see that?
10       A.   Yes.
11       Q.   Was your offices ever located
12  at First Standard?
13       A.   No.
14       Q.   Did you ever have a
15  conversation with anyone at First
16  Standard where you told them it was okay
17  to list them as -- list their address as
18  your address?
19                 MR. BURSKY:  Actually,
20            that's a different question
21            than what you are asking --
22            than what the chart reflects
23            because here it is Lieberman
24            counsel; right?
25                 MR. CANGIANO:  I will
```



```
1                      T. FEIL

2              get to that next, but it does

3              say address FSF.

4      Q.   I am just curious as to whether

5  you ever advised them that it was

6  appropriate for them to list you as --

7  with an address at FSF?

8      A.   I never advised them of such.

9      Q.   Did they ever ask you?

10     A.   Not to my recollection.

11     Q.   Then when it says, "may be

12 contacted through the undersigned

13 counsel," do you see that?

14     A.   Yes.

15     Q.   Did you ever -- did

16 Mr. Lieberman ever advise you that he was

17 going to be a contact person for you with

18 relation to anything?

19     A.   No, not at the time of this

20 document.

21     Q.   So you never -- you never gave

22 him any authority to list himself as a

23 contact person for you; did you?

24     A.   No.

25     Q.   Okay.  If you will flip back to
```



Page 21

1                    T. FEIL

2    page three quickly, the last box says,

3    "subject."

4        A.    Yes.

5        Q.    If you look next to your name

6    it says, "negotiation, execution,

7    performance, and frustration of the

8    clearing agreement."  Do you see that?

9        A.    I do.

10       Q.    Do you have any knowledge

11   regarding the negotiation of the clearing

12   agreement between Cor and First Standard?

13       A.    The negotiation -- and my

14   hesitation is just trying to understand

15   what could be encompassed in that phrase

16   or term.  Generally, no, I don't.

17       Q.    Okay.  Were you involved in

18   negotiating the clearing agreement

19   between Cor and First Standard at all?

20       A.    No.

21       Q.    Were you ever asked to review

22   any negotiated terms prior to the

23   agreement being executed?

24       A.    No.

25       Q.    Did you discuss any negotiated



Page 22

1                    T. FEIL
2    terms prior to the execution of the
3    contract between Cor and First Standard
4    with anyone at First Standard?
5        A.    Not to my recollection.
6        Q.    Is there anything that we could
7    use to refresh your recollection?
8        A.    Not that I can think of at the
9    moment.
10       Q.    Maybe looking back at your time
11   sheets, would that help at all?
12       A.    No.
13       Q.    Now, it also says that you have
14   knowledge regarding the execution of the
15   clearing agreement between Cor and First
16   Standard.  Do you have any knowledge
17   regarding the execution of the clearing
18   agreement between Cor and First Standard?
19       A.    Just so I understand the
20   question, prior to or contemporaneous of
21   the execution?
22       Q.    Let's start with prior to?
23       A.    No.
24       Q.    Okay.  And now let's move to
25   contemporaneous with?



Page 23

```
 1                     T. FEIL
 2      A.   No.
 3      Q.   Do you know when the agreement
 4   was executed between Cor and First
 5   Standard?
 6      A.   I believe it was the latter
 7   part of 2016.
 8      Q.   Sure.  Just so we can get this
 9   clear, you produced some documents in
10   relation to this case?
11      A.   Yes.
12      Q.   Do you have those documents
13   there?
14      A.   Yes.
15      Q.   Can you take the documents that
16   are Bates stamped TF 006 through 058,
17   which I think is the bulk of the
18   production.
19      A.   Yes.
20      Q.   Okay.  I am going to hand those
21   to the court reporter and ask her to mark
22   them for identification purposes as
23   Plaintiff's Exhibit 59.
24             (Whereupon, Bates stamped
25             TF 006 through 058 was marked
```



Page 24

```
 1                     T. FEIL
 2          as Plaintiff's Exhibit 59 for
 3          identification, as of this
 4          date.)
 5     Q.    Mr. Feil, can I ask you to look
 6  at these documents.  These were all
 7  produced from your files; is that
 8  correct?
 9     A.    Yes.
10     Q.    TF 006 through 12 appear to be
11  an e-mail chain; is that correct?
12     A.    Yes.
13     Q.    The top one is you forwarding
14  this e-mail chain on to your attorney;
15  correct?
16     A.    Yes.
17     Q.    Immediately under that is an
18  e-mail from Mr. McCormick to you; is that
19  correct?
20     A.    Yes.
21     Q.    That was sent on February 13,
22  2017; is that right?
23     A.    Yes.
24     Q.    If you will look at the very --
25  at page TF 012.
```



Page 25

```
 1                    T. FEIL
 2        A.   Yes.
 3        Q.   You will see there are two PDF
 4   attachments?
 5        A.   Yes.
 6        Q.   If you can look quickly through
 7   pages 13 through 58 and tell me if those
 8   represent the two attachments?
 9        A.   (Perusing.)  Yes.
10        Q.   These are the attachments that
11   Mr. McCormick sent to you on February 13,
12   2017?
13        A.   Yes.
14        Q.   Okay.  If you look at page TF
15   50.
16             MR. BURSKY:  5-0?
17             MR. CANGIANO:  5-0.
18        A.   Yes.
19        Q.   Okay.  You will see that -- you
20   see it says, "First Standard Financial
21   Company," and there is a signature
22   underneath that?
23        A.   I do see that.
24        Q.   Do you recognize the signature?
25        A.   I don't.
```



Page 26

```
 1                      T. FEIL
 2      Q.   Okay.  You see that it is
 3  dated, though, 11/18/2016?
 4      A.   Yes.
 5      Q.   Okay.  I will represent to you
 6  that Mr. Berardi has already testified
 7  that he signed this on or about
 8  November 18, 2016.  Then if you will go
 9  to page -- if you go to page 52.
10      A.   Yes.
11      Q.   You see this is a Schedule A of
12  clearing agreement, and it is dated at
13  the top October 27, 2016.
14      A.   Yes.
15      Q.   There are initials at the
16  bottom for correspondent.  Do you
17  recognize those initials?
18      A.   I don't.
19      Q.   If I represent to you that they
20  are Mr. McCormick's initials, that he has
21  already testified that he has signed them
22  or initialed them.  Had you seen either
23  of these --
24      A.   I'm sorry, I didn't catch the
25  first part of your --
```



Page 27

```
 1                    T. FEIL
 2      Q.    I am going to represent to you
 3   that those are Mr. McCormick's initials,
 4   and he has testified that he initialed it
 5   on or about that date.
 6           Had you seen either the
 7   clearing agreement or the Schedule A
 8   prior to February 13, 2017?
 9      A.    I don't recall.
10      Q.    Is there anything that we can
11   do to refresh your recollection as to
12   that?
13      A.    I don't believe so.
14      Q.    Okay.  Would a review of your
15   time sheets for the period of
16   October 2016 through February 2017 do
17   anything to refresh your recollection in
18   that regard?
19      A.    No.
20      Q.    Did you bill any time in that
21   period for reviewing this contract?
22      A.    I don't believe so.
23      Q.    Or the Schedule A?
24      A.    I don't believe so.
25      Q.    Do you remember discussing the
```



Page 28

```
 1                     T. FEIL
 2   contract with anyone at First Standard in
 3   or around November of 2016?
 4       A.    I don't believe so.
 5       Q.    Or the Schedule A?
 6       A.    I don't believe so.
 7       Q.    So you have no recollection as
 8   to whether at the time of the execution
 9   of the agreements you had any personal
10   knowledge in regards to them?
11       A.    Personal knowledge with regard
12   to the content of the documents, no.
13       Q.    The content or the execution of
14   the documents?
15       A.    Without receiving a document my
16   only hesitation is there may have been a
17   generic or general discussion about the
18   documents without me seeing them.  I may
19   have been aware of it, I just don't
20   recall the contact time-frame.
21       Q.    So if you can look back at
22   Exhibit 59.
23                   MR. BURSKY:  Page 59?
24                   MR. CANGIANO:  No, the
25             exhibit.  I am sorry.  Just
```



Page 29

```
 1                    T. FEIL
 2          the exhibit right now.
 3                MR. BURSKY:  Going to
 4          the very beginning?
 5                MR. CANGIANO:  Yes.
 6                MR. BURSKY:  TF 001?
 7                MR. CANGIANO:  Let's go
 8          to TF 008.
 9                MR. BURSKY:  08?
10                MR. CANGIANO:  Yes.
11                MR. BURSKY:  Okay.  We
12          are there.
13      Q.   You will see that this is an
14  e-mail from Ethan McComb to Jonathan
15  McCormick copying some other people as
16  well?
17      A.   Yes.
18      Q.   Do you know who Mr. McComb is?
19      A.   I do.
20      Q.   Who do you know him to be?
21      A.   The in-house general counsel
22  for COR Clearing.
23      Q.   Okay.  Have you ever had any
24  discussions with Mr. McComb?
25      A.   I have.
```



Page 30

```
 1                      T. FEIL
 2      Q.   What did you discuss with him?
 3      A.   Well, may I ask a clarifying
 4 point or question?  Are you relegating
 5 that question only to this matter with
 6 COR Clearing?
 7      Q.   Have you had contacts with
 8 Mr. McComb unrelated to First Standard?
 9      A.   Yes.
10      Q.   Okay.  So I don't care about
11 your contacts unrelated to First
12 Standard.  Just in regards to First
13 Standard, have you had any contacts with
14 Mr. McComb?
15      A.   I don't specifically recall.
16      Q.   Okay.  Did you have any
17 contacts with Mr. McComb regarding the
18 negotiation of this agreement?
19      A.   No.
20      Q.   Did you have any contacts with
21 Mr. McComb regarding the execution of
22 this agreement?
23      A.   No.
24      Q.   Have you had any contacts with
25 Mr. McComb regarding this agreement at
```



```
 1                        T. FEIL
 2   all?
 3        A.    There may have been one brief
 4   telephone call in early 2017 regarding
 5   the agreement.
 6        Q.    Do you recall what would have
 7   been discussed?
 8        A.    I believe -- I believe it was
 9   the -- it was relative to a letter that
10   COR Clearing had sent in or about
11   February 2017 regarding the alleged
12   breach of the clearing agreement.
13        Q.    Okay.  You just broke up there
14   a little bit towards the end.  In or
15   about when?
16        A.    I believe it was in or about
17   the same time period of that -- of the
18   letter that COR Clearing sent to First
19   Standard regarding the purported breach
20   of the clearing agreement.
21        Q.    Do you recall what you sent to
22   Mr. McComb?
23        A.    Not specifically.
24        Q.    Do you recall what he said to
25   you?
```



Page 32

```
 1                    T. FEIL
 2      A.   Not specifically, no.
 3      Q.   Do you recall how long the call
 4  was?
 5      A.   It was brief, maybe a few
 6  minutes, if at all.
 7      Q.   Okay.  As a result of the call,
 8  did you do anything?
 9      A.   I don't understand the
10  question, sorry.
11      Q.   As a result of whatever you and
12  Mr. McComb discussed, did you take any
13  actions thereafter?
14      A.   With Mr. McComb?
15      Q.   With regard to anything in
16  relation to First Standard?
17      A.   Right.  I am sorry, I don't
18  specifically recall what transpired
19  thereafter.
20      Q.   Is there anything that would
21  refresh your recollection?
22      A.   I don't believe so.
23      Q.   Would a review of your time
24  sheets at all refresh your recollection?
25      A.   No.
```



```
 1                      T. FEIL
 2      Q.    Did you bill time for making
 3   the call?
 4      A.    I don't believe so.
 5      Q.    Okay.  You said that the call
 6   was in regards to a letter regarding a
 7   purported breach of the agreement; is
 8   that correct?
 9      A.    Yes.
10      Q.    That's the agreement that we
11   just looked at, the one that you were
12   sent on the 13th?
13      A.    Yes.
14      Q.    Why do you say it was a
15   purported breach?
16      A.    Well, I believe there was a
17   divergence of opinion in or about that
18   time First Standard and Cor as to whether
19   there was in fact a breach.
20      Q.    Okay.  And do you recall what
21   the substance of the disagreement was?
22      A.    No.
23      Q.    Did you have any personal
24   knowledge regarding the breach or
25   purported breach of the contract?
```


MAGNA
LEGAL SERVICES

1                    T. FEIL

2        A.    I have no personal knowledge,

3    no.

4        Q.    Or any of the facts or

5    circumstances regarding the breach or

6    purported breach of the contract?

7        A.    I generally recall that being

8    informed by First Standard that there was

9    a conference call between principals at

10   First Standard and Cor, and there was

11   some heated debate about going forward

12   with the agreements.  There were some

13   concerns by First Standard by its rep

14   force about transitioning to Cor.  There

15   was concern by FINRA about the

16   transaction itself, and some perceived

17   business interruption issues, significant

18   business interruption issues that could

19   result with the intended transaction.

20       Q.    Okay.  What personal knowledge

21   do you have regarding the issue of -- any

22   of the issues raised by the rep force

23   that you just referenced?

24       A.    As I stated in response to the

25   question before, I have no personal



Page 35

```
 1                      T. FEIL
 2  knowledge.  This was all information that
 3  was shared with me in or about this late
 4  2016, early 2017 time-frame.
 5       Q.   It was shared to you by
 6  management at First Standard?
 7       A.   Correct.
 8       Q.   So you never spoke to anyone on
 9  the rep force, and no one on the rep
10  force ever expressed any concern to you?
11       A.   Not to me, no.
12       Q.   Now, regarding FINRA, were you
13  present for any discussions with FINRA
14  where FINRA raised any issues in regards
15  to the contract between Cor and First
16  Standard?
17       A.   No.
18       Q.   Have you had any independent
19  conversations with anyone at FINRA where
20  any issues were raised regarding the
21  contract between Cor and First Standard?
22       A.   No.
23       Q.   Do you know who William Jacob
24  is?
25       A.   I believe he is a FINRA
```



```
 1                    T. FEIL
 2   employee.
 3       Q.    Okay.  Have you had any
 4   conversations with Mr. Jacob regarding
 5   the contract between Cor and First
 6   Standard?
 7       A.    I have not.
 8       Q.    Just so that I can exhaust all
 9   of the topics that you raised, do you
10   have any personal knowledge of any -- of
11   the business interruption issues that
12   were identified to you?
13       A.    No, and as I stated, I have no
14   personal knowledge of any of those
15   issues.
16       Q.    So the only basis for your
17   statement is you were informed of this by
18   the First Standard management?
19       A.    That's my knowledge base, yes.
20       Q.    Were you ever asked for any --
21   to provide any legal advice regarding any
22   of those subjects?
23       A.    Just for clarity purposes,
24   those subjects are business
25   interruption --
```



Page 37

1                    T. FEIL

2        Q.   I can break them down.

3        A.   Okay.

4        Q.   Were you ever asked to provide

5   any legal advice with regards to the

6   issues, the purported issues regarding

7   the rep force, and the Cor/First Standard

8   agreement?

9        A.   There were discussions in that

10  regard, yes.

11       Q.   Where your legal advice was

12  sought?

13       A.   I would say it was in

14  connection with a legal consultation,

15  yes.

16       Q.   Were you ever asked to provide

17  any legal advice concerning FINRA and the

18  Cor/First Standard agreement?

19       A.   There was a discussion in that

20  realm with management at First Standard.

21       Q.   Do you recall when that was?

22       A.   I believe it was in or about

23  that same late 2016, early 2017

24  time-frame.

25       Q.   Okay.  Can I ask you what the



Page 38

```
 1                    T. FEIL
 2   nature of the legal advice was?
 3        A.   I don't believe I am at liberty
 4   to say.
 5        Q.   So I just want to get it on the
 6   record, are you asserting a privilege?
 7        A.   Any communications had on those
 8   issues I believe is covered squarely by
 9   the attorney-client privilege.
10        Q.   Okay.  That's fine.  I just
11   want to get it on the record.
12        A.   Yes.
13        Q.   Likewise, the legal advice that
14   you asked in regards to the rep force?
15        A.   Yes.
16        Q.   You are -- yes, you are
17   asserting privilege to that as well?
18        A.   Yes, there was a discussion,
19   and any of those discussions are covered
20   by the attorney-client privilege.
21        Q.   Okay.  Were you asked to
22   provide any legal advice in regards to
23   the business interruption issues?
24        A.   There were discussions in the
25   same realm and manner as the other two
```



```
 1                    T. FEIL
 2    topics that we just discussed.  And yes,
 3    I believe it is covered by
 4    attorney-client privilege.
 5         Q.   Did they take your advice on
 6    any of those subjects?
 7         A.   I don't know if they took it or
 8    not.  I don't know that I can answer
 9    that.
10         Q.   You don't know you can answer
11    that because you believe it to be
12    privileged, or you just don't know the
13    answer to the question?
14         A.   I think there are a lot of
15    variables in that answer.  There was a
16    discussion.  More than that, I can't say
17    what they used to make any decisions.
18         Q.   If you go back to the initial
19    disclosures, it says that you have
20    discoverable information concerning the
21    performance of the clearing agreement
22    between Cor and First Standard.  Are you
23    aware -- do you have any information,
24    personal information regarding the
25    performance of the clearing agreement?
```



Page 40

```
 1                    T. FEIL
 2              MR. BURSKY:  When you
 3         say, "personal information,"
 4         do you mean personal
 5         knowledge?
 6     Q.   Personal knowledge, do you have
 7  any personal knowledge?
 8     A.   I have no personal knowledge.
 9     Q.   Okay.  Did you have any
10  discussions with anyone at First Standard
11  regarding the performance of the clearing
12  agreement?
13     A.   Or lack thereof, yes.
14     Q.   Okay.  Do you recall when you
15  had those conversations?
16     A.   Yes, in that same time period
17  of late 2016, early February 2017.
18     Q.   Do you recall who you had them
19  with?
20     A.   Yes.
21     Q.   Who was it?
22     A.   I believe it was Jonathan
23  McCormick.
24     Q.   Okay.  So now you have
25  indicated that you represented
```



Page 41

```
 1                    T. FEIL
 2   Mr. McCormick both individually and you
 3   represent First Standard.  Were you
 4   speaking to Mr. McCormick as an
 5   individual, or were you speaking to him
 6   as a representative of the company?
 7        A.   As a principal of the company.
 8        Q.   Do you know if Mr. McCormick is
 9   a principal of the company?
10        A.   Yes.
11        Q.   What interest does he hold in
12   the company?
13        A.   In terms of his office or
14   share, I believe he is chief operating
15   officer.
16        Q.   Okay.  Does he have a personal
17   equity interest in the company at all; do
18   you know?
19        A.   I don't -- at that time, I
20   don't -- I don't know if it has changed,
21   but I think at that time he did not have
22   an equity interest.
23        Q.   Do you still represent him
24   personally?
25        A.   No.
```



Page 42

```
 1                    T. FEIL
 2      Q.    Do you still represent First
 3 Standard?
 4      A.    Yes.
 5      Q.    Throughout this period, were
 6 you their primary attorney?
 7      A.    No.
 8      Q.    Do you know who their primary
 9 attorney was?
10      A.    You know, as far as primary, at
11 that time I don't know that that phrase
12 fits.  I think they had a few different
13 outside counsels that handled various
14 sectors of the firm business.
15      Q.    Do you know who any of them
16 were?
17      A.    Yes.
18      Q.    Can you name them for me?
19      A.    I believe Ian Frimet of Wexler
20 Burkhart was one of them, and I believe
21 Paul Lieberman.
22      Q.    Okay.  Those attorneys were
23 representing First Standard
24 contemporaneous to your representation as
25 well?
```



Page 43

```
 1                    T. FEIL
 2      A.   I am confident Ian Frimet of
 3 Wexler Burkhart was.  I am not sure if
 4 Paul Lieberman and/or his firm overlapped
 5 that same time period.  As I testified,
 6 my time-frame spans from, I think, mid
 7 2016.
 8                MR. BURSKY:  Hold on.  I
 9           have an emergency.  Wait one
10           second.  Please.
11                MR. CANGIANO:  We will
12           go off for five minutes.
13                (Whereupon, a short break
14           was taken at this time.)
15      Q.   So you didn't have any
16 involvement in reviewing or comments on
17 any drafts of the agreement between Cor
18 and First Standard; is that correct?
19      A.   Correct.
20      Q.   Do you know if Mr. Frimet did?
21      A.   I believe that's correct.
22      Q.   Okay.  You didn't have any
23 involvement advising Hilltop that First
24 Standard was terminating its agreement
25 with Hilltop?
```



Page 44

```
 1                    T. FEIL
 2      A.   Correct, I did not.
 3      Q.   Do you know if Mr. Frimet was
 4  involved in that at all?
 5      A.   I don't.
 6      Q.   Did you have any -- you didn't
 7  have any involvement -- did you have any
 8  involvement with the decision to renew
 9  negotiations with Hilltop after First
10  Standard entered into the Cor agreement?
11      A.   No.
12      Q.   Did they advise you that they
13  were considering re-entering into
14  negotiations with Hilltop after they
15  entered into the agreement with Cor?
16      A.   I believe they did.
17      Q.   Do you recall when that was?
18      A.   I do not.
19      Q.   Was it prior to February of
20  2017?
21      A.   I believe it must have been,
22  but I just can't recall when.
23      Q.   Were you asked to provide any
24  legal advice with regards to that?
25      A.   As I addressed earlier, that
```



Page 45

```
 1                    T. FEIL
 2   was the nature of the legal consultation.
 3        Q.    Their desire to renew
 4   negotiations with Hilltop?
 5        A.    No.
 6        Q.    Okay.  So maybe I have lost it.
 7   Let me re-ask the question.  Were you
 8   asked to provide legal advice regarding
 9   the decision to reopen negotiations with
10   Hilltop after the Cor agreement was
11   signed?
12        A.    No.
13        Q.    You mentioned before that you
14   were advised that there were issues, you
15   were advised by First Standard management
16   that there were issues that FINRA had
17   raised; correct?
18        A.    Yes.
19        Q.    Do you remember what facts were
20   provided to you with regards to that?
21        A.    I do not.
22        Q.    Do you remember what the issue
23   was that FINRA purportedly raised?
24        A.    In a very general summary that
25   there was some indication or commentary
```



MAGNA ▶
LEGAL SERVICES

Page 46

1                    T. FEIL

2     by FINRA that Cor may not be the most

3     appropriate fit.

4          Q.   Okay.  And do you recall who

5     supposedly said that?

6          A.   Who at FINRA?

7          Q.   Yes.

8          A.   I do not.

9          Q.   Did you reach out to anyone

10    other than First Standard in regards to

11    that issue?

12         A.    I don't believe I said I

13    reached out to anybody on it, but that

14    was communicated to me by First Standard.

15         Q.   Okay.  So did you then reach

16    out to anyone at all, not -- as a result

17    of that issue being raised by First

18    Standard?

19         A.   I did not.

20         Q.   Okay.  Do you recall doing any

21    research as a result of being informed

22    that that issue had been raised by FINRA?

23         A.   No.

24         Q.   Do you recall at all being told

25    that FINRA advised them not to --



Page 47

1                         T. FEIL

2      directed them not to perform the

3      contract?

4          A.    Can you please repeat that?

5          Q.    Sure.  Do you recall being --

6      were you ever advised that FINRA had

7      directed them not to change clearing

8      firms?

9          A.    I don't believe I used the term

10     "directed," but, again, I was told that

11     by First Standard.  I did not

12     subsequently go out and do anything with

13     that information.

14         Q.    Okay.  But what I am asking is,

15     were you told by them that they were told

16     that they couldn't do it?

17         A.    I don't believe that was the

18     language, the specific language that

19     there was an edict by FINRA that they

20     couldn't.

21         Q.    That there was not one;

22     correct?

23         A.    Correct.

24         Q.    Did you ever see anything in

25     writing from FINRA expressing concern



Page 48

```
 1                    T. FEIL
 2  with First Standard clearing with Cor?
 3       A.   No.
 4       Q.   Did you ever see any e-mails
 5  from any FINRA examiner or representative
 6  expressing any concerns with FINRA moving
 7  to Cor --
 8       A.   Same response, no.
 9       Q.   Let me correct my question.
10  From First Standard moving to Cor?
11       A.   No.
12       Q.   Did you have any discussions
13  with anyone at Hilltop regarding the
14  Cor/First Standard agreement?
15       A.   No.
16       Q.   Were you consulted on any
17  matters at all regarding the
18  Hilltop/First Standard clearing
19  relationship?
20       A.   Not more than I have already
21  testified.
22       Q.   Okay.  So you had no
23  involvement in their initial contract
24  with -- between Cor and First Standard --
25  rather, First Standard and Hilltop?
```



Page 49

```
 1                    T. FEIL
 2      A.    Correct, I had no involvement.
 3      Q.    First Standard and Southwest?
 4      A.    Correct, I had no involvement
 5   with either the Hilltop and/or Southwest
 6   agreement.
 7      Q.    Okay.  What about the renewed
 8   terms that they entered into eventually,
 9   were you ever asked to review those
10   renewed terms?
11      A.    I don't believe so.
12      Q.    Were you ever asked to review
13   any reviewed Schedule A regarding Hilltop
14   and First Standard?
15      A.    I don't believe so.
16      Q.    Were you ever asked to consult
17   with FINRA in regards to the
18   nonperformance of the Cor/First Standard
19   agreement?
20      A.    As I -- no.
21      Q.    Did you have any discussions
22   with anyone at FINRA regarding this
23   lawsuit?
24      A.    No.
25      Q.    Were you ever asked to provide
```



Page 50

```
 1                      T. FEIL
 2   any legal advice concerning the affect of
 3   this lawsuit on First Standard's filings
 4   with FINRA?
 5        A.   Can you repeat that?
 6                 MR. CANGIANO:  Can you
 7             read back my question?
 8                 (Whereupon, a portion of
 9             the testimony was read back.)
10        A.   No.
11        Q.   Did you ever speak to anyone at
12   FINRA regarding this lawsuit's effect on
13   First Standard's net capital
14   calculations?
15        A.   No.
16        Q.   Were you ever asked to provide
17   any legal advice by First Standard
18   regarding net capital calculations and
19   this lawsuit?
20        A.   I did have a discussion that I
21   believe is covered by attorney-client
22   privilege.
23        Q.   Okay.  Do you recall when you
24   had that discussion?
25        A.   During the last few months.
```



```
 1                    T. FEIL
 2      Q.   Okay.  Do you recall who you
 3  had it with?
 4      A.   Yes.
 5      Q.   What is your basis for
 6  believing that it is covered by the
 7  attorney-client privilege?
 8      A.   There were inquiries made by
 9  now general counsel to First Standard to
10  myself.
11      Q.   And those inquiries were with
12  regards to net cap calculations and that
13  lawsuit?
14      A.   Yes.
15      Q.   Who is the general counsel at
16  First Standard?
17      A.   Jay Israel.
18      Q.   And when did he become general
19  counsel; do you know?
20      A.   I believe it was late 2017,
21  perhaps December.
22      Q.   So it was after the
23  commencement of this lawsuit?
24      A.   If that's when it was.  It may
25  have been a little before, a little
```



Page 52

```
 1                    T. FEIL
 2   after.  I can't be sure.
 3       Q.   Were you aware that this
 4   lawsuit commenced in March of 2017?
 5       A.   Yes.
 6       Q.   Were you asked to provide any
 7   legal advice with regards to this
 8   lawsuit?
 9       A.   No.
10       Q.   Were you ever asked prior to
11   today to review the amended initial
12   disclosures that we looked at,
13   Plaintiff's Exhibit 42?
14       A.   Was I asked prior to today?
15       Q.   Yes.  We looked at it this
16   morning, so prior to today?
17       A.   Right.  I did.  I was presented
18   the document in the last month or so.
19       Q.   Okay.  Was that after it became
20   clear that your testimony was going to be
21   requested?
22       A.   Yes.
23       Q.   Okay.  So prior to that you had
24   not seen that document?
25       A.   Correct.
```



Page 53

```
 1                    T. FEIL
 2      Q.   What information do you
 3  personally have regarding the -- and I am
 4  looking back at the initial
 5  disclosures -- frustration of the
 6  clearing agreement?
 7      A.   The only thing that I have,
 8  which is what was provided, that I think
 9  would fall under that category would be
10  that Cor letter in or about
11  February 2017.
12      Q.   Okay.  So if we can go back to
13  the documents that you produced, and look
14  at pages one through five?
15      A.   Yes.
16      Q.   I am going to give those pages
17  Bates stamped TF 001 through TF 005 to
18  the court reporter and ask her to mark it
19  for identification purposes as
20  Plaintiff's Exhibit 60.
21              (Whereupon, Bates stamped
22              TF 001 through TF 005 was
23              marked as Plaintiff's Exhibit
24              60 for identification, as of
25              this date.)
```



Page 54

```
 1                    T. FEIL
 2      Q.   Do you have that in front of
 3  you, sir?
 4      A.   I do.
 5      Q.   Can I ask you to review that,
 6  please?
 7      A.   (Perusing.)  Yes.
 8      Q.   Okay.  The first three pages,
 9  TF 001 through 003, are a series of
10  e-mails; is that correct?
11      A.   Yes.
12      Q.   And the first one is an e-mail
13  that you sent to your counsel,
14  Mr. Bursky; correct?
15      A.   Yes.
16      Q.   And that's forwarding the other
17  ones?
18      A.   Yes.
19      Q.   Okay.  So the next e-mail on
20  this list in the chain is from Jonathan
21  McCormick to you sent on February 13,
22  2017; do you recall receiving that?
23      A.   I do.
24      Q.   Okay.  And that's forwarding an
25  e-mail from Mr. McComb to Mr. Berardi,
```



Page 55

```
 1                    T. FEIL
 2   Mr. McCormick, and CCing a bunch of other
 3   people; do you see that?
 4        A.   I do.
 5        Q.   Okay.  It has got an attachment
 6   to it?
 7        A.   Yes.
 8        Q.   And that's pages TF 004 to 005?
 9        A.   Yes.
10        Q.   Which is a letter from
11   Mr. McComb to Mr. Berardi and
12   Mr. McCormick?
13        A.   Yes.
14        Q.   Is this the letter we have been
15   discussing?
16        A.   Yes.
17        Q.   Okay.  And you received this
18   from Mr. McCormick on February 13th;
19   correct?
20        A.   Yes.
21        Q.   Okay.  Were you asked to
22   provide legal advice with regards to this
23   letter?
24        A.   I was consulted for purposes of
25   this letter.
```



Page 56

```
 1                    T. FEIL
 2      Q.   Okay.  Were you consulted with
 3  regard to your provision of legal advice?
 4      A.   The communications with myself
 5  and First Standard regarding this letter
 6  was in the confines of a legal
 7  consultation, yes.
 8      Q.   Okay.  Do you recall what
 9  subject your legal advice was sought?
10      A.   The subject matter of the
11  letter.
12      Q.   Okay.  Does looking at the
13  letter -- when you said you spoke to
14  Mr. McComb, did you speak to him -- you
15  spoke to him regarding this letter; is
16  that correct?
17      A.   I believe I did.
18      Q.   Okay.  Looking at the letter,
19  does that refresh your recollection as to
20  anything that you and he may have
21  discussed in your call?
22      A.   Well, it does, but I think I
23  testified earlier that -- yes, I did
24  speak to him, and it was relative to this
25  letter.
```



1                      T. FEIL

2          Q.    I am asking does looking at the

3    letter now refresh your recollection as

4    to any specific things that you discussed

5    with him, or he discussed with you?

6          A.    No.  The letter does not.

7          Q.    Okay.  Did you undertake any

8    other actions as a result of receiving

9    this letter other than speaking to

10   Mr. McComb?

11         A.    No.

12         Q.    Did you do any legal research

13   as a result of receiving this letter?

14         A.    I don't recall.

15         Q.    Did you write any responses to

16   Mr. McComb or anyone at Cor as a result

17   of receiving this letter?

18         A.    No.

19         Q.    Do you recall what the result

20   of your conversation with Mr. McComb on

21   the phone was, if anything?

22         A.    I believe there was no result.

23   It was a very brief conversation, and

24   there was no result, there was no

25   happening.  The call was the sum and



Page 58

```
 1                    T. FEIL
 2   substance of -- there was no result.
 3       Q.    Okay.  Do you recall any other
 4   discussions thereafter regarding the
 5   claim that First Standard had breached
 6   the agreement with Cor?
 7       A.    I'm sorry, with Mr. McComb?
 8       Q.    Sure, with Mr. McComb?
 9       A.    No.
10       Q.    Do you recall ever being
11   consulted further with regards to the
12   claim that First Standard had breached
13   the agreement with Cor between, let's
14   say, the date of February 13th, and the
15   filing of this Complaint?
16       A.    I believe there was
17   conversation with First Standard, but
18   after that, no, nothing further.
19       Q.    Okay.  Do you recall what you
20   discussed with First Standard in regards
21   to that?
22       A.    I do.
23       Q.    Okay.  Can I ask you what that
24   was?
25       A.    I don't believe so.  That
```



Page 59

```
 1                    T. FEIL
 2  conversation would be covered by
 3  attorney-client privilege.
 4      Q.   And why do you believe that it
 5  would be covered by attorney-client
 6  privilege?
 7      A.   Because it was in connection
 8  with a legal consult.
 9      Q.   Okay.  What further legal
10  consultation did you have with them?
11  What was the general subject of it?
12      A.   This letter, and my
13  conversation with Ethan McComb.
14      Q.   Do you recall if you made any
15  notes of your conversation with
16  Mr. McComb, short as it may have been?
17      A.   I do recall that I did not.
18      Q.   Can I ask you to look at
19  Plaintiff's Exhibit 37, which was sent to
20  you yesterday, it was previously marked.
21      A.   Yes.
22      Q.   Okay.  This is an e-mail from
23  Mr. McComb to Mr. Berardi, and
24  Mr. McCormick, and it CCs some other
25  people.  It says, "dear Mr. Berardi and
```



```
 1                  T. FEIL
 2   McCormick, I am writing to follow up on
 3   our February 13th letter attached below
 4   in which we asked that First Standard let
 5   us know whether First Standard intends to
 6   immediately hear breaches of the FCDA,
 7   and fulfill its obligations under the
 8   FCDA.  Since we have not received any
 9   response to our request we are writing
10   again to ask that First Standard please
11   respond."
12           Do you recall if you were
13   provided a copy of this e-mail?
14       A.   I don't.
15       Q.   You see that it is dated
16   February 21, 2017?
17       A.   Yes.
18       Q.   Do you believe that you spoke
19   to Mr. McComb prior to this e-mail being
20   sent?
21       A.   I don't recall whether it was
22   shortly before or afterwards.
23       Q.   Okay.  Do you have any reason
24   to believe that he would be questioning
25   as to whether they had responded if you
```



MAGNA
LEGAL SERVICES

```
 1                   T. FEIL
 2  had spoken to him already?
 3      A.    I don't -- I can't answer that.
 4      Q.    Do you recall if when you spoke
 5  to him you would -- you advised him that
 6  they would be providing a further
 7  response?
 8      A.    No, I don't recall that.
 9      Q.    So is it safe to say that your
10  involvement with regards to the agreement
11  between Cor and First Standard happened
12  subsequent to the agreement being signed,
13  and around the time that they were
14  breaching or purportedly breaching the
15  agreement?
16      A.    That's a fair statement.
17      Q.    And that prior to that you had
18  no real involvement with the agreement or
19  the decision to seek a new agreement with
20  Cor?
21      A.    Seek a new agreement with --
22      Q.    Seek a new clearing
23  relationship with Cor?
24      A.    Yes, my involvement was after
25  the execution, and in that late 2016,
```



Page 62

```
 1                    T. FEIL
 2  early 2017 time-frame.
 3       Q.   Around the time of the
 4  allegation that First Standard had
 5  breached the agreement?
 6       A.   Yes.
 7       Q.   And even as to that you have no
 8  personal of any facts?
 9       A.   Other than what I have stated,
10  yes.
11       Q.   Other than what you were told
12  by First Standard's management, you have
13  no personal knowledge of any of the facts
14  surrounding it?
15       A.   Correct.
16       Q.   Okay.
17            MR. CANGIANO:  Can we
18            take a minute or two off the
19            record?
20            MR. BURSKY:  Sure.
21            (Whereupon, a short break
22            was taken at this time.)
23       Q.   Mr. Feil, can you take a look
24  at what has been previously marked as
25  Plaintiff's Exhibit 38, please?
```



Page 63

```
1                        T. FEIL

2        A.    Yes.

3        Q.    Okay.   That's the First Amended

4   Complaint in this matter.

5        A.    Yes, it appears to be.

6        Q.    Have you seen this before?

7        A.    Yes.

8        Q.    Okay.   In what context have you

9   seen it?

10       A.    In or about the time that it

11  was filed, I believe we were made aware

12  of it, of same.

13       Q.    Okay.   I am sorry, finish your

14  answer.

15       A.    Then I think we pulled it up

16  through ECF.

17       Q.    Okay.  Did you review it at

18  that time?

19       A.    Yes.

20       Q.    Okay.  Do you have any

21  discoverable non-privileged information

22  regarding the factual allegations in this

23  Complaint?

24       A.    No.

25                    MR. BURSKY:  Before you
```



Page 64

```
 1                       T. FEIL
 2            say that, I mean, did you
 3            review the Complaint?
 4                 MR. CANGIANO:  He can
 5            feel free to.  If he wants to
 6            re-review the Complaint,
 7            because he did say that he
 8            has reviewed it once at
 9            least, but if he wants to
10            re-review it, it is
11            completely up to him.
12                 MR. BURSKY:  Keep in
13            mind some documents have been
14            furnished from you already
15            from Cor standpoint which may
16            be issues raised in the
17            Complaint; right?
18                 MR. CANGIANO:  You mean
19            the documents that he has
20            produced, and we have already
21            gone through?
22                 MR. BURSKY:  Right.
23       A.   Nothing more than what I have
24    previously provided through Mr. Bursky.
25       Q.   So since we are talking about
```



Page 65

1                          T. FEIL
2    the documents, can I ask you what sort of
3    review you did to find documents in
4    regards to the case?
5                    MR. BURSKY:  If I
6            understood correctly the
7            question is what documents?
8        Q.   What review did you undertake
9    to find documents, what search?
10       A.   It was -- we reviewed
11   documented, or I reviewed any documents
12   that we had on our server for First
13   Standard relative to Cor, and we also --
14   I also did an e-mail search.
15       Q.   Did you maintain a physical
16   file in regards to First Standard?
17       A.   Not for this matter.
18       Q.   Okay.  The only documents that
19   you found that were responsive to the
20   Subpoena were the ones that you produced?
21       A.   Correct.
22       Q.   Okay.  And you can't think of
23   anywhere else where such documents might
24   be?
25       A.   No.



1                         T. FEIL

2       Q.    And you haven't withheld any

3  documents on the basis of privilege?

4       A.    No.

5       Q.    Okay.  Do you have any

6  understanding as to why First Standard

7  continues to maintain your name on their

8  Amended Initial Disclosures?

9       A.    Frankly, no.

10      Q.    Have you asked them to amend to

11 remove your name?

12      A.    I don't believe it went that

13 far other than perhaps to point out that

14 there was a different attorney that was

15 involved in the negotiation or drafting

16 process on behalf of First Standard, and

17 perhaps there was some confusion at that

18 point.

19      Q.    You advised Mr. Lieberman of

20 that?

21      A.    Very recently, yes.

22      Q.    Okay.  By "very recently," does

23 that mean when you found out that you

24 were going to be called as a witness in

25 this matter?



Page 67

```
 1                      T. FEIL
 2      A.   Yes.
 3      Q.   Okay.  And that was within the
 4  past month; is that right?
 5      A.   Approximately, yes.
 6      Q.   Okay.  Mr. Lieberman had not
 7  discussed with you the fact that you had
 8  been named as a potential witness as far
 9  back as August 2017; did he?
10      A.   I don't believe I was made
11  aware of that until recently.
12      Q.   Okay.  Have you had any
13  discussions, other than the ones we just
14  talked about, with Mr. Lieberman in
15  regards to this case?
16      A.   Very generally just getting
17  sort of the update as to timing.
18      Q.   Okay.  Do you remember when
19  that was?
20      A.   In or about the same time of
21  the Subpoena.
22                THE WITNESS:  Can you
23          give me one second?
24                (Whereupon, a short break
25          was taken at this time.)
```



Page 68

1                          T. FEIL

2        Q.    You said that you had

3   identified to Mr. Lieberman that perhaps

4   you were not the correct attorney to

5   call, and that there was another attorney

6   who was involved in the drafting and

7   negotiation process; do you recall that

8   testimony?

9        A.    Yes.

10       Q.    And which attorney were you

11  referring to?

12       A.    Ian Frimet.

13       Q.    It is your understanding if

14  anyone has any information regarding that

15  it would be Mr. Frimet?

16       A.    That's my understanding, yes.

17       Q.    Did you have any discussions at

18  all with Mr. Lieberman regarding your

19  testimony here today?

20       A.    Yes, I had conversations with

21  him.

22       Q.    Okay.  What was said?

23       A.    Generally why am I being

24  called, and is it necessary.

25       Q.    And do you recall what he said



Page 69

1                    T. FEIL

2   to you?

3        A.   Yes, that I was previously

4   identified, and, you know, the capacity

5   in which I was identified, and my retort

6   that I don't think the description is

7   quite correct from the 26(a).

8        Q.   Okay.  Great.  Do you recall

9   any further response to him in regards to

10  that?

11       A.   No, not really.

12       Q.   Do you recall how many

13  conversations you had with him in that

14  regards, I mean, how many times you spoke

15  to him in regards to this issue?

16       A.   Two or three limited, and

17  then -- yeah, two or three.

18       Q.   Okay.  That's within the past

19  month; is that right?

20       A.   Yes.

21       Q.   Okay.  Have you spoken to

22  Mr. Lieberman since you retained

23  Mr. Bursky?

24       A.   I don't believe so.

25       Q.   Has there been any discussion



Page 70

```
 1                    T. FEIL
 2   about First Standard covering
 3   Mr. Bursky's fees on your behalf?
 4        A.   I don't believe so.  I think
 5   that's my responsibility.
 6        Q.   Your responsibility to ask them
 7   to do so?
 8        A.   No, I think my responsibility
 9   to pay Mr. Bursky.
10        Q.   Do you plan to ask them to
11   reimburse you?
12        A.   I am sorry?
13        Q.   Do you plan to ask them to
14   reimburse you?
15        A.   No.
16        Q.   Do you plan to ask them to
17   compensate you for the time you had to
18   spend here today?
19        A.   No.
20              MR. CANGIANO:  Off the
21             record.
22              (Whereupon, a discussion
23             was held off the record.)
24              MR. CANGIANO:  Mr. Feil,
25             I think that's all of the
```



Page 71

1                         T. FEIL

2          questions we have for you.

3          Thank you very much for your

4          time and your patience, and

5          we will close our deposition

6          of you.

7                 THE WITNESS:  You are

8          very welcome, and thank you

9          for the accommodation via

10         zoom.

11                MR. CANGIANO:  Happy to

12         help.  Hopefully it was a

13         little easier than Skype.  We

14         had issues with Skype

15         depositions before.

16                MR. BURSKY:  Will you be

17         sending us a copy of this

18         transcript to review?

19                MR. CANGIANO:  I believe

20         that -- I don't want to

21         advise as to what the rules

22         are, but I believe it is your

23         responsibility to ask for it,

24         and if you do the court

25         reporter will provide one to



Page 72

```
 1                    T. FEIL
 2          you.
 3                MR. BURSKY:  I just
 4          wanted to know if you were
 5          doing so as a matter of
 6          course.
 7                MR. CANGIANO:  We would
 8          absolutely send you a copy of
 9          it, but I think in order to
10          be able to -- we can off the
11          record.
12                (TIME NOTED: 12:40 p.m.)
13
14
                        TIMOTHY FEIL
15
    Subscribed and sworn to
16
    before me this      day
17
    of              , 2018.
18
19
        NOTARY PUBLIC
20
21
22
23
24
25
```



Page 73

```
 1
 2                    INDEX TO TESTIMONY
 3
 4   WITNESS           EXAMINATION BY          PAGE
 5   Timothy Feil   Mr. Cangiano              4
 6
 7                    INDEX TO EXHIBITS
 8   PLAINTIFF'S
     EXHIBITS          DESCRIPTION            PAGE
 9
10   59    Bates stamped TF 006 through 058  23
11   60    Bates stamped TF 001 through 005  53
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



 1

 2                     C E R T I F I C A T E

 3

 4         I, ILYSA A. LINZER, a Shorthand

 5    Reporter and Notary Public of the State

 6    of New York, do hereby certify:

 7

 8         That, TIMOTHY FEIL, the Witness

 9    whose examination is hereinbefore set

10    forth, was duly sworn, and that such

11    examination is a true record of the

12    testimony given by such Witness.

13

14         I further certify that I am not

15    related to any of the parties to this

16    action by blood or marriage; and that I

17    am in no way interested in the outcome of

18    this matter.

19

20    _____

      ILYSA A. LINZER              MAY 23, 2018

21

22

23

24

25

